2013 OK CR 11

**MILLER**

v.

**STATE.**

No. D–2008–1206.

Court of Criminal Appeals of Oklahoma.

Sept. 6, 2013.

Pete Silva, Chief Public Defender, Shena Burgess, Chief Deputy Public Defender, Tulsa, OK, attorneys for defendant at trial.

Tim Harris, District Attorney, William Musseman, Assistant District Attorney, Tulsa, OK, attorneys for the State at trial.

Lanita Henricksen, attorney at law, Henricksen & Henricksen Lawyer, attorney for appellant on appeal.

Victor Cornell Miller, Oklahoma State Penitentiary, McALester, OK, defendant pro se.

E. Scott Pruitt, Attorney General of Oklahoma, Jennifer J. Dickson, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

*OPINION*

SMITH, Vice Presiding Judge:

¶ 1 On September 22, 1999, Victor Cornell Miller, Appellant, was charged, along with co-defendant John Fitzgerald Hanson, with two counts of First–Degree Malice Murder, in violation of 21 O.S.Supp.1998, § 701.7(A), or alternatively, First–Degree Felony Murder, in violation of 21 O.S.Supp.1998, § 701.7(B) (Counts I & II), in the District Court of Tulsa County, Case No. CF–1999–4583. Count I was for the murder of Mary Agnes Bowles. Count II was for the murder of Jerald Thurman. The co-defendants, who were charged with acting "in concert" on both counts, were tried separately.

¶ 2 John Hanson was originally tried by a jury in May of 2001. He was found guilty of First–Degree Malice Murder on Count I and First–Degree Felony Murder on Count II. The jury recommended a sentence of death on Count I and a sentence of life imprisonment without the possibility of parole on Count II, and Hanson was sentenced accordingly. On appeal this Court affirmed both murder convictions and Hanson's sentence of life without the possibility of parole on Count II, but reversed his death sentence on Count I and remanded the case for resentencing on this count. *See Hanson v. State*, 2003 OK CR 12, 72 P.3d 40. Hanson's resentencing jury trial was held in January of 2006, and he was again sentenced to death for the Count I murder of Mary Bowles. We affirmed this sentence in *Hanson v. State*, 2009 OK CR 13, 206 P.3d 1020.

¶ 3 Victor Miller was originally tried by a jury in April of 2002. He was found guilty of First–Degree Malice Murder on both counts (and also of First–Degree Felony Murder on both counts). The jury recommended that he be sentenced to imprisonment for life without the possibility of parole on Count I and that he be sentenced to death on Count II; and Miller was sentenced accordingly.[1] It

1. Miller's (original) jury found the following four aggravating circumstances in regard to both murders: (1) Miller was "previously convicted of a felony involving the use or threat of violence"; (2) Miller "knowingly created a great risk of death to more than one person"; (3) "the murder was committed for the purpose of avoiding

or preventing a lawful arrest or prosecution"; and (4) there was a "probability" that Miller would "commit criminal acts of violence that would constitute a continuing threat to society." *See* 21 O.S.1991, § 701.12(1), (2), (5), and (7), respectively.

should be noted that even though Miller's jury found that all four of the aggravating circumstances alleged in the case applied to the murder of Bowles, Miller's original jury chose *not* to sentence him to death for Bowles' murder, thereby "acquitting" him of the death penalty on Count I.[2] Miller appealed his convictions and his sentences to this Court, and we reversed both his convictions and his sentences in *Miller v. State*, 2004 OK CR 29, 98 P.3d 738.[3]

¶ 4 After various proceedings following this reversal and remand, Miller was re-tried on both first-degree murder counts in November of 2008, before the Honorable Dana L. Kuehn, District Judge. No new Bill of Particulars was filed. Instead, on August 8, 2008, the State filed a "Notice of Intent to Reurge Previously filed Motions and Notices," asserting that it was incorporating all relevant motions and notices filed in connection with Miller's original charges and trial, and noting that the Bill of Particulars was one of the filings being incorporated.[4] Consequently, on retrial, the State again sought to obtain *two* death sentences against Miller, one on each of the murder counts charged.[5]

¶ 5 The record contains no argument or legal authority from the State regarding how or why it was authorized to re-seek the death penalty against Miller for the Count I murder of Mary Bowles—even though he had been "acquitted" of the death penalty on this count at his first trial. Remarkably, the record is likewise silent regarding any objection from defense counsel to the State's action in this regard; and the record contains no evidence of any discussion before the trial court, comment by the trial court, or decision by the trial court regarding the fact that Miller had already been acquitted of the death penalty on Count I. The issue simply was not addressed.

¶ 6 At his second trial, Miller was again convicted by a jury of First–Degree Malice Murder on both counts (and also of First–Degree Felony Murder on both counts). During the sentencing phase of this trial, Miller's jury found that the following four aggravating circumstances applied to both counts: (1) Miller was "previously convicted of a felony involving the use or threat of violence"; (2) Miller "knowingly created a great risk of death to more than one person"; (3) "the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution"; and (4) there is a "probability" that Miller will "commit criminal acts of violence that would constitute a continuing threat to society."[6] The jury recommended a sentence of death on both counts, and the Honorable Dana L. Kuehn sentenced Miller to death on both counts, in accordance with this recommendation. This Court finds that Miller has perfected this direct appeal of his

2. As discussed *infra*, the State concedes that Miller was acquitted of the death penalty on Count I at his first trial.

3. This Court reversed Miller's original convictions based upon the trial court's decision to allow Rashad Barnes to testify regarding codefendant *Hanson's* statements to Barnes, about Hanson and Miller's involvement in the murders of Bowles and Thurman. See *Miller*, 2004 OK CR 29, ¶¶ 13–16, 23–48, 98 P.3d at 741–42, 743–48. We found that "the admission into evidence of Hanson's statement to Barnes violated [Miller's] Sixth Amendment right to confrontation." *Id.* at ¶ 47, 98 P.3d at 748. Because this Court could not conclude, beyond a reasonable doubt, that this error was harmless, this error required that Miller's convictions be reversed and remanded for a new trial. *Id.* at ¶ 48, 98 P.3d at 748.

4. The Bill of Particulars in Miller's case was filed on April 3, 2000, and alleges four aggravating circumstances, *i.e.*, the four aggravating circumstances that were found by Miller's jury in his

first trial (and also in his second trial). No other Bill of Particulars was ever filed in Miller's case. Miller's Bill of Particulars does not specifically note that there are two counts of first-degree murder at issue in his case. It simply alleges that Miller committed "the offense of Murder in the First Degree" and that he "should be punished by death due to and as a result of the following four aggravating circumstances," which are then listed.

5. This Court notes that when Hanson's case was remanded for resentencing on Count I (the murder of Bowles), the State did not attempt to re-seek the death penalty against Hanson for the Count II murder of Thurman, upon which Hanson's first jury sentenced him to life without parole.

6. *See* 21 O.S.1991, § 701.12(1), (2), (5), and (7), respectively.

convictions and his sentences.[7]

## FACTS

¶ 7 The following summary of facts is based entirely on the evidence presented at Victor Miller's 2008 retrial. Only evidence actually presented at this trial, along with reasonable inferences from this evidence, are included herein. It should be noted that Miller's 2008 jury was not presented with some evidence that was an important part of the previous trials regarding the crimes at issue—in particular, the testimony of Rashad Barnes—and also that some evidence was presented at Miller's 2008 retrial that had not been presented during the earlier trials (or at Hanson's re-sentencing).

¶ 8 On August 31, 1999, Mary Bowles, who was 77 years old, worked her regular volunteer shift at St. Francis Hospital in Tulsa. She clocked out at 3:51 p.m. Lucille Neville, a pharmacy technician at the hospital and long-time friend of Bowles, testified that Bowles' car—a 1993 tannish/gold-colored Buick LeSabre—was in front of her car that afternoon, going north on Yale Avenue. Bowles honked and waved at Neville while they both waited at a light, just before turning left onto the Skelly Bypass merge. The women parted ways when Bowles stayed on the service road, apparently going home. Bowles was scheduled to be back at the hospital at 9:30 a.m. the next morning. She never returned.

¶ 9 That same afternoon James Lavendusky and his father, Ken Lavendusky, were winterizing James' boat at his Tulsa home at 6802 North Mingo Road. The Lavendusky home and pecan farm were across the road from a dirt pit owned by Jerald Thurman. James testified that around 5:45–6:00 p.m., he heard three or four gunshots coming from the area toward the dirt pit. After a few seconds, he heard three or four more shots. When James looked up, he noticed Thurman's dump truck parked between Mingo Road and the entrance gate into the dirt pit area. Shortly thereafter, Ken went to talk to Thurman about getting some gravel.

¶ 10 James testified that he continued working on his boat until his dad started yelling and waving for him to come over. When James arrived he found Thurman's dump truck still running. Ken told James that Thurman had been shot and handed James a cell phone to talk to a 911 operator. James then saw Thurman on his back on the ground near the gate. James testified that before going over to the dirt pit, he noticed a car leaving the area, headed south on Mingo. James described the car as a silver or grayish-colored four-door sedan. He noticed a driver and something "dark" in the back seat.

¶ 11 Jim Moseby, Thurman's nephew, was driving a dump truck for Thurman that day. Moseby testified that he received a call from his uncle around 5:50 p.m. Thurman told Moseby that there was a car in the dirt pit that had been lingering there, that he was concerned about it, and that if the car was still there when Thurman was ready to leave, he was going to lock the gate on his way out.[8]

¶ 12 When Moseby arrived at the dirt pit a short time later, he was met by the Lavenduskys, who told him that Thurman had been shot. Moseby, who was also a certified EMT (emergency medical technician), testified that he found his uncle lying outside the gate, with his head at the base of the tree where

---

7. Miller filed his Petition in Error on June 1, 2009. On January 18, 2011, Miller's appellate counsel filed his "Brief in Chief" and also an "Application for Evidentiary Hearing on Sixth Amendment Claims." In addition, on March 21, 2011, Miller filed a *"Pro Se* Supplemental Brief of Appellant on Direct Appeal" and also a "[*Pro Se* ] Supplemental Application for Evidentiary Hearing," in accord with the Order of this Court granting Miller's requests to accept these *pro se* filings. On September 2, 2011, the State filed its "Brief of Appellee" and its "Response to Defendant's Application for Evidentiary Hearing," in response to the filings of Miller's appellate counsel, and also a "Response to Defendant's *Pro Se*

Supplemental Brief" and a "Response to Defendant's Supplemental Application for Evidentiary Hearing," in response to Miller's *pro se* filings. On October 17, 2011, Miller's appellate counsel filed his "Reply Brief of Appellant," and on this same date, Miller filed a "[*Pro Se* ] Reply to Appellee's Response to Defendant's in *Pro Se* Supplemental Brief." Oral argument before this Court was held on October 2, 2012.

8. Moseby described this gate as a "lightweight barbed-wire gate." It stretched across one of the two entrance roads to the dirt pit.

the gate was attached. Thurman was breathing with difficulty, but was unconscious and bleeding from the right side of his head, as well as from his chest and hand. Thurman's cell phone was on the ground next to him. Moseby noted that the phone had a hole in part of it, apparently from a bullet going through it.

¶ 13 Jerald Thurman, who was 44 years old, never recovered consciousness and died from his injuries on September 14, 1999, at Hillcrest Hospital. The medical examiner determined that he had four gunshot wounds: one through the back part of his head (going from right to left and passing through his brain), one entering his back at the base of his neck, one that entered his upper left arm, and one through his right hand.[9] The medical examiner concluded that the cause of Thurmans death was the gunshot wound to his head.

¶ 14 Sundeep Patel testified that on August 31, 1999, he was a student and worked as a desk clerk at the Oasis Motel, which was owned by his parents.[10] Patel testified that he was watching Home Improvement that evening, which aired between 6:00 and 6:30 p.m., when John Hanson came into the motel, asked about the price of a room, and then walked back out. Hanson returned a short time later and stated that his car wasn't starting, so he was going to need a room. Patel testified that Hanson then rented a room, using his actual name.[11] After Hanson paid for the room, Patel gave him the key to Room 118, but to the best of Patel's knowledge, no one stayed in that room that night. Hanson also asked for tools to work on his car, and Patel loaned him some pliers and screwdrivers.

¶ 15 Patel testified that there was another man with Hanson that day, but acknowledged at trial that he had never been able to identify anyone as being that second man. Patel testified that both men were black, but that he was focused on Hanson, who was the one he dealt with and whose identity Patel confirmed with his driver's license. Patel testified that he "wasn't worried about the other person" and never interacted with him. Patel testified that the other man came in with Hanson when Hanson first inquired about a room, but did not come back inside. When Patel looked out to see what the men were doing with his tools, both men were outside the car doing something under the hood. Patel testified that the two men arrived in and were working on a "champagne-colored" Buick LeSabre and that the car remained parked in the Oasis Motel parking lot for more than a week, until it was towed off by Tulsa police.

¶ 16 Patel was cross-examined extensively about whether there was anything in the lobby that blocked his view of the second man and the fact that he originally described the second man as weighing about 250 pounds. (Victor Miller weighed approximately 180 pounds at the time.) This Court notes that Patel's testimony and pictures of the Oasis Motel lobby in 1999 establish that Patel would have been behind a plexiglass window, which had some papers hanging on it about hotel policies, but that Patel would have been able to see anyone in the hotel's tiny lobby—if he had wanted to and was paying attention.

¶ 17 On September 2, 1999, Police were notified regarding the disappearance of Mary Bowles. Her body was discovered on September 7, 1999, in a ditch alongside 66th Street North in Tulsa, not far from North Mingo and Thurman's dirt pit. Bowles' body was significantly decomposed and skeletonized and had been subject to animal scavenger activity, to the point that it was not readily identifiable. However, investigating officers found an address book beneath the body with Mary Bowles' name on it, and her body was later conclusively identified through dental records. The medical examiner who examined Bowles' body concluded

9. The medical examiner was able to recover two bullets from Thurman's body, one from the wound that began at the base of his neck and one from the wound in his upper left arm.

10. The Oasis Motel is located on 11th Street in Tulsa, between Mingo and Memorial.

11. The paper rental registration card filled out by "John Hanson" also had fingerprints on it that were later identified as belonging to Hanson.

that she died as a result of multiple gunshot wounds.[12]

¶ 18 On the morning of September 9, 1999, Bowles' car was spotted in the Oasis Motel parking lot by a Tulsa police officer and was towed off for processing. A thorough search of the car revealed two bloodstains on opposite sides of the rear seat bench and a bloodstain in the middle of the rear area carpet, all of which were consistent with the DNA of Bowles. In addition, a fingerprint was found on the latch portion of the driver's seatbelt buckle, which was later determined to be from John Hanson's right thumb, and another fingerprint was found on the latch portion of the seatbelt buckle for the front passenger's seat, which was later determined to be from Victor Miller's right thumb.

¶ 19 Also on September 9, 1999, Hanson and Miller were arrested at the Muskogee EconoLodge Motel, after an anonymous tip was called in to Tulsa police by Miller's wife, Phyllis Miller.[13] Two loaded guns were found in the tank of the toilet in their motel room: a silver Taurus .38–caliber Special revolver ("the silver .38" or "the silver revolver") and a Starfire black 9–mm Luger semi-automatic pistol ("the black 9–mm").[14] The silver .38 (State's Exhibit 52) was later matched to the two bullets recovered from Thurman's body, while the black 9–mm (State's Exhibit 53) was later matched to the bullet recovered from Bowles' body, as well as to two spent 9–mm cartridges found near her body and a spent 9–mm bullet found buried in the dirt underneath her body.[15]

¶ 20 The State put on evidence at trial regarding certain armed robberies committed by Miller and Hanson around the time of August 31, 1999, in order to establish that the silver .38 was customarily used and carried by Miller, while the black 9–mm was customarily used and carried by Hanson. The trial court limited the breadth and content of this "other crimes" evidence, however, and repeatedly admonished the jury, before the evidence was presented, that the evidence regarding these other robberies was to be considered "solely on the issue of the defendant's alleged identity."

¶ 21 This evidence established that on August 23, 1999, Hanson and Miller robbed the Apache Junction Liquor Store, and Miller acquired the silver .38 during this robbery. The clerk at the time testified that Miller held a gun to her chest while he demanded the store's cash and that Miller later discovered the silver .38 under the counter and took it.[16] In addition, the transcript testimony of unavailable witness Bettye Brimmer, a former clerk at a Tulsa Dreamland Video Store, was presented at Miller's retrial to establish that on September 3, 1999, during a robbery of the video store by Miller and Hanson, Miller held Brimmer at gunpoint with a silver revolver, while forcing her to put the store's money into a bag.[17] The State also established that on September 7, 1999, Miller used a silver revolver (that looked like State's Exhibit 52) to help Hanson rob a Signature Loan Service and then used duct tape to constrain the hands and feet of two employees there.[18] Finally, the

12. The medical examiner concluded that Bowles had at least four separate gunshot wounds, and he was able to recover a bullet from a gunshot wound to her chest.

13. Evidence presented at trial established that Miller came out without incident, after being informed that the motel was surrounded. Hanson stayed in the room 5–6 hours longer and only came out after tear gas was used.

14. A roll of duct tape and a Crown Royal bag of ammunition were also found in the room. Latent fingerprints from the paper sack containing the Crown Royal bag were later matched to Miller.

15. Unfortunately, no usable latent prints were found on the guns recovered from the room.

16. David Leavell, the owner of the Apache Junction Liquor Store, testified that the silver .38–caliber Taurus revolver found at the EconoLodge (State's Exhibit 52) belonged to him.

17. On the other hand, according to Dreamland Video customer Johhny Noe (whose prior testimony was read at trial), when Noe ran out of the store and was confronted by Miller and Hanson outside, *Hanson* had the shiny silver revolver, which he used to hit Noe on the head. This was the only victim testimony connecting Hanson, rather than Miller, with the silver .38.

18. Brandi Wilson testified that Miller pointed a loaded silver revolver at her forehead that day and demanded all the money in her cash drawer.

State established that on September 8, 1999, Hanson used a black 9–mm and Miller used a silver .38 to rob the Tulsa Federal Employees Credit Union. Miller and Hanson robbed two separate tellers at the same time that day, but the teller robbed by Hanson was able to slip a dye pack into the manila envelope of money that she gave to Hanson.[19]

¶ 22 Phyllis Miller, Victor Miller's estranged wife, testified at his retrial regarding the events of the summer of 1999.[20] Phyllis listed the various places she and her husband lived that summer and testified that by the end of August, they were staying at a Motel 6 in west Tulsa.[21] Phyllis testified that during that time period, Hanson carried a black semi-automatic 9–mm, and she identified State's Exhibit 53 as Hanson's gun. Phyllis likewise testified that just before they moved into the Motel 6, Miller began carrying a silver revolver, and she identified State's Exhibit 52 as Miller's gun. Phyllis testified that Miller got this gun by taking it from the Apache Junction Liquor Store and that he always kept this gun with him during the time that they were living at the Motel 6. She also testified that both men carried their guns by putting them in the side waistband of their pants.

¶ 23 Phyllis testified that around 3:00 p.m. on August 31, 1999, she and Miller got into a loud argument in the Motel 6 parking lot about who was going to use their car that day.[22] She testified that Miller wanted to take their car, which was an Oldsmobile, but that she needed it to pick up her sons from school, who got out around 3:15 or 3:30 p.m. Phyllis testified that Miller ultimately got so mad he "pulled my wires out of my car," so it wouldn't start, and that she had to call the school and ask that her sons be instructed to take a city bus home. Phyllis testified that around this same time, John Hanson arrived on a city bus.[23] Phyllis testified that when she returned to the parking lot, after going inside to call the school, Miller and Hanson were gone, as was a van owned by Sherry Carter. Carter was Miller's friend and was also living at the Motel 6 at the time. Phyllis testified that Miller had the silver revolver with him that day.

¶ 24 Phyllis testified that it was after midnight when Miller and Hanson finally returned to the motel. Phyllis testified that Miller still had the silver revolver and was acting "[r]eal nervous, looking out the window, thinking somebody's out there, pacing the floor." Phyllis testified that Hanson got a different room at the motel, but that Miller stayed with her and put the silver revolver under his pillow. Phyllis testified that the next morning, Miller put the wires back on their car and asked her to take him to the Oasis Motel. When they got there, Miller took a blue rag and walked over to a beige-gold-looking car that was parked in the motel

19. Bobbie Filak Kohowey, a teller, testified that Miller showed her the gun in his waistband, told her to "be cool," gave her a note that said, "Don't panic and don't press any buttons," and handed her two manila envelopes for the money. Another teller, Jolanda Beasley, testified about being robbed by Hanson at the same time, in basically the same manner, and that Hanson tapped on the black-handled gun in his waistband to let her know "that he means business." According to the tellers, Miller obtained about $5,000, and Hanson got about $2,500.

20. Victor and Phyllis Miller remained married even at the time of Miller's 2008 retrial, though they apparently did not remain in contact after his arrest in 1999. Miller's jury learned immediately that Phyllis, who was wearing an ankle monitor, had been arrested in Texas on a material witness warrant in order to secure her testimony at the 2008 retrial. She testified that her only instructions from the State, however, were "Tell the truth."

21. Phyllis testified that they were evicted from the Parkview Apartments and had to be out by August 21, stayed at a motel on 11th Street for about 5 days, and then moved to the Motel 6.

22. While there was no dispute at trial regarding whether this particular argument actually occurred, whether it occurred around 3:00 p.m. on August 31 or not—and whether Phyllis could actually remember the date and time of this argument—were major issues of contention at trial.

23. Phyllis testified that Hanson did not own a car and that she and Miller would give him rides and he would take the bus. At the time, Hanson was basically living in a car parked outside the home of his friend, Rashad Barnes, near 54th and North Hartford in Tulsa.

parking lot.[24] Phyllis testified that Miller got in the car through the driver's door, began moving around and wiping things down with the blue rag, and then got back out a few minutes later using the same door.[25] When Miller returned, he was carrying the blue rag and some cassette tapes and told her to "take off." Phyllis testified that they then returned to the Motel 6 and that she and Miller went their separate ways.[26]

¶ 25 Phyllis also testified about a later occasion, when she was recruited to help Miller and Hanson rob a bank by buying them a pack of manila envelopes and then acting as the getaway driver. She described the area where she was told to park (near the Tulsa Federal Employees Credit Union) and that after a while, the men came running back, got in the car, and told her to take off. Phyllis testified that she heard a "pop," which was a red dye pack going off in Hanson's bulging manila envelope of cash, and that Miller chided Hanson for "letting the lady put a pack in there." Miller then instructed her to take them to Muskogee, and they went to the home of some of his relatives, where Miller talked about the robbery. Phyllis testified that she and Miller then got into another big fight, because he wanted to take their car and leave her there, which made her mad, and that Miller then disabled their car, "tore everything up in it," and left with Hanson.

¶ 26 Phyllis testified that she got a tow truck to take her and the car back to Tulsa and that she made note of two Muskogee motels nearby, an EconoLodge and a Holiday Inn. Phyllis testified that she knew Miller and Hanson were headed to a motel and had already decided that she was going to call the police and turn them in, which she did.[27] Phyllis called the Tulsa police late that same night. She called gain the next morning, which was September 9, 1999, after seeing a picture of the car that Miller had wiped down at the Oasis Motel on the news, in connection with a report about a missing elderly woman.

¶ 27 Victor Miller testified in his own defense at trial. He began his direct testimony by acknowledging that he had "suffered felony convictions on many occasions." He admitted having felony convictions in five different state cases and also to 16 federal felony convictions, as a result of the series of armed robberies that he committed with John Hanson during the summer of 1999.[28] Miller testified that he was serving a total sentence of Life plus 157 years for these federal convictions.[29]

¶ 28 Miller acknowledged Phyllis Miller as his wife and admitted the truth of the overwhelming majority of her testimony about him, including her testimony about the places they had lived, their relationship, and Phyllis' participation in some (but not all) of the armed robberies that he had committed. Miller testified that he and Hanson robbed the Apache Liquor Store on August 23, 1999, and volunteered that he had robbed that same liquor store, without Hanson's help,

---

24. Phyllis identified a picture of Bowles' car (parked at the Oasis Motel) as the car from that day.

25. Phyllis noted that Miller shut the driver's door with the blue rag over his hand.

26. Phyllis was cross-examined regarding her preliminary hearing testimony that after being at the Oasis Motel, they went out looking for Hanson on 54th. Phyllis acknowledged her earlier testimony and that it could be correct, but testified she didn't recall it that way "at this point." Phyllis was certain, however, that she and Miller did *not* go see Hanson before going to the Oasis Motel that morning, because she was sure they went straight there from the Motel 6.

27. Phyllis testified on cross-examination that even though she had assisted Miller and Hanson

with various armed robberies, this time—after Miller tore up her car—she'd had enough.

28. Miller acknowledged that the federal convictions were for conspiracy, interference with interstate commerce (armed robbery), possession of a firearm during a crime of violence, possession of a firearm after former felony conviction, and bank robbery.

29. Miller testified that in the summer of 1999, he was addicted to and regularly used crack cocaine. He traced his addiction to a workplace back injury in mid–1998, which led to him using powerful prescription drugs, which led to him using alcohol and then to illegal drugs. Miller acknowledged on cross-examination, however, that he had his first three armed robbery convictions in 1981, when he was 18 years old, and well before his most recent addiction.

back in January of 1999. Miller testified that the silver .38 revolver was obtained during the August robbery of· Apache Liquor, but maintained that it was Hanson who stole this gun—and that the cashier was "mistaken" when she said it was him. He admitted that the silver .38 ended up in his Oldsmobile on the day it was stolen and that Phyllis saw it in their car that day, when it slid up from underneath his seat, after he picked her up. Miller emphasized, however, that Hanson normally kept the silver .38, since Hanson would keep the guns used for their robberies and bring them in a brown paper sack when they were needed.[30]

¶ 29 Miller acknowledged the loud argument that he had with Phyllis in the Motel 6 parking lot, but he described the date of this argument as "just about three days before I got arrested," which would have been September 6, 1999. Miller testified that Phyllis had been gone for much of the day, returning around 1:00 p.m., and that he was very angry with her because he wanted to use their car to "go plan some illegal activities" with Hanson, i.e., plan some bank robberies. Miller testified that the disagreement started inside, went on for a long time, got intense and loud, and eventually moved outside. Miller admitted that he ultimately pulled the spark plug wires out of their car, so Phyllis would not be able to drive it, and that he and Hanson left in Sherry Carter's van.

¶ 30 Although Miller maintained that his loud argument with Phyllis occurred on approximately September 6, 1999, i.e., well after the day of the murders on August 31, he also testified about where he was between the time he left that afternoon and the time he returned late that night. He described stopping at a liquor store to get malt liquor and beer to drink and then getting dropped off with Hanson at the home of Rashad

Barnes in North Tulsa. Miller testified that they went out back and that he sat down "under the shade tree and started drinking my beer and thinking." Later, though Miller had no idea when, he and Hanson took a bus to downtown Tulsa and then he (but not Hanson) transferred to a different bus that took him back to the Motel 6.[31] Miller testified that he arrived back at the Motel 6 while it was still daylight, but that he didn't want Phyllis to "make a scene," so he went to a store, bought some cold beer, and then spent hours alone outside the motel—"just sitting out there drinking and smoking cigarettes and thinking." [32] He testified that Hanson arrived at the motel in a cab around sunset and that he and Hanson then went to Sherry Carter's room, where he drank more beer and got high on cocaine.[33] Thus Miller's defense was essentially that if the argument with Phyllis was on August 31, he was busy "drinking and thinking" at the time of the murders.

¶ 31 Miller, like Phyllis, testified that the day after their big fight, he put the spark plug wires back on their car, and Phyllis drove him to the Oasis Motel, where the Buick LeSabre was parked. Miller testified that Hanson had called that morning and asked him to try to start that particular car and that Phyllis drove him to Barnes' place in North Tulsa, in order to get the car keys from Hanson.[34] Miller testified that he had experience working on cars, described himself as "a shade-tree mechanic's apprentice," and noted that Hanson was aware of his experience with cars—and that Hanson himself did not have any "skills" in this area. Miller acknowledged that as he approached the Buick, he was carrying a blue rag, although his task was to try to get the car started.

30. Phyllis likewise noted that Hanson sometimes carried robbery guns in a brown paper sack.

31. Miller maintained that he did not know what Hanson did after they parted ways downtown.

32. Miller testified he would occasionally move to a new spot—and eventually made a complete circle around the motel parking lot area—so no one would think that he was "casing" the place.

33. Miller suggested that the behavior Phyllis described as "nervous" or "paranoid" was probably caused by the fact that he was smoking cocaine that night.

34. Miller testified that Hanson called while Phyllis was gone that morning and that they went to the Oasis Motel that afternoon. Phyllis insisted that before doing anything else the next day, she took Miller directly from the Motel 6 to the Oasis Motel and that no one called that morning.

¶ 32 Miller testified that the car wouldn't start with the key and that he then tried looking for a "kill switch," which could be preventing the car from starting. He testified that he tried pushing the signal lever forward, tried the gearshift, tried the parking brake and regular brake, and then even tried buckling the seatbelts.[35] Miller testified that when all of these attempts failed, he gave up and began using the blue rag to wipe down everything he had touched, because he knew Hanson did not own a car, and he did not want to be "connected" to this one.[36] Miller testified that Phyllis then drove him to return the keys to Hanson. On cross-examination, Miller specifically conceded that it was his fingerprint that was found on the latch of the passenger-side seatbelt buckle of Bowles' car.

¶ 33 Miller's testimony about the events leading up to his arrest was largely consistent with the testimony of State witnesses. Miller acknowledged his participation in the September 8, 1999 armed robbery of the Federal Employees Credit Union and did not seriously contest any of the State's evidence in this regard—except that he insisted that the dye pack in Hanson's envelope exploded just after they exited the credit union, rather than back in the car with Phyllis. Miller testified that they drove to his cousin's house in Muskogee afterward, that they divided up the money among the three of them, that he and Phyllis "got into quite a fuss" there, and that he and Hanson left her at the house in Muskogee, intending to buy a new car, because Miller saw someone writing down the license plate of the Oldsmobile just after the Credit Union robbery.[37]

¶ 34 Regarding the murders of Jerald Thurman and Mary Bowles, however, Miller adamantly denied being involved or present and also denied having any knowledge, at the time, regarding what had happened.[38] On cross examination, Miller admitted that the State had "proven" that the silver .38 revolver found at the EconoLodge was the gun that killed Thurman. He also acknowledged that "numerous witnesses" had testified to seeing him using this gun and even that he would carry the silver .38 "[w]hen we went to go do a robbery." [39] Miller likewise testified that he "believed" the State's evidence establishing that the black 9–mm found at the Econo-Lodge was the gun that killed Bowles and that this same gun was "the gun that John Hanson carried on a regular basis." Miller also acknowledged that these two guns, i.e., the murder weapons, were found in the toilet tank of the EconoLodge room that he shared with Hanson (and no one else). Nevertheless, Miller denied any involvement in the murders and denied ever having the silver .38 with him on the day he fought with Phyllis at the Motel 6. Miller also denied having any knowledge about whether Hanson was involved.[40]

## ANALYSIS OF CLAIMS ON APPEAL

### Death Penalty Acquittal on Count I

¶ 35 This Court notes at the outset that in Proposition XII of "Appellant's Brief in Chief," Miller argues that the State violated his constitutional protection against double jeopardy when it sought the death penalty against him for the Count I murder of Mary Bowles. This Court further notes that

35. On cross-examination, Miller acknowledged that he had never actually come across (or heard of) a situation where a car's kill switch was located on a passenger-side seatbelt mechanism.

36. Miller testified that he did not get out and look under the hood of the car, because "I wasn't really dressed to go under no hood of no car and work on the car." Miller admitted that he stole a coin purse and cassette tapes from the car, as described by Phyllis, because "I was a thief."

37. Miller noted that Hanson was going to get rid of the dye-stained money, but he asked for it. A search of Miller after his arrest revealed $665 in red-dye-stained cash in his left shoe.

38. Miller also denied thinking that he was being arrested for anything other than armed robbery on September 9, 1999, "[b]ecause I hadn't committed no murder."

39. Miller also admitted the truth of the testimony of Brandi Miller that he pointed the silver .38 at her forehead during the robbery of the Signature Loan.

40. When asked whether Hanson killed Mary Bowles, Miller responded, "I don't have no idea."

the State *concedes* that when Miller's first jury sentenced him to life without the possibility of parole on Count I, rather than to death, this functioned as an "acquittal" on the death penalty on this count. Thus the State concedes that Miller's death sentence on Count I must be reversed.

¶ 36 In *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), the United States Supreme Court held that because the sentencing stage of a capital murder trial is like a separate trial on the issue of punishment, if a jury rejects a State's attempt to obtain a death sentence (as it did in Bullington's first murder trial), this functions as an "acquittal" on the death penalty. *Id.* at 438–46, 101 S.Ct. at 1857–62. The *Bullington* Court wrote: "A verdict of acquittal on the issue of guilt or innocence is, of course, absolutely final. The values that underlie this principle ... are equally applicable when a jury has rejected the State's claim that the defendant deserves to die." *Id.* at 445, 101 S.Ct. at 1861. Hence the *Bullington* Court held that the Double Jeopardy Clause prohibits any attempt to re-seek the death penalty against a defendant who was previously acquitted of the death penalty on the crime at issue, *i.e.*, who was sentenced to something less than death for the same crime in an earlier trial. *See id.* at 446, 101 S.Ct. at 1862 ("Having received 'one fair opportunity to offer whatever proof it could assemble,' the State is not entitled to another." (citation omitted)).

¶ 37 This Court has recently recognized that *Bullington* continues to be the binding law of the land in this context.[41] This Court agrees with Miller and the State that because Miller was acquitted of the death penalty on Count I at his original trial, his current death sentence on Count I must be reversed.

¶ 38 Furthermore, this Court also recognizes that the State's unlawful and unconstitutional attempt to obtain a death sentence on Count I may have impacted Miller's retrial in ways that cannot be fully rectified by simply reversing his death sentence on Count I, *e.g.*, by the improper admission of second-stage evidence that was relevant *only* to the State's attempt to obtain a death sentence on Count I—such as victim impact evidence regarding Mary Bowles.[42] Consequently, this Court must determine whether the State's pursuit of a death sentence on Count I may have prejudicially impacted the capital sentencing stage of Miller's retrial as a whole, including the jury's capital sentencing determination on Count II (for the murder of Thurman). We will address this issue *infra*, within this Court's discussion of Miller's challenges to the victim impact evidence presented at his 2008 retrial.

¶ 39 This Court now takes up Miller's other claims on direct appeal—both those made by his appellate counsel and his *pro se* claims—beginning with Miller's double jeopardy/double punishment claim and then continuing with his numerous other claims, in roughly the order that they arise at trial.[43]

**41.** In *Hogan v. State*, 2006 OK CR 19, 139 P.3d 907, this Court stated:

A defendant is acquitted of the death penalty whenever a jury agrees or an appellate court decides that the prosecution has failed to prove its case for the death penalty. *See Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981) (defendant sentenced to life by a capital sentencing jury has been acquitted of the death penalty and the Double Jeopardy Clause forbids the state from seeking the death penalty on retrial in the event the defendant obtains reversal of his conviction); *Arizona v. Rumsey*, 467 U.S. 203, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984) (sentencer's finding, albeit erroneous, that no aggravating circumstance is present resulting in the imposition of a life sentence is an acquittal barring a second capital sentencing proceeding).

*Id.* at ¶ 53, 139 P.3d at 927. The United States Supreme Court has likewise reaffirmed the binding nature of *Bullington*. *See Sattazahn v. Pennsylvania*, 537 U.S. 101, 109, 123 S.Ct. 732, 738, 154 L.Ed.2d 588 (2003) ("Under the *Bullington* line of cases ..., the touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an 'acquittal.' ").

**42.** Mary Bowles' niece, Sarah Mooney, testified as a victim impact witness at Miller's 2008 retrial. Mooney testified about the effect of Bowles' death on her mother, *i.e.*, on Bowles' sister. Miller raises a separate challenge (Proposition XIV) to Mooney's (very powerful) victim impact testimony.

**43.** For claims raised in Appellant's Brief in Chief, which was filed by Miller's appointed counsel on appeal, this Court will refer simply to the designation of the claim within the brief, *e.g.*, "Proposition I." For claims raised within Miller's

### Double Jeopardy/Double Punishment

■ ¶ 40 In Proposition I, Miller asserts that although he was not charged with the murders of Bowles and Thurman in his earlier federal case—since there is no federal crime of simply "first-degree murder"—he was, in fact, "punished" for these murders in that earlier case. Miller was charged and convicted in federal district court of 16 federal crimes, based upon his involvement in seven different armed robberies during the summer of 1999. Miller maintains that his involvement in the murders of Bowles and Thurman was considered as part of the federal district court's decision to sentence him to "Life." Hence Miller argues that it violates his federal and state constitutional protections against "double jeopardy" to allow the State of Oklahoma to punish him for these murders, because he is already being punished for these same murders by the federal government.[44] Thus Miller asserts that his state murder convictions violate his double jeopardy protection against "double punishment" for the same offense.[45]

■ ¶ 41 Miller acknowledges the traditional doctrine of "dual sovereignty," which functions as an exception to the traditional double jeopardy prohibition of "double punishment," and which allows for the "double prosecution" and "double punishment" of the same defendant for the same criminal conduct when the prosecutions are pursued by different "sovereigns," such as the federal government and a state.[46] Nevertheless, Miller asserts that his situation is an exception to this doctrine, i.e., an exception to the dual sovereignty "exception" to the constitutional protection against double jeopardy.[47] Miller's claim is fatally flawed on two fundamental grounds. First, he fails to establish that the consideration of these two murders within his federal sentencing even constitutes

*Pro Se* Supplemental Brief, this Court will refer to the claim noting its number and that it is raised by Miller acting *pro se*, e.g., "*Pro Se* Proposition I." This Court notes that the three propositions of error raised by Miller *pro se*—(1) prosecutorial misconduct, (2) ineffective assistance of counsel, and (3) improper testimony by witness Mark Boese—all parallel claims already raised by Miller's counsel in his direct appeal. Hence this Court will address Miller's *pro se* claims within the sections addressing the parallel claims raised by his appellate counsel.

44. The transcript from Miller's June 2000 federal sentencing is within the record in this case. Although the transcript suggests that the federal district judge concluded that it *was* appropriate, under the federal sentencing guidelines, to consider Miller's involvement in the murders of Bowles and Thurman as part of that court's sentencing decision, the transcript does not clearly establish that the court actually considered or relied upon these uncharged, state offenses (*i.e.*, these murders) within its sentencing determination. Nevertheless, this Court will presume, for the sake of this appeal, that the federal district court did consider, as "relevant conduct," Miller's involvement in the murders of Bowles and Thurman within its decision to sentence Miller to "Life" on his Count XVI federal conviction for possession of a firearm after former conviction of a felony.

45. This Court has repeatedly held that the constitutional protection against double jeopardy includes protection against: (1) a second prosecution for the same offense after an acquittal, (2) a second prosecution for the same offense after a conviction, and (3) multiple punishments for the same offense. *See, e.g., Mack v. State*, 2008 OK CR 23, ¶ 4, 188 P.3d 1284, 1287.

46. The dual sovereignty doctrine allows for multiple prosecutions and multiple punishments for the same criminal activity and even "the same offense," when the prosecutions are pursued by separate "sovereigns," *i.e.*, separate governments. *See, e.g., Heath v. Alabama*, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985) (Alabama trial for capital murder during kidnapping, following Georgia murder conviction for same homicide, does not violate double jeopardy). Under the dual sovereignty doctrine, offenses against different sovereigns are not considered the same "offense" for double jeopardy purposes, even when the offenses at issue are for the same conduct or even exactly the same crime. *See id.* at 88, 106 S.Ct. at 437 ("The dual sovereignty doctrine is founded on the common-law conception of crime as an offense against the sovereignty of the government. When a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offences.'" (citation omitted)).

47. On January 27, 2005, Miller filed a motion to dismiss in district court raising this claim. After this motion was denied by the district court, Miller then filed a petition for a writ of prohibition in this Court on this same basis. Miller's petition was denied by this Court on November 9, 2005, in an Order finding that his double jeopardy challenge "should be reviewed on appeal." Hence the current claim has been fully and adequately preserved by Miller.

"punishment" for the purposes of the constitutional protection against double jeopardy. Second, Miller totally fails to show that his situation is a plausible exception to the doctrine of dual sovereignty. The parties agree, citing *Mack v. State*, 2008 OK CR 23, ¶¶ 4–7, 188 P.3d 1284, 1286–88, that this Court should review the current challenge *de novo*.

■ ¶ 42 In *Witte v. United States*, 515 U.S. 389, 403–04, 115 S.Ct. 2199, 2208, 132 L.Ed.2d 351 (1995), the United States Supreme Court held that the sentencing consideration of "relevant conduct" that is not part of the offense for which a defendant is actually convicted, in order to sentence a defendant within a legislatively-authorized range, does not constitute "punishment" of that related conduct for double jeopardy purposes. In other words, only the offense of conviction is being "punished" for double jeopardy purposes. *Id.* Consequently, a single sovereign (such as the federal government) *can* constitutionally prosecute and punish a defendant for a criminal offense, even if the conduct comprising that offense has already been considered as part of the sentencing determination (on a different offense) in an earlier case brought by that same sovereign. *Id.* at 406, 115 S.Ct. at 2209. We find that if this kind of punishment consideration of certain conduct, followed by direct prosecution of that same conduct, by a *single* sovereign does not constitute prohibited "double punishment" for double jeopardy purposes, it certainly does not violate double jeopardy when the earlier punishment consideration was in the context of a prosecution by one sovereign, *i.e.*, the United States, and the later direct prosecution of that same conduct is by a separate sovereign, *i.e.*, the State of Oklahoma.

¶ 43 Regarding Miller's attempt to argue that somehow the fact that he *couldn't* have been prosecuted for the murders in his federal case means that his current case is an exception to the dual sovereignty "exception" to the proscription against double jeopardy ... and that somehow this double negative means that he is *immune* from any State prosecution for these murders ... Miller acknowledges that this Court took up this same (odd) argument in *Mack* and explicitly rejected it.[48]

¶ 44 This Court sees no reason to depart from *Mack*. Proposition I is rejected accordingly.

### *Jury Selection Claims*

### Denial of Sentencing *Voir Dire* & Death Penalty Rehabilitation

¶ 45 In Proposition II, Miller challenges the trial court's for-cause removal of 17 prospective jurors at his trial, based upon the court's finding that these jurors were unable or unwilling to consider the death penalty as a possible sentencing option for first-degree murder.[49] This Court notes that of the 17 jurors struck for cause on this basis, defense counsel was allowed to question only two.[50]

---

**48.** In *Mack*, 2008 OK CR 23, ¶ 3, 188 P.3d at 1286, the defendant's sentences in a prior federal case (on charges of conspiracy to distribute cocaine and possession of cocaine) were "enhanced" under the federal sentencing guidelines, based upon his murder of two persons in connection with this drug conspiracy. After later being convicted in Oklahoma state court of the first-degree murders of the same two persons, Mack raised the same double jeopardy argument that Miller now attempts to raise: "Mack claims that dual sovereignty does not apply here because his actions in killing the victims were chargeable as murder in state court, but could not be charged as murder in federal court." *Id.* at ¶ 6, 188 P.3d at 1287. We rejected this argument in Mack and concluded as follows: "Two separate sovereigns sought to prosecute Mack for conduct violating laws in each jurisdiction. The doctrine of dual sovereignty applies, and the State prosecution is not barred by double jeopardy." *Id.* at ¶ 7, 188 P.3d at 1288.

**49.** This Court will sometimes refer to the prospective jurors discussed in this proposition as simply "jurors," even though none of them were actually "jurors" at the time.

**50.** The parties both list 17 specific jurors as being struck for cause for being unable or unwilling to consider the death penalty, although there were actually 18 jurors struck on this basis. The parties fail to count Juror S.K.S. (# 24) in this list, probably because she remained on the panel throughout sentencing *voir dire*, after clearly indicating that she could and would consider the death penalty. S.K.S. later brought up the issue herself during general *voir dire* and indicated that she would *not* consider the death penalty. Defense counsel was allowed to question S.K.S., did not object to the court's for-cause removal of

Consequently, 15 prospective jurors were struck for cause from Miller's panel, for being unable or unwilling to consider the death penalty, without any questioning at all from defense counsel. Miller challenges the trial court's refusal to give his counsel any chance to question and attempt to "rehabilitate" these prospective jurors, *i.e.*, to show that despite their expressed concerns about the death penalty, at least some of these jurors might actually have been eligible to serve and should not have been struck for cause. Miller focuses, in particular, upon the jurors within this group who gave equivocal, confusing, or contradictory responses regarding their ability and willingness to consider the death penalty, either during the court's sentencing *voir dire* or in a pre-trial questionnaire. Defense counsel repeatedly requested the opportunity to question and attempt to rehabilitate these jurors and challenged the court's denials of this opportunity. Hence Miller adequately preserved this claim in the district court.

¶ 46 In *Witherspoon v. Illinois*, 391 U.S. 510, 519, 88 S.Ct. 1770, 1775, 20 L.Ed.2d 776 (1968), the Supreme Court noted that "a jury that must choose between life imprisonment and capital punishment can do little more—and must do nothing less—than express the conscience of the community on the ultimate question of life or death." The *Witherspoon* Court held that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious

scruples against its infliction." *Id.* at 522, 88 S.Ct. at 1777. In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court upheld this *Witherspoon* holding, but clarified that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment" is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Id.* at 424, 105 S.Ct. at 852 (quoting *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). In *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the United States Supreme Court recognized that jurors who would *never* consider sentencing a defendant to death and jurors who would *always* vote for the death penalty for a first-degree murder conviction are both unfit to serve in a capital case.[51]

¶ 47 Following these cases, this Court has repeatedly held that the standard for capital juror acceptability in Oklahoma is simply whether, in a first-degree murder case where the law and facts make a defendant eligible for the death penalty, each juror will be willing to *consider* each of Oklahoma's three authorized punishments: the death penalty, life imprisonment without the possibility of parole, and life imprisonment (with parole).[52] This Court has likewise recognized that "[t]he trial court should not excuse for cause persons who oppose in principle, harbor doubts, or express scruples regarding imposi-

---

S.K.S., and does not challenge this removal on appeal. The removal of Juror S.K.S. will not be further addressed herein.

51. *Morgan v. Illinois*, 504 U.S. 719, 735, 112 S.Ct. 2222, 2233, 119 L.Ed.2d 492 (1992) ("[S]uch jurors—whether they be unalterably in favor of, or opposed to, the death penalty in every case—by definition are ones who cannot perform their duties in accordance with law, their protestations to the contrary notwithstanding."). Thus *Morgan* held that a juror who will "automatically" vote for the death penalty in any first-degree murder case is ineligible and should be struck for cause: "Any juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law." *Id.* at 735, 112 S.Ct. at 2233.

52. *Coddington v. State*, 2011 OK CR 17, ¶¶ 4–5, 254 P.3d 684, 694; *Harmon v. State*, 2011 OK CR 6, ¶ 19, 248 P.3d 918, 930; *Mitchell v. State*, 2006 OK CR 20, ¶ 39, 136 P.3d 671, 688–89; *Hogan v. State*, 2006 OK CR 19, ¶ 17, 139 P.3d 907, 918; *see also Cudjo v. State*, 1996 OK CR 43, ¶ 10, 925 P.2d 895, 898 ("Violence done to one's conscience is not the point of the *Witherspoon* decision.... Rather, the only legitimate concern is whether each jury member is willing to consider the imposition of the death sentence, as one of the alternatives provided by state law, should the case be appropriate for that punishment." (citations omitted)); *Lewis v. State*, 1998 OK CR 24, ¶ 8, 970 P.2d 1158, 1164 (quoting *Cudjo* ).

tion of the death penalty, as long as those persons can *consider* the punishment." [53]

¶ 48 This Court has also acknowledged that "[t]he wrongful exclusion of an eligible juror in a capital case based solely upon that juror's opposition to the death penalty can never constitute 'harmless error.' " [54] Consequently, if the trial court improperly struck even a single juror who, despite expressing some concerns about the death penalty, clearly stated (and maintained) that he or she could consider this punishment, this Court would have no choice but to immediately strike down any death sentence in the case. Fortunately, this is not what happened; nor is it the claim Miller is raising on appeal.[55]

¶ 49 Miller's Proposition II claim is that the trial court erred by repeatedly refusing to give his counsel *any* opportunity to question or attempt to rehabilitate prospective jurors who gave equivocal, confusing, or inconsistent answers regarding their willingness and ability to consider the death penalty.[56] This Court granted relief on this same claim in *Cudjo v. State*, 1996 OK CR 43, ¶¶ 11–12, 925 P.2d, 895, 898–99 (reversing death sentence "where two venire-persons who expressed reservations about the death

penalty were immediately excused," without "further inquiry into their views regarding the death penalty"), and in *Mitchell v. State*, 2006 OK CR 20, ¶¶ 109–10, 136 P.3d 671, 712 (reversing death sentence after finding "the trial court abused its discretion in denying defense counsel any opportunity to question prospective jurors who expressed reservations about the death penalty."). In *Mitchell*, this Court concluded:

> Because the last-recorded answers of [Prospective Jurors] M.M. and T.P. indicated that they were not able to consider the death penalty, this Court cannot conclude that the trial court erred when it struck them for cause. However, because these jurors had also indicated ... that they could, in fact, consider the death penalty, we conclude that the trial court abused its discretion in not allowing defense counsel an opportunity to further question them.

*Id.* at ¶ 44, 136 P.3d at 692 (citations omitted).[57] We must likewise determine whether the trial court abused its discretion in this regard in the current case.[58]

¶ 50 *Voir dire* is intended to serve two fundamental purposes in a criminal trial: (1) to allow the parties and the court to determine whether any prospective jurors

---

**53.** *Coddington*, 2011 OK CR 17, ¶ 4, 254 P.3d at 694 (emphasis added) (citing *Witherspoon* ).

**54.** *See, e.g.*, *Hogan*, 2006 OK CR 19, ¶ 17, 139 P.3d at 918 (citing *Gray v. Mississippi*, 481 U.S. 648, 668, 107 S.Ct. 2045, 2057, 95 L.Ed.2d 622 (1987)).

**55.** Although Miller briefly asserts that "every prospective juror on the panel opposed to the death penalty was excused for cause" and that "in effect" this was no different from that which was condemned in *Witherspoon*, this is *not* a case where every juror who expressed uncertainty or discomfort with the death penalty was summarily excused. Jurors who expressed concern about the death penalty but who also clearly and consistently stated, from the start, that they were able and willing to consider it were not summarily excused by the court. (On the other hand, most of these jurors were ultimately struck from the panel by the State's use of a peremptory challenge.)

**56.** The State has likewise interpreted Miller's claim of "not giving defense counsel an opportunity to rehabilitate these prospective jurors" as "the crux" of his Proposition II claim.

**57.** This Court notes that the current case does *not* parallel *Mitchell* in terms of a trial judge displaying "an inconsistent approach" toward jurors, depending upon which penalty they favored or disfavored. *See Mitchell*, 2006 OK CR 20, ¶ 45, 136 P.3d at 692–93. The trial court in this case did not hesitate to strike prospective jurors who expressed an unwillingness to consider giving a life sentence for murder. Yet the finding of abuse of discretion in *Mitchell* was based upon the trial court's refusal to allow defense counsel any opportunity to attempt to rehabilitate equivocal jurors, *see id.* at ¶¶ 38–44, 136 P.3d at 688–92, not the bias of the trial judge. Although this Court was quite disturbed by the trial court's obvious bias in *Mitchell*, this bias—which was not a properly preserved claim—was *not* the basis for granting Mitchell relief on any of his claims on appeal; rather, it was the basis for this Court's order that a new judge be assigned to the case on remand. *See id.* at ¶¶ 45–48, 88, 111, 136 P.3d at 692–94, 706, 713.

**58.** *See Coddington*, 2011 OK CR 17, ¶ 10, 254 P.3d at 695; *Harmon*, 2011 OK CR 6, ¶ 22, 248 P.3d at 931.

are not eligible or suitable to serve in the case at issue, *i.e.*, to identify jurors who should be removed for cause, and (2) to allow the parties an opportunity to gather information about prospective jurors, in order to facilitate the intelligent use of peremptory challenges.[59] In a *voir dire* limited to capital sentencing issues (such as in this case), the primary purpose of the *voir dire* is to determine whether prospective jurors are actually eligible to be *capital* jurors, *i.e.*, whether they are able and willing to consider all three of the legally authorized penalties in Oklahoma. Although the parties should also be given a fair opportunity to learn enough about potential jurors to facilitate the intelligent use of peremptory challenges, the first and most important purpose of capital sentencing *voir dire* is to determine whether prospective jurors are eligible capital jurors.[60] Jurors who are clearly ineligible should be struck from the panel and need not be questioned further.[61] On the other hand, eligible capital jurors, *i.e.*, jurors who are able and willing to consider all three authorized penalties for first-degree murder, cannot be lawfully struck for cause based upon their views about the death penalty.

¶ 51 We recognize that the trial court is able to assess juror responses to questions firsthand, including non-verbal conduct that may not be memorialized in a transcript, which can be very significant in the capital context.[62] Hence we review for abuse of discretion, and we are particularly deferential regarding jurors who struggle to honestly and accurately answer the fundamental capital-eligibility question at stake: whether they can and will consider the death penalty, along with the punishments of imprisonment for life and imprisonment for life without parole, if the facts of the case establish that the defendant is eligible for the death penalty. Where the trial court has allowed both parties a fair opportunity to question such jurors and a particular juror simply cannot come to a definitive conclusion, this Court has often held that the trial court did not abuse its discretion in striking that juror for cause.[63] But where the trial court has not allowed counsel a fair opportunity to question prospective jurors about the basic capital eligibility question at issue, *and* where the record contains substantial ambiguity or equivocal responses from one or more jurors regarding their ability and willingness to consider the death penalty, this Court has found that the trial court abused its discretion and reversed the death sentence(s) at issue.[64]

¶ 52 *Voir dire* in the current case was conducted as follows. The trial court began

---

**59.** *See Coddington,* 2011 OK CR 17, ¶ 5, 254 P.3d at 694; *Harmon,* 2011 OK CR 6, ¶ 7, 248 P.3d at 927; *Sanchez v. State,* 2009 OK CR 31, ¶ 44, 223 P.3d 980, 997.

**60.** *See Morgan,* 504 U.S. at 739, 112 S.Ct. at 2235 (reversing death sentence where defendant not allowed adequate *voir dire* to determine capital eligibility of prospective jurors at trial).

**61.** *See, e.g., Harmon,* 2011 OK CR 6, ¶¶ 20–22, 248 P.3d at 930–31 (where eleven prospective jurors stated "unequivocally" that they "would not consider the death penalty regardless of the law and evidence," it was not error to deny defense counsel an opportunity to "rehabilitate" these jurors). This Court recognizes that one of the pragmatic reasons for beginning a capital trial with *voir dire* limited to capital sentencing eligibility is to rid the panel of prospective jurors who cannot lawfully serve in a capital case early on, without the need to question them about other issues.

**62.** *See Coddington,* 2011 OK CR 17, ¶ 5, 254 P.3d at 694; *see also Harmon,* 2011 OK CR 6, ¶ 19, 248 P.3d at 930.

**63.** *See Davis v. State,* 2011 OK CR 29, ¶¶ 44–64, 268 P.3d 86, 105–09 (finding no abuse of discretion in for-cause removal of three jurors for inability to consider the death penalty, despite some "ambiguity" and "vacillating" by the jurors, after extensive *voir dire* by both parties); *cf. Harmon,* 2011 OK CR 6, ¶ 9, 248 P.3d at 927–28 (noting that although trial court imposed some limits on *voir dire,* "defense counsel was permitted to question the potential jurors at length about their attitudes toward the death penalty," finding that limitations on *voir dire* "did not prevent defense counsel from fully exploring the potential jurors' views on the death penalty," and concluding that "[t]he *voir dire* allowed was broad enough to enable defense counsel to challenge prospective jurors for cause and to intelligently exercise peremptory challenges").

**64.** *See Mitchell,* 2006 OK CR 20, ¶¶ 44, 109–10, 136 P.3d at 692, 712; *Cudjo,* 1996 OK CR 43, ¶¶ 11–12, 925 P.2d at 898–99.

by dividing the venire into eight groups, with twelve prospective jurors in each group. The members of each group were then given color-coded questionnaires, to be filled out and returned.[65] After the questionnaires were completed, copies of the completed questionnaires were given to the parties and the trial court. Then the groups were brought in, one at a time, for capital sentencing *voir dire*, beginning with group Yellow A (prospective jurors 1–12).[66] The trial court itself conducted the initial sentencing *voir dire*. Afterward, outside the presence of the jurors, the court would announce which jurors it intended to strike for cause—either for being unable/unwilling to consider the death penalty *or* for indicating that they would "automatically" give the death penalty. The court would then take motions and arguments from the parties. After this process was completed, the court would allow the State and then (usually) defense counsel to *voir dire* the prospective jurors who had not already been found removable for cause—but the parties were *forbidden* to ask any questions of the prospective jurors who had already been declared removable by the court.

¶ 53 In Proposition II, Miller challenges the "for cause" removal of 17 different prospective jurors from his panel. This Court finds that these 17 jurors can be broken down into three groups: (1) eight jurors who clearly indicated that they could not or would not consider the death penalty—who defense counsel was not allowed to question; (2) two jurors who gave conflicting responses regarding their ability and willingness to consider the death penalty—who defense counsel was allowed to question; and (3) seven jurors who gave equivocal, confusing, or inconsistent responses regarding their ability and willingness to consider the death penalty—who defense counsel was not allowed to question.

1. *Unequivocal Jurors*

¶ 54 This Court recognizes that when a prospective juror's responses to trial court questioning (and on any questionnaire) clearly establish that he or she is ineligible to serve in a capital case—because that juror cannot or will not consider the death penalty *or* because that juror will "automatically" give the death penalty—it is entirely reasonable to prohibit further questioning of that juror by either party. In the current case, the trial court struck 12 prospective jurors who acknowledged, during the court's initial questioning, that if the defendant was convicted of first-degree murder, they would "automatically impose the penalty of death." Neither party was allowed to question these "automatic" jurors; the State did not object to the for-cause removal of these jurors; and this Court finds that these removals were entirely appropriate.[67]

¶ 55 Similarly, the first group of jurors at issue in Miller's Proposition II claim is made up of jurors who clearly indicated that they could not or would not consider the death penalty. This Court finds that six prospective jurors were struck under circumstances where there was obviously no need for further questioning or "rehabilitation." In particular, this court finds that Juror V.R. (# 3), Juror S.R. (# 20), Juror M.F. (# 28), Juror K.S. (# 37), Juror P.P. (# 69), and Juror S.W. (# 71) were all unequivocal regarding their inability/unwillingness to consider the death penalty. These jurors clearly stated—in both their questionnaires and in answers to trial court questioning—that regardless of the law and the facts at issue, they would not consider the death penalty. This Court further finds that Juror R.J. (# 59) should likewise be considered to be

**65.** Jurors 1–12 were group Yellow A; Jurors 13–24 were group Yellow B; Jurors 25–36 were group Pink A; Jurors 37–48 were group Pink B; Jurors 49–60 were group Green A; Jurors 61–72 were group Green B; Jurors 73–84 were group Blue A; Jurors 85–96 were group Blue B. The color-coded questionnaires of all 96 prospective jurors have been preserved in the record in this case.

**66.** Ultimately, seven of the eight jury groups were questioned.

**67.** The trial court later struck two additional prospective jurors who, though they originally said they would consider all three penalties, stated during subsequent *voir dire* by defense counsel that they would vote to give the death penalty to anyone convicted of first-degree murder. These removals were likewise clearly appropriate.

within this group of clearly appropriate removals.[68]

¶ 56 Juror J.C. (# 5) was unique among all the prospective jurors questioned at Miller's retrial, since she had already served as a juror in a capital case and had actually voted to sentence a defendant to death. Miller's counsel vigorously asserted that he should be allowed to at least question J.C., and he vigorously challenges the trial court's denial of this opportunity on appeal. Nevertheless, upon reviewing the record as a whole, this Court cannot find that the trial court abused its discretion in striking J.C. without allowing defense counsel (or the State) any opportunity to separately question her. Although J.C.'s prior experience as a capital juror suggested that she "could" consider a death sentence—since she had done it before—she clearly did not want to serve in another death penalty case. More importantly, J.C.'s statements that her current reservations about the death penalty were so strong that she would never again be able to sentence someone to death were enough to support the trial court's decision to strike her for cause, without allowing party questioning. Despite her past experience as a capital juror, J.C.'s answers, as a whole, in her questionnaire and at trial, were consistent and clear regarding her strong reservations about the death penalty and her belief that she could not (again) consider sentencing someone to death.

¶ 57 Because the record clearly established that these eight jurors were unable or unwilling to consider the death penalty, there was no reason to allow "rehabilitation" of these jurors by defense counsel.

2. *Equivocal Jurors Who Both Parties Were Allowed to Question*

¶ 58 The second group of "struck-for-cause" jurors within Miller's Proposition II claim consists of the two jurors who gave conflicting responses regarding their ability/willingness to consider the death penalty, but whom defense counsel *was* allowed to question: Juror D.D. (# 60) and Juror E.M. (# 45). Juror D.D. indicated on her questionnaire that she was in favor of the death penalty and could return a death penalty verdict. When questioned by the trial court, she again stated that she could consider the death penalty. During defense counsel's sentencing *voir dire* the next day, however, D.D. noted that she had "really agonized" over the issue overnight and that even though she believed in the death penalty, "I could not sit on a jury and say this person has to die; I couldn't do it." Defense counsel was unable to move D.D. away from her position that she could not consider a death sentence, even after further questioning. Thus the court's decision to strike D.D. for cause was correct and not an abuse of discretion.

¶ 59 Juror E.M. (# 45), on the other hand, is a good example of a juror who was very "conflicted" about the death penalty, whose eligibility was difficult to determine.[69] Although E.M. indicated multiple times that she could and would consider the death pen-

68. In her questionnaire, R.J. noted her strong opposition to the death penalty and her inability to give a death sentence "under any circumstances." When she was asked by the court if she could consider all three punishments, however, R.J. answered, "Yes." When the court then noted that she looked "a little reserved," R.J. responded, "I'm kind of zoning out." (Juror R.J. noted in her questionnaire that she had a tendency to "zone-out" when something "drastic or catastrophic" was happening.) Later, during questioning by the State, R.J. announced that she could not consider the death penalty, regardless of the evidence. The court eventually struck her for cause on this basis and denied defense counsel's request to rehabilitate her. This Court finds, after looking at the record as a whole, that R.J.'s removal was appropriate, because R.J. clearly indicated that based upon her strong opposition to the death penalty, she was unable to consider it as a punishment. The trial court did not abuse its discretion in denying defense counsel's request to question and attempt to rehabilitate R.J. simply because she one time "zoned out" and indicated she could consider the death penalty. The record, as a whole, establishes that she was ineligible.

69. E.M. indicated on her questionnaire that she was not in favor of the death penalty and did not think it should ever be imposed, but also that it is "a necessary evil" and she could assess it in a proper case. During the court's questioning, E.M. initially indicated that she could not consider the death penalty, but then changed her mind and stated she could consider it. E.M. acknowledged how she was struggling with the issue, that "even my questionnaire is different," and that "I've had to really soul-search it." During State *voir dire*, E.M. stated that she probably could not

alty, the record as a whole—which included extensive questioning by both parties—clearly supported the trial court's decision to strike her for cause.[70] We note again that when both parties have had a fair and adequate opportunity to question a prospective juror about his or her capital eligibility, this Court will be particularly deferential to trial court decisions about whether to strike that juror for cause. In such situations, a trial court's observations of the juror's demeanor, tone of voice, voice volume, body language, *etc.* can be quite revealing regarding the juror's suitability for jury service, regardless of (or in addition to) that juror's recorded answers.[71]

### 3. Equivocal/Inconsistent/Confused Jurors—Defense Questioning Denied

¶ 60 This Court now takes up the "third group," *i.e.* the jurors who are the heart of

actually give a death sentence "full consideration" and stated, "I think it would destroy me. I think it would take a piece of my heart and it would change me forever in a place I don't want to go." Yet when the trial court attempted to confirm the certainty of her position a short time later, E.M. stated that she *could* consider the death penalty. The court then denied the State's for-cause challenge of E.M., despite the court's "grave concerns with a woman that says it's going to rip her heart out and change her forever." During subsequent defense questioning, E.M. stated that she would follow her duty, her oath, and the law given by the court, acknowledged that "there [are] just some things in life that we wish we didn't have to do," and then stated again that she could consider all three penalties—and was left on the jury panel.

Nevertheless, E.M. was ultimately dismissed two days later, during general *voir dire*, after it became quite apparent that she did *not* want to serve. After defense counsel talked to her about the idea of civic responsibility, E.M. stated that she did not feel "qualified" and "I won't budge on my personal beliefs about the death penalty." When pushed further about whether she would "consider it," E.M. responded, "I don't want to, no." E.M. indicated that she did not like the way defense counsel was making her feel "guilty," that she was willing to do her civic duty, but that she was not "capable to be a good juror." The trial court then granted the State's motion to dismiss E.M. for cause, over defense objection. The court described E.M. as "very angry," "very adverse," and even "hateful in her responses."

**70.** In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court recognized that even if a particular *juror* cannot

Miller's Proposition II claim. Seven jurors were struck for cause at Miller's trial for being unable or unwilling to consider the death penalty—without defense counsel being allowed any opportunity to question or attempt to rehabilitate them—even though these jurors gave equivocal, confusing, or inconsistent responses regarding their ability and willingness to consider the death penalty.

¶ 61 Juror A.A. (# 10) was in the first group of prospective jurors questioned at Miller's retrial (Group Yellow A). A.A. gave contradictory answers on her questionnaire regarding her willingness to consider the death penalty, which appear even more confusing and unclear in light of her an-

come to a definitive conclusion regarding his or her ability to consider the death penalty, a trial judge will often be able to make a fair determination regarding that juror's "bias" *(i.e.,* unwillingness to consider one or more of the sentencing options in a death penalty case) if that juror is asked enough questions:

> [D]eterminations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law....
> [T]his is why deference must be paid to the trial judge who sees and hears the juror.

*Id.* at 424–25, 105 S.Ct. at 852–53. And the more that a trial judge has been able to see and hear a particular juror, the more deference that should be accorded to that judge's decision.

**71.** *See, e.g., Coddington,* 2011 OK CR 17, ¶¶ 9–10, 254 P.3d at 695 (finding trial court did not abuse its discretion in for-cause removal of prospective juror "C.K.," who, while she did not state that she would not consider the death penalty, said that she "could not live with herself if she had to impose the death penalty," became emotional and even nauseated during sentencing *voir dire*, and was unable to firmly state that she could consider the death penalty).

swers at trial.[72] A.A. checked "Yes" on the questionnaire that she was "in favor of the death penalty" and then explained, "Yes if you are a child molester." A.A. also indicated that she believed the death penalty was used "too seldom" (rather than "too often" or "an appropriate amount"). On the same questionnaire, however, A.A. also indicated "[a]lthough I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances." When she was asked by the court if she could consider all three legal punishments, however, A.A. responded, "No, ma'am." When the trial court then asked, "Which one do you have—", A.A. apparently interrupted the court to say, "The death." When the court then asked if A.A.'s reservations were so strong that she would not consider imposing death, she responded, "Yeah, I wouldn't consider it."

¶ 62 When the trial court completed its questioning of Group Yellow A, the court announced that it intended to excuse Juror A.A., as well as two other jurors. Defense counsel objected to the removal of all three and argued, at length, that he should at least be able to *question* A.A. and the other two jurors (one of which, *i.e.*, Juror J.C., had previously served as a capital juror and voted for the death penalty). The court noted that

it had reviewed the questionnaires of all three jurors and that "all of these jurors that we are talking about—Juror No. 10 [A.A.], not as much as Jurors No. 5 [J.C.] and 3 [V.R.]—made it very well-known in their questionnaires that they were completely unable to even consider the option of death." The court then announced it was striking all three jurors for cause and ordered the parties "not to ask any of those ladies any additional questions when they return to court."

¶ 63 Defense counsel then pointed out that A.A.'s questionnaire indicated she *could* assess the death penalty. The trial court responded:

> I find Ms. [A.A.'s] questioning, she says that the death penalty is used too seldom, but then she does believe that the death penalty should never be imposed but then can assess it. At this point, she has made it perfectly clear to us, based on the Court's questioning, that she will not. So noting your objections, I will overrule those at this time and note your exception.

Group Yellow A was then brought back into the courtroom, and the parties were allowed to conduct their own, quite extensive sentencing *voir dire* of the nine other prospective jurors, amounting to over 100 transcript pages.[73] But neither party was allowed to

---

**72.** This Court notes that just last year, in *James v. Tyson Foods, Inc.*, 2012 OK 21, 292 P.3d 10 (2012), the Oklahoma Supreme Court emphasized the vital importance of allowing counsel to ask probing questions of prospective jurors about the contents of questionnaires filled out by the jurors. The trial court in that case had established a policy that attorneys were not allowed to question prospective jurors regarding issues that were covered within their jury questionnaires (which included questions about each juror's criminal history and involvement in civil litigation). *Id.* at ¶ 17, 292 P.3d at 15. The Supreme Court noted that various jurors gave incomplete, untruthful, and/or misleading responses in their questionnaires. *Id.* at ¶¶ 2, 18–20, 292 P.3d at 12, 16. The *James* Court emphasized that "parties have a right to question prospective jurors concerning matters relevant to their fitness to sit in a particular case." *Id.* at ¶ 20, 292 P.3d at 16. The *James* Court concluded that because the trial court's restriction on *voir dire* violated that right—by preventing defense attorneys from revealing the false and misleading nature of questionnaire answers that were relevant to potential juror partiality—the defendant was entitled to a

new trial. *Id.* at ¶¶ 20–21, 292 P.3d at 16–17. Hence the Oklahoma Supreme Court recognized in the civil context that answers on juror questionnaires cannot always be taken at face value and that attorneys must be allowed to further question prospective jurors regarding questionnaire answers that are relevant to fitness to serve in the case at issue.

**73.** The wide-ranging sentencing *voir dire* of the other nine jurors by the parties covered topics such as the death penalty process; the seriousness of the issues at stake; the ability of prospective jurors to consider all three penalties and to actually give the death penalty; juror feelings about the process and being on the jury; and juror opinions about the death penalty, their questionnaire answers, what constitutes a "strong juror," whether life without parole is a "severe punishment," and whether mercy is a "gift" or must be earned. Both parties used this sentencing *voir dire* both to learn about these prospective jurors and also to educate (and sometimes lobby) them regarding the entire capital trial process, the burden of proof in a crimi-

ask any questions of A.A. or the other two struck jurors, even though these jurors remained in the courtroom throughout this *voir dire*.

¶ 64 Juror A.A. said only nine words on the record at trial and was never asked to explain the inconsistencies within her questionnaire *or* the inconsistencies between her questionnaire answers and her in-court answers. It is hard to understand how the trial court could have come to the conclusion that A.A. "made it perfectly clear to us" that she would not consider the death penalty, when she said so little in court and was never asked about the very contradictory answers she had given—even though the trial court acknowledged the strangeness of her questionnaire answers. Juror A.A. is the kind of juror who absolutely required more questioning in order to determine if she was an eligible capital juror. It is possible that further questioning would have revealed that since filling out her questionnaire, A.A. had reflected further and come to the personal conclusion that she was unable or unwilling to consider the death penalty; and her for-cause removal at that point would have been appropriate. But defense counsel was not allowed to *ask* A.A. why her in-court statements were so different from her questionnaire answers—or how to make sense of her inconsistent questionnaire answers in the first place.

¶ 65 This Court finds that Juror A.A.'s answers regarding her willingness to consider the death penalty were equivocal, inconsistent, and also confusing. Consequently, we further find that the trial court abused its discretion by denying defense counsel any opportunity to question and attempt to rehabilitate A.A., despite repeated requests from counsel to do so.

¶ 66 The importance of determining whether prospective jurors are eligible capital jurors dictates that when the record is unclear or inconsistent regarding the capital eligibility of a particular juror (such as A.A.), it is much more important to allow the parties to question that juror about his or her *eligibility*—whether he or she is able and willing to consider all three punishments options—than it is to allow the parties almost unbounded sentencing *voir dire* on other related topics (as occurred in this case). While trial courts have broad discretion to set limits on party sentencing *voir dire* regarding other death-penalty related issues, trial courts must ensure that adequate *voir dire* is allowed in order to confidently and correctly determine whether individual prospective jurors are eligible capital jurors.

¶ 67 This Court finds that the trial court also abused its discretion by denying defense counsel any opportunity to question Juror B.S. (# 18),[74] Juror R.L. (# 41),[75] and Juror L.D. (# 61).[76] The record in this case

nal case, the "beyond a reasonable doubt" standard, the role of mitigating circumstances, the role of the sentencing jury in Oklahoma, the power of a single juror to decline to give a death sentence, *etc.*

74. Juror B.S. indicated on his questionnaire that he was in favor of the death penalty and that he personally could return a death penalty verdict. B.S. likewise indicated that he could consider all three penalties when questioned by the court at trial. After the State's second round of questioning a different juror (Juror S.S.), however—and over 70 transcript pages after the court had completed its questioning of B.S.—B.S. apparently raised his hand and indicated that he had "done a lot of thinking" and was now concerned about his ability to determine that a defendant "deserved it," *i.e.*, death, and that even though he supported capital punishment, he didn't "think" or "believe" that he personally could give a death sentence. B.S. was then struck for cause, over defense objection, without any opportunity for defense questioning or rehabilitation.

75. Juror R.L. likewise indicated on his questionnaire that he was in favor of the death penalty (even for felony murder) and that he personally could return a death penalty verdict. Yet when he was questioned by the trial court, R.L. stated that he would not consider imposing the death penalty, without comment or explanation. Defense counsel's request to *voir dire* R.L. was denied, despite the sharp contrast between his questionnaire answers and his in-court answers.

76. Juror L.D. indicated on her questionnaire that although she was not in favor of the death penalty, she did think it was appropriate in some cases, that it is used "an appropriate amount," and that she personally could return a verdict imposing the death penalty. When questioned by the court at trial, however, L.D. indicated that she had "an issue with the death penalty" and would not be able to consider imposing it. Defense counsel's request to question L.D. was denied, despite the inconsistency between her questionnaire answers and her in-court answers.

establishes that there were clear inconsistencies between the questionnaire answers and the in-court trial answers of these three jurors, such that the trial court should have granted defense counsel's request to *voir dire* these jurors regarding their willingness to consider the death penalty as a sentencing option.

¶ 68 This Court recognizes that denying defense counsel any opportunity to question prospective jurors regarding their capital eligibility is particularly troubling when the State has been allowed to question these same jurors—especially when the State was able to successfully use its own *voir dire* questioning to convince the trial court to strike these jurors "for cause" (for being unable/unwilling to consider the death penalty), even though these jurors had already "passed" the trial court's own initial, capital-eligibility screening. On at least three occasions during Miller's retrial, the trial court reviewed the questionnaire of the prospective juror at issue, questioned the juror in open court, determined that the juror was an eligible capital juror, allowed the State to question the juror—during which questioning the juror gave answers suggesting that he or she was not able/willing to consider the death penalty—and then granted the State's request to strike the juror for cause, after denying defense counsel's request to question and attempt to rehabilitate that same juror.

¶ 69 In other words, on at least three occasions the trial court allowed the State to use its *voir dire* questioning to show that a juror who had some misgivings regarding the death penalty (but whom the trial court had found to be "capital-eligible") should be struck "for cause" from the panel, without allowing defense counsel any corresponding opportunity to use further questioning to show that despite these misgivings, this same juror was, in fact, an eligible capital juror, who could and would consider all three sentencing options. As noted in the preceding section (regarding jurors whom both parties were allowed to question), this back-and-forth process is a familiar and common scenario within capital sentencing *voir dire*. And as long as both parties are given a fair and adequate opportunity to question the "waffling" jurors at issue—who often struggle mightily to honestly answer the morally difficult and sometimes confusing questions at issue—this process is consistent with due process and a defendant's 8th Amendment right to a reliable sentencing.

¶ 70 On the other hand, allowing the State to use its *voir dire* questioning to "establish" that a seemingly capital-eligible juror should, in fact, be struck for cause (for being unable/unwilling to consider the death penalty), without allowing defense counsel any opportunity to even *attempt* to establish, through counsel's own *voir dire* questioning, that the same juror should *not* be struck for cause raises serious due process and 8th Amendment reliability concerns. This Court finds that this happened at least three times during Miller's retrial.

¶ 71 Juror S.S. (# 16) gave responses on her questionnaire that suggested she was quite opposed to the death penalty and would likely be ineligible to serve in a capital case. When she was initially questioned by the court at trial, however, S.S. indicated that she *could* consider all three punishments. After S.S. survived this initial round of questioning, the State questioned her and challenged S.S. on whether she could actually consider the death penalty. S.S. became confused and flustered, but then acknowledged her questionnaire responses and indicated that she *couldn't* consider the death penalty. The trial court, noting the inconsistency of S.S.'s responses, later re-questioned her. This time, after indicating that she had been "listening and listening," S.S. indicated she *could* consider the death penalty and that if the defendant "really done it," she could and would consider the death penalty. Nevertheless, when the State was allowed to question S.S. a second time (and review her questionnaire), S.S. eventually stated that she could not "consider and actually return a verdict of death."

¶ 72 At a bench conference immediately following this questioning, the trial court granted the State's request to strike S.S. for cause and denied multiple requests by defense counsel to *voir dire* S.S.—even though the State had been given two opportunities to question S.S., while defense counsel had no

such opportunity, and even though the court acknowledged that S.S.'s in-court answers were "all over the place." After denying a final defense request to *voir dire* S.S., the trial court struck her for cause, stating:

> I am going to find that based on her back and forthness; her questionnaire; the fact that I think she is stating what she believes is that she could possibly consider it, but when it comes down to it, she will not and does not believe in the death penalty and that will not allow her to do it. Because when I asked her those questions, however, she went back and forth. So at this point in time I am going to note your exception and dismiss her for cause.

This Court finds that S.S.'s "back-and-forth" answers were equivocal and inconsistent; hence defense counsel should have been allowed to question her. Denying defense counsel this opportunity was particularly inappropriate after the State was given two chances to question S.S. Thus the trial court abused its discretion when it denied defense counsel's repeated requests to question S.S.

¶ 73 Juror S.G. (# 43) indicated on his questionnaire that he was in favor of the death penalty, adding, "If he committed the crime he should take the punishment." S.G. also noted that he personally could return a death sentence. When questioned by the court at trial, S.G. again stated that he could consider the death penalty. When questioned later by the State, however, about whether he could give "meaningful consideration" to all three penalties, S.G. stated, "I don't think I could do the death." [77] When asked why, he responded, "Just scared, sir." [78] When the prosecutor returned to him again, S.G. stated, "I cannot do death." When the court announced its intent to strike

S.G. for cause on this basis, defense counsel requested an opportunity to question him. The court responded, "That will be denied. I believe he was unequivocal." But overall S.G. was *not* unequivocal, since he gave inconsistent responses regarding his ability to consider a death sentence; and it was particularly unfair to allow the State to question S.G., but then deny defense counsel any chance to attempt to rehabilitate him. Once again, the trial court abused its discretion when it refused to give defense counsel any opportunity to question S.G.

¶ 74 Juror J.V. (# 51) gave answers on his questionnaire suggesting that he was *very* favorable toward the death penalty. He indicated that he was in favor of the death penalty for premeditated murder, but that for "an accidental death [it] would depend on circumstances." [79] When questioned by the court, J.V. indicated that he could give the death penalty. Later, however, after extensive sentencing *voir dire* by the State, J.V. stated:

> I was always raised an eye for an eye. But, you know, it's a little different when you're standing inside the courtroom looking in. The last 30 minutes I have completely changed my opinion. I don't think I could stand there and tell that man that—I couldn't give the death—there is no way.

When the State asked that J.V. be struck for cause on this basis, defense counsel objected and requested an opportunity to question J.V. The court denied this request, found that J.V. was "unequivocal" in his unwillingness to consider the death penalty, and struck him for cause on this basis. Once again, this Court finds that J.V. was *not* unequivocal and that the trial court abused

---

77. Defense counsel repeatedly objected to State *voir dire* questioning about whether prospective jurors would be able to "meaningfully consider" or "fairly consider" the death penalty, and two separate bench conferences were held on this issue. At the end of the second bench conference, after reviewing this Court's decision in *Mitchell v. State*, 2006 OK CR 20, 136 P.3d 671, the trial court ruled that both of the State's formulations of the rule were incorrect, finding that "the *Mitchell* decision . . . is very straightforward" and that jurors are *only* required to state that they can "consider" the death penalty to be eligible to serve in a capital case. This Court

agrees with the trial court and reaffirms *Mitchell* in this regard. *See id.* at ¶ 40 n. 97, 136 P.3d at 690 n. 97.

78. Juror S.G. was 19 years old at the time.

79. J.V. also indicated that the death penalty is used "too seldom," that he believes that strict enforcement of the death penalty would cause "the homicide rate [to] drop significantly," and that he personally could sentence someone to the death penalty.

its discretion in denying defense counsel any opportunity to question J.V., particularly since the State was allowed a prolonged opportunity to do so.

¶ 75 This Court concludes that the trial court abused its discretion by refusing to allow defense counsel any opportunity to question or attempt to rehabilitate Jurors A.A., B.S., R.L., L.D., S.S., S.G., and J.V., because these prospective jurors gave equivocal, confusing, and inconsistent responses regarding their ability and willingness to consider the death penalty. Furthermore, defense counsel was denied this opportunity regarding Jurors S.S., S.G., and J.V., even though the State was allowed to question these jurors. This Court finds that this violated due process and Miller's 8th Amendment right to a reliable sentencing. Hence Miller is entitled to sentencing relief on his Proposition II claim.

¶ 76 This Court recognizes that defense counsel will often be unable to rehabilitate equivocal/inconsistent jurors to the point that they will clearly state (and maintain) that they would be able and willing to consider imposing the death penalty in an appropriate case. Similarly, prosecutors will often be unable to rehabilitate prospective jurors who are inclined to give the death penalty in all (or nearly all) first-degree murder cases. Nevertheless, if both parties are allowed to question prospective jurors whose statements in court and on any questionnaire suggest that they *may* be ineligible to serve, this party *voir dire* could potentially make the eligibility/ineligibility of these jurors clear— thereby allowing the court to confidently and correctly rule on any motions to excuse these jurors for cause. On the other hand, if further questioning merely results in further demonstrating that a particular juror is unable to come to a definitive conclusion regarding his or her ability and willingness to consider all three penalties, the juror's answers will still give the trial court further opportunity to observe and evaluate the juror, in order to make a ruling on that juror's capital eligibility. And trial court rulings

that are based on more juror answers and more observation are rightfully accorded more deference on appellate review.

### Refusal of Individual, Sequestered *Voir Dire*

 ¶ 77 In Proposition III, Miller asserts that it was reversible error for the trial court to deny defense counsel individual, sequestered *voir dire*. The State concedes that Miller adequately preserved this claim in the trial court. Nevertheless, Miller candidly acknowledges that this Court has never held that individual, sequestered *voir dire* is required in all capital cases. Although this Court has "encouraged" the use of jury questionnaires and individual *voir dire* in capital cases, "we have consistently refused to require trial courts to use questionnaires or individual *voir dire* " and have held that the decision whether to use either of these tools is within the discretion of the trial court.[80] This Court has also noted that individual, sequestered *voir dire* "is appropriate where the record shows jurors are not candid, or are trying to avoid jury service through their responses." [81]

¶ 78 Although Miller makes general arguments about the value of individual, sequestered *voir dire*, he cites no specific examples from his 2008 retrial suggesting that the refusal to provide such *voir dire* was inhibiting or prejudicial in his case. This Court notes that the use of jury questionnaires at Miller's retrial gave prospective jurors a valuable opportunity to candidly express their views on the death penalty and to provide personal background information, before even coming into court and being questioned along with other jurors. In addition, the trial court brought jurors in for *voir dire* in groups of twelve, rather than all at once, thereby limiting the potentially stifling impact of other jurors on any one juror's candor. This Court does not hesitate to conclude that the trial court did not abuse its discretion by refusing to provide individual,

**80.** *See Coddington v. State*, 2011 OK CR 17, ¶ 12, 254 P.3d 684, 696; *Jones v. State*, 2006 OK CR 17, ¶ 16, 134 P.3d 150, 156.

**81.** *Coddington*, 2011 OK CR 17, ¶ 12, 254 P.3d at 696 (citation omitted).

sequestered *voir dire* in this case.[82] Proposition III is rejected accordingly.

### Restriction of Questioning Regarding "Two Murders"

¶ 79 In Proposition IV, Miller attempts to assert that the trial court abused its discretion in not allowing defense counsel to question jurors about whether they would consider all three penalty options even for a defendant who had murdered two victims. Miller would like to bring his case within the ambit of *Jones v. State*, 2006 OK CR 17, 134 P.3d 150, wherein this Court held that in a capital murder case involving two (or more) counts of first-degree murder, a defendant must be allowed to ask prospective jurors whether they would be willing to consider a sentence other than death for a defendant who had killed more than one victim.[83]

¶ 80 However, Miller did *not* make or preserve this claim in the trial court. While questioning Juror M.D. (# 66), defense counsel asked whether M.D. would consider someone to be "a weak juror" if he or she couldn't vote for the death penalty in a case where two innocent victims were killed. After M.D. indicated that she would not consider such a juror "weak," the trial court asked the parties to approach for a bench conference and challenged defense counsel about "getting into specifics." Rather than disagreeing with the trial court in this regard, however, defense counsel asserted that it was not his "intention" to get into specifics and raised no objection regarding the court's ad-

monition that he "back off from specifics about this case" and "move along."[84] Although the trial court's limitation on *voir dire* in this regard appears contrary to *Jones*, Miller did not properly preserve this claim in the trial court, nor does he even argue that the trial court's ruling was plain error. Hence Miller is not entitled to relief on his Proposition IV claim, and this claim is rejected accordingly.[85]

### Guilt Stage Claims

#### Sufficiency of the Evidence to Establish Guilt

¶ 81 In Proposition V, Miller asserts that the evidence presented at trial was insufficient to convict him of the first-degree murders of Mary Bowles and Jerald Thurman. This Court evaluates such sufficiency claims by determining "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt."[86]

¶ 82 Miller notes, quite correctly, that the evidence presented at his 2008 trial was rather different from the evidence presented at his 2002 trial, which included substantial testimony from Rashad Barnes about things Hanson told Barnes.[87] Unlike the jury at Miller's first trial, the jury at his second trial did not hear any evidence about how Hanson and Miller came to be in possession of Bowles' car, how her blood ended up in the

**82.** *See Cuesta–Rodriguez v. State*, 2010 OK CR 23, ¶ 57, 241 P.3d 214, 233.

**83.** *See Jones v. State*, 2006 OK CR 17, ¶ 14, 134 P.3d 150, 156 (prohibiting counsel from asking if prospective juror would "automatically" impose the death penalty and not consider life sentence options if defendant is convicted of multiple counts of first-degree murder "is reversible error"); *id.* at ¶ 11, 134 P.3d at 155 (juror who acknowledged she would sentence defendant to death if he were convicted of two counts of first-degree murder should have been excused "for cause").

**84.** Miller admits in his brief that his counsel "failed to press the issue."

**85.** We note that this same issue could arise in any resentencing in this case.

**86.** *Jackson v. Virginia*, 443 U.S. 307, 319–20, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–04 (quoting *Jackson* ); *see also Easlick v. State*, 2004 OK CR 21, ¶¶ 5, 15, 90 P.3d 556, 558, 559.

**87.** Barnes' testimony at Miller's first trial is summarized in this Court's earlier opinion. *See Miller v. State*, 2004 OK CR 29, ¶¶ 14–16, 98 P.3d 738, 741–42. As noted *supra* in note 3, this Court reversed Miller's murder convictions from this first trial because the admission of Barnes' testimony (regarding what Hanson said to Barnes) violated Miller's Sixth Amendment right to confront the witnesses against him and could not be declared "harmless beyond a reasonable doubt." *Id.* at ¶¶ 47–48, 98 P.3d at 748.

back seat, what exactly happened at the dirt pit leading up to the shooting of Thurman, or what exactly happened leading up to the shooting of Bowles. Furthermore, the jury at the second trial was presented with very little evidence regarding why these events unfolded as they did, and not any specific evidence that the whole episode began as a carjacking.

■ ¶ 83 Nevertheless, the evidence presented at Miller's 2008 retrial was more than sufficient to support his convictions for the first-degree murders of Thurman and Bowles. This Court acknowledges that the evidence presented at Miller's 2008 retrial regarding his involvement in these murders was overwhelmingly circumstantial and that no eyewitness testimony was presented regarding the actual shootings of the victims; nor was there any evidence that Hanson or Miller confessed or implicated each other. Yet this Court has already recognized that such direct evidence—*i.e.*, eyewitness testimony, accomplice testimony, confession evidence, *etc.*—is itself not always the most reliable evidence and that circumstantial evidence can be more than sufficient to establish the commission of a crime by a defendant.[88]

■ ¶ 84 In *Pavatt v. State*, 2007 OK CR 19, ¶ 36, 159 P.3d 272, 285, this Court noted that fingerprint evidence and DNA evidence are both "merely" circumstantial evidence, yet the compelling nature of this kind of evidence to establish either guilt or innocence is widely recognized and accepted. In the current case, Miller himself accepted the fact that the State's fingerprint evidence established that he had touched the passenger-side seatbelt buckle in Bowles' car—and proceeded to try to explain why he had done so. Miller also specifically accepted that the State's ballistics evidence—which is also circumstantial evidence—established that Thurman was shot with the silver .38 (State's Exhibit 52) and that Bowles was shot with the black 9–mm (State's Exhibit 53). We

recognize again here, as we recognized in *Pavatt*, as follows:

> In the end, the law makes no distinction between direct and circumstantial evidence; either, or any combination of the two, may be sufficient to support a conviction. *Clark v. State*, 1983 OK CR 79, ¶ 8, 664 P.2d 1065, 1066; OUJI–CR(2nd) No. 9–4. The jury may consider all competent evidence, along with [the] rules of law and basic common sense, in reaching a verdict.

*Id.* at ¶ 36, 159 P.3d at 285. This Court finds that Miller's jury had plenty of evidence to support his convictions in the current case.

¶ 85 Regarding Miller's sufficiency challenge on appeal, Miller's jury was made quite aware of the limits of Sundeep Patel's testimony and that although Patel could convincingly identify Hanson as arriving at the Oasis Motel (in Bowles' car) shortly after 6:00 p.m. on August 31, 1999, Patel could not identify Miller as the man with Hanson that evening. Yet Miller's fingerprint was found in Bowles' car, in a location that Miller's testimony could not convincingly explain, and Hanson and Miller were clearly involved in a whole series of crimes (mostly robberies) as a two-person crime team during this time period. In addition, the State's evidence established that Miller customarily used the silver .38, which was used to kill Thurman, and that Hanson customarily used the black 9–mm, which was used to kill Bowles. And these two men—and no one else—were arrested together at a Muskogee motel on September 9, 1999, after robbing the Tulsa Federal Employees Credit Union one day earlier, still together and still in possession of these same guns, *i.e.*, the murder weapons.

¶ 86 Furthermore, although Miller's jury was made quite aware of the limits of Phyllis Miller's testimony (and credibility problems and her own involvement with certain robberies), her basic testimony about the series of events leading up to Miller's departure with Hanson on August 31, 1999, Miller's behavior after his return to their motel room

---

**88.** In *Pavatt v. State,* 2007 OK CR 19, ¶ 36, 159 P.3d 272, 285, this Court noted that not all direct evidence is reliable evidence and that many "classic sources of 'direct' evidence—a confession, an eyewitness identification, the testimony

of an informant or accomplice—are themselves the subject of special cautionary instructions and corroboration rules." *Id.* at ¶ 36, 159 P.3d at 285.

late that same night, and Miller's actions the next morning in connection with Bowles' car at the Oasis Motel ... is all *much* more believable and consistent with common sense than is Miller's testimony regarding these same events and circumstances. Miller's jury quite reasonably chose to credit Phyllis Miller's version of events over Victor Miller's version of events.

¶ 87 Looking at the evidence in the light most favorable to the State, this Court does not hesitate to conclude that the evidence presented during Miller's 2008 retrial was more than sufficient to support his convictions for two counts of first-degree murder. Miller's jury had more than enough evidence to conclude that he himself shot Thurman and that he aided and abetted in the shooting of Bowles by Hanson. Proposition V is rejected accordingly.

### "Other Crimes" Evidence

■■■ ¶ 88 In Proposition IX, Miller argues that the trial court's admission of "other crimes" evidence at trial—specifically, evidence regarding his involvement in four armed robberies during late August and early September of 1999—violated his right to due process and a fair trial. Miller repeatedly challenged the admission of this evidence at trial, and the State does not contest that he adequately preserved this claim at trial. This Court reviews a trial court's decision to admit such "other crimes" evidence for an abuse of discretion.[89]

■■■ ¶ 89 This Court has repeatedly recognized that any criminal conviction obtained through a trial must be based upon evidence establishing that the defendant committed the charged crime(s), rather than evidence of other offenses.[90] We have also repeatedly recognized, however, and Oklahoma law specifically provides, that evidence a defendant has committed "other crimes" or "bad acts" can be admissible at trial to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.[91] We have likewise maintained that in order to be admissible, evidence that a defendant has committed another crime or "other crimes": (1) must be probative of a disputed issue in the case being tried; (2) that there must be a "visible connection" between the charged crime(s) and the evidence sought to be introduced; (3) that the evidence of the other crime(s) must be necessary to support the State's burden of proof in the case being tried; (4) that the evidence of the other crime(s) sought to be introduced must be clear and convincing; and (5) that the probative value of the other crime(s) evidence must outweigh any unfair prejudice to the defendant resulting from its introduction.[92] In addition, the trial court must issue a limiting instruction at the time the other crimes evidence is introduced at trial and at the conclusion of the trial.[93]

¶ 90 In the current case, the trial court explicitly ruled that the evidence regarding Miller's involvement in the armed robberies was being admitted to help establish the *identity* of Miller as one of the perpetrators in the Thurman and Bowles homicides. The identity of the killer(s) of these victims was the major factual question at issue. Miller and Hanson were connected to the murders primarily by their fingerprints in Bowles' car and by the fact that they were found together, along with the murder weapons, at the Muskogee EconoLodge. Although Hanson was further connected with Bowles' car by the testimony of Sundeep Patel, Patel could not identify Miller as the man with Hanson on August 31, 1999. Thus it was critical that Miller be substantially connected with the murder weapons, particularly with the silver .38 used to kill Thurman, since this was the gun that Miller's wife testified he used and kept with him at the time.

**89.** *See, e.g., Williams v. State,* 2008 OK CR 19, ¶ 36, 188 P.3d 208, 218.

**90.** *See, e.g., id.; Lott v. State,* 2004 OK CR 27, ¶ 40, 98 P.3d 318, 334.

**91.** *See* 12 O.S.2001, § 2404(B); *Williams,* 2008 OK CR 19, ¶ 36, 188 P.3d at 218; *Burks v. State,* 1979 OK CR 10, ¶ 2, 594 P.2d 771, 772, *overruled in part on other grounds by Jones v. State,* 1989 OK CR 7, 772 P.2d 922.

**92.** *See, e.g., Lott,* 2004 OK CR 27, ¶ 40, 98 P.3d at 334-35.

**93.** *Id.* at ¶ 40, 98 P.3d at 335.

¶ 91 The purpose of admitting the evidence regarding the four armed robberies was to connect Miller to the silver .38, from its acquisition through the time of the murders. In addition, the evidence regarding the armed robberies helped establish that Hanson and Miller regularly acted "in concert" to commit crimes during this time period, *with Miller using the silver .38 and Hanson using the black 9–mm.* As noted in Miller's brief, the trial court was quite concerned about limiting the extent of this "other crimes" robbery evidence and not allowing evidence that was unduly prejudicial. The court insisted that the State focus upon evidence connecting Miller to Hanson and evidence connecting Miller to the silver .38, without allowing unnecessary or unduly prejudicial facts about the robberies. The court also gave a contemporaneous limiting instruction in connection with each witness who testified about the robberies, instructing that the jury could consider the evidence only in regard to Miller's identity, and gave another limiting instruction regarding this evidence at the conclusion of trial.

¶ 92 The armed robbery evidence was probative on the critical issue of Miller's identity and was necessary to support his convictions. The evidence of these armed robberies was clear and convincing and was "visibly connected" to the murder charges at issue, through the use of the same guns by the same partners in crime. And the probative value of this evidence outweighed the potentially unfair prejudice resulting from its admission, particularly since no one was significantly injured or killed during the robberies. Miller's brief confuses the "identity" value of the robbery evidence in his case with cases involving other crimes evidence offered to establish a "highly peculiar method of committing a crime." [94] Unlike such cases, the armed robbery evidence in this case was *not* offered to establish a distinctive or "signature" crime.

¶ 93 Rather, the connection between the armed robbery "other crimes" evidence and the murder charges at issue herein is primarily the use of the same distinctive guns by the same two men acting together.[95] The "identity" value of the armed robbery evidence was that it powerfully and probatively established that at the time of the Thurman and Bowles shootings, Miller and Hanson were regularly committing crimes together, with Miller using the silver .38 (which killed Thurman) and Hanson using the black 9–mm (which killed Bowles). The trial court properly limited the other crimes evidence admitted at Miller's trial and did not abuse its discretion in this regard. Proposition IX is rejected accordingly.

### "Substitute" Expert Witnesses & the Confrontation Clause

¶ 94 In Proposition X, Miller challenges the State's use of "substitute" expert testimony at his 2008 trial, in particular, the State's use of substitute autopsy testimony and substitute ballistics testimony. Miller begins by arguing that the testimony of medical examiner Dr. Ronald Distefano, as a substitute for the medical examiner testimony of Dr. Mary Anzalone—who actually performed the autopsies of both victims and who testified at Miller's original trial in 2002—violated his Sixth Amendment right to confront the witnesses against him. Miller then argues that the State's use of Mark Boese as a "ballistics expert" at his 2008 trial, as a substitute for the testimony of Dennis Fuller—who testified at Miller's 2002 trial—likewise violated his Sixth Amendment right to confront the witnesses against him. We will take up the State's use of these two substi-

---

94. *See, e.g., Williams,* 2008 OK CR 19, ¶ 37, 188 P.3d at 219.

95. *Williams* recognized that the "identity" exception to the rule against other crimes evidence can allow for evidence of one crime in the trial of another, where the same gun was involved in both:

> [I]n *Warner v. State,* 1977 OK CR 257, ¶ 9, 568 P.2d 1284, 1286, evidence that a particular firearm was recovered at a robbery scene where the defendant was apprehended was admissible to show that the defendant committed an earlier home invasion robbery where that particular firearm was stolen. No highly peculiar method of operation was discussed. The pistol merely tied the defendant to the charged robbery.

*Id.* at ¶ 39, 188 P.3d at 219 (citing *Warner v. State,* 1977 OK CR 257, ¶ 19, 568 P.2d 1284, 1286).

tute witnesses separately, since they played quite different roles at Miller's retrial, after first reviewing the legal basis for his claim and its development in the trial court.

¶ 95 Miller focuses his Proposition X claim upon the United States Supreme Court's decisions in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which was decided prior to his 2008 retrial, and *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), which was decided afterward. The Court's landmark decision in *Crawford* emphasized that a defendant's right to cross-examine the witnesses against him is "the centerpiece of the Sixth Amendment's confrontation right." [96] In *Crawford,* the Supreme Court distinguished between "testimonial" evidence and "nontestimonial" evidence and held that "[w]here testimonial evidence is at issue, ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." [97]

¶ 96 In its 2009 decision in *Melendez–Diaz,* the Supreme Court further clarified the meaning and reach of *Crawford,* finding that an analyst's "certificate of analysis" (stating that a particular tested substance is cocaine or any other drug) is essentially an affidavit, which declares certain facts to be true about the tested substance. [98] Consequently, such evidence is subject to the defendant's Sixth Amendment right to confront and cross-examine the analyst who prepared it, who is, effectively, a "witness" against the defendant. [99] Hence a defendant in a drug distribution/trafficking case who had raised his right to cross-examine the analysts who performed the drug analysis in his case had a right to demand the analysts' live testimony at trial, unless these analyst witnesses were "unavailable" *and* the defendant had a prior opportunity to cross-examine them. [100]

¶ 97 In *Bullcoming v. New Mexico,* —— U.S. ——, 131 S.Ct. 2705, 180 L.Ed.2d 610 (2011), the Supreme Court held that the Confrontation Clause was violated when the prosecution introduced a forensic laboratory report certifying that the defendant's blood-alcohol concentration was well above the threshold required for aggravated DWI (driving while intoxicated), through the testimony of an analyst who was familiar with the procedures of the testing laboratory, but had not participated in or observed the testing of Bullcoming's blood. [101] Following the logic of *Crawford* and *Melendez–Diaz,* the Court held that the blood-alcohol report contained testimonial certifications of fact by the

**96.** In *Crawford,* the Court wrote:

Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.... Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty.

*Crawford v. Washington,* 541 U.S. 36, 61–62, 124 S.Ct. 1354, 1370–71, 158 L.Ed.2d 177 (2004).

**97.** *Id.* at 68, 124 S.Ct. at 1374. The *Crawford* Court declined to specifically define "testimonial," but found that the term includes: *ex-parte* in-court testimony or its functional equivalent (affidavits, custodial examinations, *etc.*); extrajudicial statements contained in formalized testimonial materials (affidavits, depositions, prior testimony, and confessions); statements made with a reasonable expectation of use at trial; statements made during a police interrogation; and statements made during a preliminary hear-

ing, before a grand jury, or at an earlier trial. *Id.* at 51–52, 68, 124 S.Ct. at 1364, 1374.

**98.** *Melendez–Diaz v. Massachusetts,* 557 U.S. 305, 310, 129 S.Ct. 2527, 2532, 174 L.Ed.2d 314 (2009).

**99.** *Id.* at 311, 129 S.Ct. at 2532 ("[U]nder our decision in *Crawford* the analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment.").

**100.** *Id.* The *Melendez–Diaz* Court noted, "The defendant *always* has the burden of raising his Confrontation Clause objection...." *Id.* at 327, 129 S.Ct. at 2541 (emphasis in original).

**101.** *Bullcoming v. New Mexico,* —— U.S. ——, 131 S.Ct. 2705, 2709–10, 180 L.Ed.2d 610 (2011). Although the blood-alcohol laboratory report at issue was signed by an analyst, the State did not call that analyst at trial. *Bullcoming,* —— U.S. ——, 131 S.Ct. at 2709. The *Bullcoming* decision was released after the filing of Miller's Brief in Chief and his *Pro Se* Supplemental Brief.

analyst who signed it (Curtis Caylor) and that the defendant had a right to confront that analyst at trial, unless that analyst was unavailable *and* the defendant had a prior opportunity to cross-examine him.[102] The *Bullcoming* Court majority rejected many challenges to its analysis, including arguments about the reliability of such scientific reports and the overall fairness of the trial.[103] The *Bullcoming* Court concluded, "In all material respects, the laboratory report in this case resembles those in *Melendez–Diaz*," and also concluded that "the formalities attending the 'report of blood alcohol analysis' [at issue in *Bullcoming*] are more than adequate to qualify Caylor's assertions as testimonial." [104]

¶ 98 This Court has followed the lead of the United States Supreme Court in its recent decisions in this area.[105] In *Cuesta–Rodriguez v. State*, 2010 OK CR 23, ¶¶ 34–35, 241 P.3d 214, 228, this Court found that a medical examiner's autopsy report in the case of a violent or suspicious death is indeed "testimonial for Sixth Amendment confrontation purposes" and that the medical examiner who conducted the autopsy and authored the report is "a witness within the meaning of the Confrontation Clause." We concluded that because the defendant did not have the opportunity to cross-examine the medical examiner who conducted the autopsy, *i.e.*, Dr. Jordan, and because the testifying medical examiner's testimony disclosed the contents of Dr. Jordan's autopsy report (and also his autopsy diagrams, which were admitted at trial), this constituted testimonial hearsay and violated the Confrontation Clause.[106]

¶ 99 With this legal background, we review what occurred at Miller's 2008 retrial. Dr. Mary Anzalone and Dr. Ronald Distefano were both employed as medical examiners for the Tulsa Medical Examiner at the time of the September 1999 autopsies of Bowles and Thurman, but it was Dr. Anzalone who

---

102. *Id.* at ——, 131 S.Ct. at 2713. The Court concluded that the lab report contained multiple testimonial statements, rather than merely listing "a machine-generated number," including a statement about the concentration of alcohol found in Bullcoming's blood, but also statements that his blood sample was properly obtained, preserved, tested, *etc.* *Id.* at ——, 131 S.Ct. at 2714.

103. *Id.* at ——, 131 S.Ct. at 2714–17. The Court wrote: "[T]he comparative reliability of an analyst's testimonial report drawn from machine-produced data does not overcome the Sixth Amendment bar.... [A]nalysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" *Id.* at ——, 131 S.Ct. at 2715 (quoting *Melendez–Diaz*).

104. *Id.* at ——, 131 S.Ct. at 2717. In *Williams v. Illinois*, —— U.S. ——, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), the Supreme Court's most recent decision in this Confrontation arena, the result and the Court majority "shifted" on precisely this issue of "formalities." In *Williams*, a five-Justice Court majority ruled that the presentation of certain DNA testimony against a defendant in a rape case, by a DNA expert who was not involved with the actual DNA testing of the rape-kit sample at issue, did not violate the defendant's rights under the Confrontation Clause. *Id.* at ——, 132 S.Ct. at 2244. There is, however, no true Court opinion in *Williams*, since only four Justices sign Justice Alito's plurality opinion (announcing the judgment of the Court); and Justice Thomas, who provides the crucial fifth vote, declines to join the plurality opinion and clarifies that his decision is based "solely" upon the fact that the DNA report statements at issue "lacked the requisite 'formality and solemnity' to be considered "'testimonial'" for purposes of the Confrontation Clause"—an approach that no other Justice joins. *See id.* at ——, 132 S.Ct. at 2255 (Thomas, J., concurring in the judgment). In addition, Justice Thomas makes clear that he "share[s] the dissent's view of the plurality's flawed analysis." *Id.* Consequently, the precedential value of *Williams* is quite murky and unclear, and we do not further address the significance or meaning of *Williams* herein.

105. *See, e.g., Marshall v. State*, 2010 OK CR 8, ¶¶ 20–31, 232 P.3d 467, 473–76 (finding violation of Confrontation Clause where substitute DNA expert presented DNA analysis of unavailable colleague at trial, where defendant had no opportunity to examine original DNA expert regarding findings in her report); *Cuesta–Rodriguez v. State*, 2010 OK CR 23, ¶¶ 28–39, 241 P.3d 214, 226–29 (finding violation of Confrontation Clause where Chief Medical Examiner for Oklahoma was allowed to testify in place of medical examiner who actually performed autopsy of victim).

106. *Id.* at ¶ 39, 241 P.3d at 229. In both *Marshall and Cuesta–Rodriguez*, the defendant properly preserved his Confrontation Clause claim, by objecting and arguing his right to cross-examine at trial. *See Marshall*, 2010 OK CR 8, ¶ 21, 232

actually performed the autopsies of both victims, completed the autopsy reports, and testified regarding her findings at Miller's first trial. By the time of Miller's 2008 trial, Dr. Anzalone was no longer employed by the Tulsa Medical Examiner and had apparently moved to another state. Dr. Distefano had also retired by 2008, but he was allowed to testify regarding Dr. Anzalone's autopsies of Bowles and Thurman and her conclusions regarding the cause of death for both.

¶ 100 It was clear prior to and throughout the testimony of Dr. Distefano that his testimony regarding the autopsies of Bowles and Thurman consisted almost entirely of presenting *Dr. Anzalone's* findings and conclusions. Although Dr. Distefano also testified regarding general principles of forensic pathology, all of his testimony regarding Bowles and Thurman was based upon his review of Dr. Anzalone's files regarding these victims, which included her autopsy reports, diagrams, notes, photographs, and x-rays taken of the bodies. Dr. Distefano noted that he was provided with "the prior testimony of Dr. Anzalone regarding her findings" and that he reviewed this testimony in order to be prepared "to present to this jury what Dr. Anzalone's findings were regarding the autopsy of Mary Bowles" and "to also be able to relay what Dr. Anzalone's findings were regarding the cause of death of Jerald Thurman." Dr. Distefano repeatedly referred to Dr. Anzalone's autopsy reports and notes during his testimony and also used some of her diagrams as demonstrative exhibits at trial. On the other hand, the only exhibits actually put into evidence from Dr.

Anzalone's file were two digital photographs of x-rays taken of the victims, which were used to show the locations of the bullets found in the victims.[107]

¶ 101 Miller's counsel objected to Dr. Distefano's testimony, but on two specific grounds that are *not* the same as his current *Crawford* challenge.[108] At no point did counsel raise a direct Confrontation Clause challenge; assert his right to cross-examine Dr. Anzalone, or invoke *Crawford* or any of its progeny.[109]

¶ 102 On the other hand, prior to Dr. Distefano's testimony, the State described Dr. Anzalone as "unavailable," and the district attorney stated that he had attempted to contact her, but had been unable to locate her.[110] The trial court, however, did not find that Dr. Anzalone was unavailable, but rather focused upon the court's understanding that Dr. Distefano "was present for the autopsy, consulted for the autopsy" and did not, therefore, "lack any personal knowledge ... in regards to this case." [111] Dr. Distefano testified on direct examination that he was present at the autopsy of Bowles and had "independent recollection of that autopsy." He did not assert that he was present during the autopsy of Thurman, however; and during cross-examination, he testified that he recalled "being in the morgue briefly, both with respect to Ms. Bowles and with respect to Mr. Thurman." Dr. Distefano also acknowledged, during cross-examination, that Dr. Anzalone's autopsy reports both list three people as being "present" during the

P.3d at 474; *Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 36, 241 P.3d at 228.

107. During this x-ray testimony, Dr. Distefano did testify more directly to the jury regarding what he believed the x-rays showed, but then continued to focus upon Dr. Anzalone's conclusions.

108. Prior to Distefano's testimony, defense counsel made a statutory objection under 63 O.S. 2001, § 937 and an objection based on *McCarty v. State*, 1998 OK CR 61, 977 P.2d 1116. The trial court, after taking time to review both this statute and this decision, ruled that neither § 937 nor *McCarty* precluded the testimony of Dr. Distefano.

109. In fact, defense counsel suggested that she would not object to someone *else* testifying regarding Dr. Anzalone's findings, as long as that person still worked for either the Tulsa or Oklahoma City Medical Examiner.

110. The State asserted at the outset that Dr. Distefano "was personally present when Dr. Anzalone did these autopsies, was in and around the autopsy, [and] actually consulted with Dr. Anzalone about Dr. Snow doing his anthropological look at the bones of Mary Bowles."

111. After acknowledging the State's representation that Dr. Anzalone was "unavailable" and that the State indicated that it couldn't find her, the court stated, "I am going to [ ] allow Dr. Distefano to testify based on the fact of his per-

autopsies and that he is not listed as being present at either autopsy.[112]

¶ 103 Surprisingly, defense counsel did not then challenge Dr. Distefano's "personal knowledge" of the autopsies at issue, but instead objected that Dr. Anzalone was not truly "unavailable" and that the State had not exercised "due diligence" to obtain her testimony—since Dr. Distefano had testified that he remained in contact with Dr. Anzalone. The trial court again noted that it "never declared [Dr. Anzalone] unavailable" and that such a finding was *not* part of the court's ruling allowing Dr. Distefano's testimony.[113] This Court finds that although Dr. Distefano's overall testimony raises troubling questions about whether Dr. Anzalone was actually "unavailable" to testify at Miller's 2008 trial *and* about whether Dr. Distefano had significant "personal knowledge" about the autopsies of the two victims, defense counsel ultimately failed to preserve *both* of these objections at trial, by declining to raise/re-raise either objection at the conclusion of Dr. Distefano's testimony, at the invitation of the trial court.

¶ 104 Hence Miller did *not* properly preserve his current Confrontation Clause challenge to Dr. Distefano's substitute medical examiner testimony at trial. Although he raised other objections to Dr. Distefano's testimony, Miller did not raise the Sixth Amendment claim now being argued on appeal. Consequently, Miller has waived this claim regarding the testimony of Dr. Distefano, and we will review the current claim only for plain error.[114]

■ ¶ 105 On the other hand, this Court cannot ignore the clear and binding state of Confrontation Clause law as it currently exists in this country and in this State. Under these authorities (some decided well after Miller's 2008 retrial, but still binding upon his direct appeal), it is quite clear that it violated Miller's Sixth Amendment right to confront and cross-examine the witnesses against him to allow Dr. Distefano to present the autopsy findings of Dr. Anzalone, particularly since the trial court explicitly declined to find that Dr. Anzalone was "unavailable." (And there is uncertainty in the record regarding whether or not she was truly "unavailable.") We note that the current case is *unlike* the authorities relied upon by Miller in the important respect that he *did* have a prior opportunity to cross-examine Dr. Anzalone—and in an actual trial context—at his first trial in 2002. Nevertheless, because the current state of the law so clearly establishes that it violated the Confrontation Clause to allow Dr. Distefano to give voice to the analysis, findings, and conclusions of Dr. Anzalone in the *manner* that he did, we find that the trial court committed plain error in this regard. While it may have been entirely appropriate to have Dr. Distefano present the transcript testimony of Dr. Anzalone from Miller's 2002 trial—if she was unavailable to testify, as was done with various other unavailable witnesses during Miller's retrial—it clearly violated the Confrontation Clause to allow Dr. Distefano to testify as he did in this case.

■ ¶ 106 This Court must now decide whether the constitutional error in this regard was, nevertheless, harmless beyond a reasonable doubt.[115] This Court has specifically recognized the appropriateness of

---

sonal knowledge in this case as an expert witness."

**112.** Dr. Distefano noted that the listed persons would have worked together on the autopsies and that the listed persons "were the ones assigned to be there that day."

**113.** Nevertheless, the court then allowed the district attorney to question Dr. Distefano about whether he (the district attorney) had ever *asked* if Dr. Distefano knew where Dr. Anzalone was working now—to which Dr. Distefano responded, "No, I don't believe so." After getting this testimony, the court asked defense counsel if she

had anything further to say in this regard, to which counsel responded, "No, ma'am." Dr. Distefano was then released.

**114.** *See, e.g., Valdez v. State*, 1995 OK CR 18, ¶ 63, 900 P.2d 363, 381 (when specific objection made at trial and different objection raised on appeal, review is "for plain error only").

**115.** *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (holding that "before a federal constitutional error can be held harmless, the [reviewing] court must be able to declare a belief that it was harmless beyond a reasonable doubt").

harmless-error review in this context.[116] In making this determination, we focus upon the specific circumstances of Miller's case and the role played by the medical examiner's findings within the 2008 retrial of his case.[117]

¶ 107 This Court notes that although there were *many* issues of contentious dispute in this highly-circumstantial, double-first-degree murder case, neither the competency of the medical examiner who conducted the autopsies, nor her conclusions about the cause of each victim's death were a matter of dispute at Miller's trials. The primary purpose of the medical examiner testimony at Miller's trials was to establish that both victims had multiple gunshot wounds and that one or more of these wounds caused the death of both victims.[118] We note that when Miller's counsel had the opportunity to cross-examine Dr. Anzalone during his 2002 trial, the entire cross-examination covers less than two transcript pages and contains no challenge to Dr. Anzalone's competency, or to the accuracy of her autopsy findings, or to her conclusions about cause of death. Miller continued to have his same counsel, the Tulsa County Chief Public Defender, at his 2008 retrial. Once again, defense counsel did not suggest or argue that there was any problem with Dr. Anzalone's competency or her autopsy findings. In fact, defense counsel essentially conceded the validity and accuracy of the State's medical examiner evidence and asserted that Miller would not contest the medical examiner's conclusion that both Bowles and Thurman died as a result of one or more homicidal gunshot wounds.[119]

¶ 108 This Court concludes, beyond a reasonable doubt, that the Confrontation Clause violation of allowing Dr. Distefano to present the autopsy findings and analysis of Dr. Anzalone at Miller's 2008 retrial was harmless. Although this approach to presenting Dr. Anzalone's findings and analysis clearly violated Miller's constitutional right to confront and cross-examine the witnesses against him—since Dr. Anzalone was not found to be "unavailable"—the actual *content* of Dr. Anzalone's findings and analysis was *not* a matter of dispute. This Court finds that even if the medical examiner evidence had been eliminated from Miller's 2008 retrial, it would not have changed the ultimate result of this trial.

¶ 109 Regarding Thurman, the State's other evidence established the discovery of a bleeding and unconscious Thurman at the dirt pit, the nature of his readily apparent (gunshot) injuries, the fact that he never regained consciousness and died two weeks later, and the fact that two bullets were recovered from his body—both of which were fired from a gun that was found in the hotel room where Miller and Hanson were arrested and that this same gun was regularly used and possessed by Miller at that time. Regarding Bowles, the State's other evidence likewise established her disappearance, the discovery and condition of her body, the circumstances surrounding the discovery of her car at the Oasis Motel (which contained a

116. *See Marshall*, 2010 OK CR 8, ¶ 31, 232 P.3d at 476 (recognizing that "violations of the Confrontation Clause are subject to harmless error analysis"); *Cuesta–Rodriguez*, 2010 OK CR 23, ¶¶ 40–47, 241 P.3d at 230–31 (harmless error analysis).

117. *See Marshall*, 2010 OK CR 8, ¶ 31, 232 P.3d at 476 ("Therefore, we must determine, in [the] context of the other evidence presented, whether the error in admitting Mr. Wilson's testimony regarding the DNA evidence was harmless beyond a reasonable doubt.").

118. Regarding Jerald Thurman, Dr. Anzalone determined that Thurman had four gunshot wounds and that Thurman died as a result of the gunshot wound to his head. Regarding Mary Bowles, Dr. Anzalone determined that she died as a result of multiple gunshot wounds.

119. Defense counsel's only objections during Dr. Distefano's testimony were regarding: his use of diagrams from Dr. Anzalone's autopsy report as demonstrative exhibits, the admission into evidence of the two x-rays, Dr. Distefano's description of the disturbing condition of Bowles' body when it was discovered, and his testimony about "defleshing" her body in preparation for Dr. Snow's analysis. Dr. Distefano's use of Dr. Anzalone's diagrams is covered by our Confrontation Clause analysis and was likewise improper. Regarding the x-ray exhibits, however, this Court sees no reason that these exhibits should be found inadmissible. On the other hand, Miller's challenges to the relevance and unduly prejudicial nature of some of the "gory" testimony about Bowles' body and the "defleshing" of her body are *not* part of his Proposition X Confrontation Clause challenge and are not further addressed herein.

fingerprint from Miller and also one from Hanson), the fact that a bullet was recovered from her body, that a bullet was found buried in the dirt underneath her body, and that two spent cartridges were found near her body—all of which were associated with a second gun that was found in that same hotel room and which was then regularly used and possessed by Hanson, who was regularly committing "gun-assisted crimes" with Miller at that time.

¶ 110 This Court finds that Miller would have been convicted of both first-degree murder counts even without the medical examiner testimony. This Court further finds, beyond a reasonable doubt, that the medical examiner testimony at issue was not relevant to the aggravating circumstances alleged in the case and did not contribute to Miller's death sentences.

¶ 111 We turn now to the second portion of Miller's Proposition X claim, in which he challenges the forensic firearms identification testimony of Mark Boese, which matched the guns found with Miller and Hanson to the bullets found in the victims.[120] Dennis Fuller, a forensic scientist with the Tulsa Police Department's forensic laboratory, provided this firearms identification testimony at Miller's 2002 trial. Mark Boese, the director of the City of Tulsa's Forensic Laboratory, presented this evidence at Miller's 2008 retrial. Although Miller describes Boese as a "substitute" witness for Fuller, Boese played a very different role at Miller's retrial than did Dr. Distefano. Most importantly, Boese's testimony was based almost entirely on his own experience and his own *independent* examination of the firearms evidence in the case, rather than simply sum-marizing for the jury what Fuller had done, observed, and concluded—in the manner that Dr. Distefano summarized what Dr. Anzalone had done, observed, and concluded.[121]

¶ 112 Once again, Miller did not object to Boese's testimony on the ground now raised, *i.e.*, that Boese's "substitute testimony" violated his Confrontation Clause right to confront and cross-examine Fuller. Hence we review the current claim for plain error only.[122] Miller did object to Boese's testimony on a more narrow ground, *i.e.*, that even though Boese conducted his own, independent analysis of the evidence in the case, Boese conducted his comparisons using the test-fired bullets and casings generated by Fuller, without re-testing the functionality of either gun or creating new "test-fired" bullets and casings (by re-firing the recovered guns in a laboratory setting). The trial court noted that defense counsel failed to raise this objection until during the actual retrial, though counsel had Boese's report over a month earlier and had notice that Boese used the test-fired bullets and casings generated by Fuller for his comparisons. We review the court's decision to allow Boese's testimony for abuse of discretion.[123]

¶ 113 Boese's testimony did not violate Miller's Sixth Amendment right to confront and cross-examine the witnesses against him. Boese testified about his experience and expertise in the field of forensic firearms identification, his familiarity with Fuller as a co-worker and qualified expert in this field, and how he reviewed the report generated by Fuller, but then did his own independent examination of the same evidence. Boese then testified that the two .38 bullets recovered from the body of Thurman matched the test-fired bullets from State's Exhibit 52 (the

---

120. Although this type of evidence is often described as "ballistics" (and is described this way in Miller's brief), Boese specifically testified that he is a forensic scientist and that the analysis he was providing is properly understood as "firearms identification evidence," which typically involves a comparison of recovered "fired evidence," either bullets or cartridge casings, with "test-fired" bullets or cartridge casings from a particular firearm, in order to determine if the recovered evidence was fired from the particular firearm at issue.

121. Boese's only direct reference to the conclusions reached by Fuller was to tell the jury that the results of Boese's own examinations "mirrored" the results of the separate and somewhat different examinations performed by Fuller. Boese explained that he and Fuller used somewhat different techniques, but that both approaches were accepted as valid in their field.

122. *See Valdez*, 1995 OK CR 18, ¶ 63, 900 P.2d at 381.

123. *Cuesta–Rodriguez*, 2010 OK CR 23, ¶ 29, 241 P.3d at 227.

silver .38) and that the 9–mm bullet recovered from the body of Bowles, as well as the 9–mm casings found near her body and the 9–mm bullet found beneath her body, likewise matched the test-fired bullets and casings from State's Exhibit 53 (the black 9–mm). Boese acknowledged on both direct and cross-examination that he used the test-fired evidence generated by Fuller to do his forensic comparisons, and he testified that this kind of reliance is common among experts in their field. This Court concludes that Boese's reliance on the test-fired samples generated by Fuller went only to the weight of Boese's testimony, not its admissibility, and that the jury was made fully aware of this reliance. There was no Confrontation Clause violation in this regard.

¶ 114 This Court has found a harmless violation of the Sixth Amendment regarding the testimony of Dr. Distefano at Miller's retrial, and we now find that Boese's testimony did not violate Miller's constitutional right to cross-examine the witnesses against him. Miller's Proposition X claim is rejected accordingly.

¶ 115 In his *Pro Se* Proposition III claim, Miller asserts that the trial court erred in allowing Mark Boese to testify as a firearms expert at his retrial. This Court has already concluded that the trial court did not abuse its discretion in allowing Boese's forensic firearms identification testimony at Miller's retrial. Miller now proffers, in connection with his *pro se* Supplemental Application for Evidentiary Hearing, a newspaper article about Boese's subsequent termination from the Tulsa Police Department's forensic laboratory (Exhibit 3). This Court notes that Boese's testimony at Miller's retrial was entirely consistent with the testimony of firearms expert Dennis Fuller at Miller's original trial. Miller offers nothing to suggest that Boese's analysis in his case was unreliable or improperly conducted. Consequently,

Miller fails to show any entitlement to an evidentiary hearing in this regard, and his *Pro Se* Proposition III claim regarding Boese's testimony is likewise rejected accordingly.[124]

### First–Stage Prosecutorial Misconduct Claims

¶ 116 In Proposition XI, Miller claims that prosecutorial misconduct violated his right to due process and a fair trial. In particular, Miller raises the following claims of prosecutorial misconduct: (1) improper reference to "other crimes," (2) unnecessarily theatrical behavior, (3) improper assertion of personal opinion, (4) improper argument that a sentence less than death would be "meaningless," (5) improper appeal to jury sympathy, and (6) improper reference to a "diminished" presumption of innocence.[125] We evaluate such claims to determine whether the challenged action so infected the defendant's trial that it was rendered fundamentally unfair, such that the jury's verdicts cannot be relied upon.[126]

¶ 117 This Court has already rejected Miller's Proposition IX challenge to the "other crimes" evidence admitted at his trial. The only additional example of such evidence cited in Proposition XI is that while cross-examining Miller at trial, the prosecutor asked if Miller had previously testified "in an unrelated case ... for a guy by the name of Summers, Phillip Summers," and whether that other case was "a double murder case." Defense counsel objected on the basis of relevancy, arguing that the State was attempting to associate Miller with other homicides, and the trial court instructed the jury that it should disregard the fact that prior testimony by Miller "was in a murder case." The prosecutor then attempted to establish that Miller had personal animosity toward

---

**124.** At the conclusion of this opinion, this Court further addresses the application for evidentiary hearing filed by Miller acting *pro se*, as well as the application filed by Miller's appellate counsel.

**125.** These claims are numbered in accord with Appellant's Brief in Chief. Since Miller's fourth

claim involves only the second stage of his 2008 trial, however, it will be addressed *infra*.

**126.** *See Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974); *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986).

him.[127] The challenged exchange does not actually involve "other crimes" evidence, however, since testifying in a criminal case is not a crime. This Court does not hesitate to conclude that the challenged reference to another criminal case and the "other crimes" robbery evidence (addressed earlier) did not render Miller's 2008 retrial unfair.

¶ 118 Miller also challenges the unnecessarily "theatrical behavior" of the district attorney during his cross-examination of Miller.[128] However, he cites only two specific examples of such behavior. Miller points to one example in the transcript where defense counsel objected to the prosecutor shouting during cross-examination and another point at which the court granted defense counsel's request that the prosecutor be asked to "step away from" the defendant. This Court finds that the record in this case does not suggest improper prosecutorial behavior that is anything like the case cited by Miller, nor does the record suggest that this trial court would have allowed such misconduct.[129] Miller fails to show that his trial was rendered fundamentally unfair in this regard.

¶ 119 In the third part of his prosecutorial misconduct claim, Miller objects to some stumbling language in the district attorney's final, first-stage closing argument, asserting that it constituted an improper expression of the prosecutor's personal opinion.[130] This Court finds that the sole, unremarkable example cited by Miller did not render his trial fundamentally unfair.

¶ 120 In the fifth part of his prosecutorial misconduct claim, Miller argues that the prosecutor improperly appealed to juror sympathy for the victims within his final *first-stage* argument to the jury. The challenged argument came up after the district attorney noted that because of Miller's federal sentence of life plus 157 years, "he ain't ever getting out." [131] The prosecutor continued: "Now, you can look at that a couple of ways. Mr. Harris, what are we doing here? We are here about justice, for Mary Bowles' decomposed body, and we are here for justice for Jerald Thurman, shot in the head, languishing for two weeks in Hillcrest Hospital." Defense counsel then objected, stating: "Your Honor, I object to this blatant appeal of sympathy of the jury. This is the guilt or innocence stage, not punishment." [132] This Court notes that although the trial court did not actually sustain counsel's objection, the prosecutor adjusted his argument and continued as follows: "That's what this is about, ladies and gentlemen. This is a search for the truth, and the law, a nation of laws, not men, is what governs." He later continued on this theme, arguing that it was the job of law enforcement and the prosecution to bring hidden evidence and "the truth" forward "so that verdicts can be reached based on the

---

127. During this questioning, the district attorney asked: "[Y]ou don't like the State of Oklahoma, do you?" Miller answered, "I was born here. I don't got no reason to hate the State of Oklahoma."

128. Miller complains that much of the State's questioning seemed designed to get "some kind of emotional response" from him, but doesn't explain how this approach constitutes "misconduct."

129. *Cf. Mitchell v. State*, 2006 OK CR 20, ¶¶ 95–103, 136 P.3d 671, 708–11 (2006) (discussing prosecutor's misconduct and trial court's allowance of this improper behavior).

130. The argument and challenge at issue went as follows:

[STATE]: ... I believe and the State of Oklahoma believes that the evidence presented you is beyond any reasonable doubt."

[DEFENSE COUNSEL]: Excuse me, Your Honor.
I hate to object, Counselor.
I object to Counselor stating his own personal opinion, Judge.
THE COURT: So noted.
Again, ladies and gentleman, remember that closing arguments are for persuasion purposes only. Mr. Harris, you can rephrase.
The district attorney then rephrased his argument, noting he was acting as "a representative of the State," and defense counsel did not make any further objection in this regard.

131. At Miller's 2008 retrial, the parties agreed to let the jury know, during the first stage of trial, that Miller was serving a federal sentence of life plus 157 years (and would not ever be released).

132. The trial court responded to defense counsel's objections as follows: "So noted. Ladies and gentlemen, again this is for persuasion purposes only. Mr. Harris, you may continue."

truth to achieve justice."[133]

¶ 121 This Court finds that the challenged prosecutorial remarks consisted mainly of an argument that the State was pursuing the case against Miller—despite the fact that he would never get out of federal prison—because it would be unfair/"unjust" to the victims not to pursue the case, because it was important for "the truth" about the murders of Thurman and Bowles to be established by verdicts in a criminal court. In the specific circumstances of this case, this was not misconduct, nor did it make Miller's retrial unfair.

¶ 122 Finally, in the sixth part of his prosecutorial misconduct claim, Miller argues that the district attorney's reference to a "diminished" presumption of innocence, during his final, first-stage closing argument, was improper and violated his right to a fair trial. The challenged remarks are as follows:

Ladies and gentlemen, the presumption of innocence, which the defendant has under the Constitution, is a legal presumption that every criminal defendant has being charged with a crime. But it is what's called a rebuttable presumption, and that presumption of innocence only remains with him unless the evidence presented by the State of Oklahoma diminishes that be-

yond a reasonable doubt, and if the evidence beyond a reasonable doubt diminishes that presumption of innocence, then it no longer exists. The evidence presented to you in this case has done exactly that.

Defense counsel did not object. Hence this Court reviews only for plain error.

¶ 123 The parties raise a number of cases, with Miller claiming that this argument is similar to prosecutorial remarks that have been found improper and the State claiming that this argument is more akin to remarks that this Court has found acceptable. This Court concludes that although the meaning of the district attorney's remarks is not totally clear, his remarks are comparable to similar remarks that this Court has found inappropriate. In particular, the remarks are similar to remarks found to be "an unconstitutional restatement of the presumption of innocence" in *Miller v. State*, 1992 OK CR 77, ¶ 4, 843 P.2d 389, 390.[134] The district attorney's remarks are even more similar to prosecutorial remarks found to be improper and misleading in *Mahorney v. Wallman*, 917 F.2d 469, 471–74 (10th Cir.1990) (per curiam) (granting habeas corpus relief based upon prosecutor's remarks about removal of presumption of innocence by trial evidence).[135] This Court further finds that the

---

**133.** The prosecutor also reminded jurors that it would not be appropriate to let sympathy, sentiment, bias, or prejudice affect their verdicts and that they would be instructed on this.

**134.** In *Miller*, the challenged remarks, made during first-stage closing argument, were as follows:

Ladies and gentlemen, the defendant stands guilty as charged and *the cloak of innocence that he wore* and he did indeed by our law wear it, when you heard the evidence, the evidence is all through now. The dust is settled, a term I used earlier, and *that cloak is gone.* It's been ripped away from him by the testimony of three men—four men, actually. He stands guilty as charged.

*Miller v. State*, 1992 OK CR 77, ¶ 3, 843 P.2d 389, 390 (emphasis added). This Court found that this statement was "misleading and if relied upon by the jury, it would serve to deny Appellant an important constitutional right." *Id.* at ¶ 5, 843 P.2d at 390. We then reversed the defendant's conviction, even though counsel failed to object at trial. *Id.* at ¶ 4, 843 P.2d at 390.

**135.** In *Mahorney*, the challenged remarks, made during the State's rebuttal, first-stage closing argument, were as follows:

I submit to you ... that we are in a little different position today than we were when we first started this trial and it was your duty at that time, under the law of this land, ... to actively in your minds presume that man over there not to be guilty of the offense of rape in the first degree, but, you know, things have changed since that time. I submit to you at this time, under the law and under the evidence, that that presumption has been removed, that *that presumption no longer exists,* that that presumption has been removed by evidence and he is standing before you now guilty. That presumption is not there anymore. *Mahorney v. Wallman*, 917 F.2d 469, 471 (10th Cir.1990) (emphasis added). Defense counsel's objection to this argument was overruled, as was his request for an admonishment and a mistrial. *Id.* The Tenth Circuit Court of Appeals found that the argument constituted misconduct and that "the essence of the error" was that the remarks "conveyed to the jury the idea that the presumption [of innocence] had been eliminated from the case prior to deliberations." *Id.* at 473. This

district attorney's remarks in this regard are not comparable to the remarks addressed in *Gilbert v. State*, 1997 OK CR 71, 951 P.2d 98.[136]

¶ 124 It appears that the district attorney was *attempting* to argue that the rebuttable presumption of innocence in Miller's case had been successfully *rebutted* by the State's evidence—and that the jury should find, on the basis of this evidence and beyond a reasonable doubt, that Miller is guilty. Unfortunately, this is not what the district attorney said. And to say that the presumption of innocence has been "diminished" and "no longer exists" is *not* the same thing as saying that this presumption has been "rebutted." Consequently, we find that the district attorney's argument was improper and clearly so.

¶ 125 Nevertheless, we do not further conclude that the guilt-stage of Miller's trial was rendered fundamentally unfair thereby or that the jury's first-stage guilty verdicts are unreliable. This Court emphasizes, in this regard, that the prosecutor's remarks were not objected to by defense counsel, that they were isolated and not emphasized at Miller's retrial, and that Miller's jury was clearly and properly instructed regarding the presumption of innocence.[137] Thus despite the improper and potentially misleading nature of the prosecutor's remarks, Miller's jury was correctly instructed that the presumption of innocence *continues*

throughout trial *unless the jury* determines that the State's evidence has established the defendant's guilt beyond a reasonable doubt.[138] Because the improper remarks were not emphasized—either by the State or the trial court—and because the jury was clearly and correctly instructed on the presumption of innocence, and because the evidence of guilt in this case was very convincing, this Court concludes that the improper remarks did not render Miller's trial fundamentally unfair, nor did they make the jury's guilt-stage verdicts unreliable. Furthermore, to the extent that the district attorney's argument could have violated Miller's right to due process or implicated any other specific constitutional rights, this Court concludes that the argument was harmless beyond a reasonable doubt. Miller's Proposition XI guilt-stage prosecutorial misconduct claims are rejected accordingly.

¶ 126 In his *Pro Se* Proposition I claim, Miller raises two additional prosecutorial misconduct claims regarding the guilt stage of his trial. In *Pro Se* Proposition I, Miller asserts that the prosecutor committed misconduct at his trial by knowingly presenting the "false" testimony of Sundeep Patel and by falsely claiming that Phyllis Miller was not made any promises in return for her testimony. As noted *supra*, we evaluate such claims to determine whether the challenged action so infected the defendant's trial

Court invoked and relied upon *Mahorney* within its analysis in *Miller*. *See Miller*, 1992 OK CR 77, ¶ 5, 843 P.2d at 390.

136. The challenged remarks in *Gilbert* (made during first-stage closing argument) were as follows:

You had to presume he was innocent. But in the real world, now you know he wasn't sitting there as an innocent man. He sat there enjoying the presumption that we would all enjoy, anybody would enjoy, but he's not an innocent man. The evidence shows he's not an innocent man.

*Gilbert v. State*, 1997 OK CR 71, ¶ 90, 951 P.2d 98, 120. This Court found that this prosecutorial argument "does not say the presumption does not apply, ... but only that the evidence shows the defendant is guilty." *Id.* at ¶ 92, 951 P.2d at 120. Unlike the remarks in *Gilbert*, the remarks in the current case stated that the presumption of innocence "no longer exists," because it had been "diminished" by the evidence in the case.

137. Within its analysis of "the prejudicial effect" of the prosecutor's argument in *Mahorney*, the court noted that when defense counsel's objection was "immediately and categorically overruled," the trial court's "official imprimatur" was placed on the remarks, which "obviously amplified their potential prejudicial effect on the jury." *Mahorney*, 917 F.2d at 473. The court also noted that the jury instruction on the presumption of innocence and burden of proof in that case "was not sufficiently specific to preserve that presumption in light of the prosecutor's specific statement that it had been extinguished from the case." *Id.* at 473–74.

138. At the conclusion of the first-stage of his trial, Miller's jury was instructed in Instruction No. 4, and in accord with OUJI–CR 10-4, as follows: "The defendant is presumed innocent of the crime charged, and the presumption continues unless, after consideration of all the evidence, you are convinced of his guilt beyond a reasonable doubt...."

that it was rendered fundamentally unfair, such that the jury's verdicts cannot be relied upon.

¶ 127 Miller argues at length in his *pro se* brief that Patel's testimony was "false," to the extent that Patel claimed that his view of the second black man in the Oasis Motel lobby (*i.e.*, the man with Hanson on August 31, 1999) was somehow "obstructed." This Court has already addressed the testimony of Patel at length. Defense counsel did a good job at trial of impeaching certain aspects of Patel's testimony, of demonstrating that his original description of the second man was rather different than Miller (particularly regarding his weight), and of establishing that Patel *would* have been able to see anyone standing in the hotel's tiny lobby—if he had wanted to do so and was paying attention. Miller fails to establish that Patel's retrial testimony was "false" or that the prosecutor committed misconduct in presenting this testimony. Miller's jury was made well aware of the limited value of Patel's testimony, and his trial was not rendered fundamentally unfair by the use of this testimony.[139]

¶ 128 Miller also argues (*pro se*) that the prosecutor falsely claimed that Phyllis Miller "received no promises in return for her testimony." Although Miller may sincerely believe that Phyllis was promised some kind of "deal" in exchange for her testimony, he presents no evidence that this is the case. The State clearly acknowledged (during its first-stage closing argument) that Phyllis was involved in a number of the robberies committed by Miller and Hanson and that she could have been prosecuted for those robberies, but that the State chose to use her as a witness, rather than prosecute her as a defendant. It should be noted in this regard (and Miller's jury learned at his retrial) that Phyllis had to be arrested on a material witness warrant in Texas to obtain her testimony at Miller's retrial.[140] This

Court finds that Miller has failed to present any evidence that the prosecutor's statements—that the State had not made any "deal" with Phyllis and that the State had not promised her anything in exchange for her testimony—were false or misleading. Miller fails to establish any prosecutorial misconduct in this regard, and his *Pro Se* Proposition I claim is rejected accordingly.

### First–Stage Rebuttal Testimony

¶ 129 In Proposition XIII, Miller argues that the trial court abused its discretion by allowing the rebuttal testimony of Detective Michael Nance at trial. Defense counsel properly preserved this issue, by objecting to Nance's rebuttal testimony. This court notes that Nance was not actually a "surprise witness," since he was one of the lead detectives in the Thurman and Bowles homicide investigations, and he testified within the State's case in chief. We review the trial court's decision to allow Nance to testify as a rebuttal witness for abuse of discretion.[141]

¶ 130 The defense presented only one witness at trial: Victor Miller himself. During his direct testimony, Miller maintained that on the day of his big argument with Phyllis, he drank beer and got high on cocaine in Sherry Carter's room, before returning to the Motel 6 room that he and Phyllis shared. When asked about Phyllis' testimony that he was acting very paranoid and looking out the window when he returned that night, Miller testified that this was "very possible." Miller continued, "I mean, I was smoking cocaine. I mean, cocaine do that. It makes you look out the window and imagine cocaine on the floor and all kinds of stuff, man, you know." Miller also testified on direct that he had used drugs on and off throughout most of his life.

¶ 131 During cross-examination, Miller acknowledged that he had not previously claimed that he smoked cocaine on the night

---

**139.** See *Omalza v. State*, 1995 OK CR 80, ¶ 77, 911 P.2d 286, 307 (standard for showing prosecutor knowingly presented false or misleading evidence).

**140.** Phyllis acknowledged at trial that she spent three days in jail in Texas, after being arrested on

this material witness warrant, and that she was wearing an ankle monitor at Miller's 2008 trial to ensure that she "wouldn't leave town" and would testify.

**141.** See *Davis v. State*, 2004 OK CR 36, ¶ 17, 103 P.3d 70, 77.

of his argument with Phyllis. When asked about his "drug of choice," Miller testified that "[i]n 1999, crack was the drug of choice or any form of cocaine." Miller also testified, without objection, about how crack is made and smoked and acknowledged that when smoking crack in a pipe, you needed to use "some kind of Chore Boy or something that's made out of copper" to keep the crack from falling through the pipe and that he personally had smoked crack this way. When Miller was then shown State's Exhibit 115, which had not been admitted, Miller testified that he knew what was depicted in the photograph and that it looked like "a paper sack and some copper wiring or Brillo padding inside it." Miller acknowledged that this was the same kind of Brillo pad that he would use in a pipe to smoke crack and that the photograph appeared to have been taken inside a car.[142] When asked if it looked like the other pictures of Bowles' car, Miller responded, "I guess so." When the prosecutor then asked if the copper pad was in Bowles' car because he and Hanson were going to smoke some crack there, Miller responded, "No, man. That's pathetic. No, I don't know nothing about how that got there. And as far as Hanson smoking crack, I have never seen Hanson smoke crack."[143]

¶ 132 After Miller finished testifying, the State asserted that it wanted to call Detective Michael Nance to testify as a rebuttal witness. The trial court allowed both parties to argue (at length and outside the presence of the jury) about the propriety of Nance testifying as a rebuttal witness. The court ultimately ruled that Nance would be allowed to testify about the finding of the copper pad in Bowles' car, but not about the fact that he associated such copper padding with drug use. Detective Michael Nance then testified that Exhibit 115 was a photograph of a bag and a Brillo pad that were found in Bowles' car.[144] Nance testified that he was present when Bowles' car was being processed and that this bag with the copper wiring was found underneath the driver's seat of the car.

¶ 133 Miller argues that Nance's testimony was not proper rebuttal testimony and that it should not have been allowed.[145] This Court has recognized that "rebuttal testimony is permitted to explain, repel, disprove, counteract or contradict facts or evidence given by the adverse party regardless of whether such evidence might have been introduced in the State's case-in-chief or whether it is somewhat cumulative."[146]

¶ 134 This Court finds that whether or not Miller was ever in Bowles' car prior to the morning of September 1, 1999—when Phyllis drove him to the Oasis Motel, and he wiped the car down with a blue rag—was one of the major factual disputes at trial. And Miller's first-stage testimony about his frequent use of crack and other forms of cocaine in 1999, about using cocaine on the night of his fight with Phyllis, that Hanson did not use crack, and then his recognition of Exhibit 115 as a photograph of the kind of copper padding that he associated with smoking crack in a pipe—and that he himself had used such padding in this way—all made Exhibit 115 and Nance's rebuttal testimony relevant and probative as further evidence that Miller (and not just Hanson) was in Bowles' car prior to the time it was left at the Oasis Motel.[147] It should be emphasized that Miller's 2008 retrial testimony that he used cocaine during the evening following his big fight with Phyllis, i.e., on the day Thurman

142. State Exhibit 115 is a photograph showing a torn paper sack on the grey-carpeted floorboard of a car, with copper "Brillo-pad-type" wire and a purchase label sticking out of the bag.

143. When then asked if he smoked crack, Miller responded, "I have, a lot."

144. State Exhibit 115 was admitted into evidence during Nance's testimony. Miller does not challenge the admission of this evidence.

145. Cf. Davis, 2004 OK CR 36, ¶ 16, 103 P.3d at 76 ("If [a] so-called rebuttal witness is not a bona

fide rebuttal witness, but rather a witness who could and should have been called in the State's case-in-chief and for whom no notice was given, the trial court should exclude the witness's testimony upon proper objection.").

146. Spencer v. State, 1990 OK CR 49, ¶ 6, 795 P.2d 1075, 1077 (citations omitted).

147. This same evidence would not have been relevant or probative during the State's case-in-chief at Miller's retrial, since it only became relevant and probative via Miller's own testimony.

and Bowles were murdered, was the first time Miller ever claimed to have used any drugs that day. Consequently, Nance's rebuttal testimony about finding the copper padding in Bowles' car was likewise admissible to counteract Miller's testimony that his drug use that night helped explain why he seemed "nervous" to Phyllis.

¶ 135 This Court finds that the trial court did not abuse its discretion by allowing the rebuttal testimony of Nance. In addition, we find that any error in this regard would be harmless beyond a reasonable doubt, since Miller's only connection to the copper padding found in Bowles' car was his familiarity with its potential use in a crack pipe. There was no other "drug evidence" found in Bowles' car, nor was there any evidence otherwise linking Miller to the paper sack or copper wiring pictured in Exhibit 115. Proposition XIII is rejected accordingly.

### First–Stage Jury Instructions

■■■ ¶ 136 In Proposition VI, Miller argues that the trial court committed plain error by failing to instruct his jurors that they were required to give separate consideration to the two first-degree murder charges at issue. In particular, Miller argues that the trial court should have instructed the jury with an instruction similar to the one discussed in *Smith v. State*, 2007 OK CR 16, ¶ 38, 157 P.3d 1155, 1168–69. Miller relies upon a 2010 unpublished opinion from this Court to support his claim that the trial court should have crafted this kind of instruction in the current case—despite the failure of his

counsel to even request such an instruction. In fact, Miller is raising *precisely* the same claim that this Court rejected in *Taylor v. State*, 2011 OK CR 8, 248 P.3d 362.[148]

¶ 137 We note that on January 25, 2011, this Court adopted various revisions to our uniform instructions for criminal cases. *See In re: Adoption of the 2010 Revisions to the Oklahoma Uniform Jury Instructions— Criminal (Second Edition)*, 2011 OK CR 2. These revisions include a new uniform instruction specifically informing jurors that they must give "separate consideration" to each charge in a case. *See* OUJI–CR(2d) 9–6A.[149] This uniform instruction was not in existence at the time of Miller's 2008 retrial. As in *Taylor*, this Court finds that the trial court did not commit plain error by failing to instruct Miller's jury, *sua sponte*, about the need to separately consider the two murder charges at issue. We note that nothing in the record suggests that Miller's jury did not give separate consideration to these two charges. Proposition VI is rejected accordingly.

■■■ ¶ 138 In Proposition VII, Miller asserts that the district court erred in refusing to instruct his jury on the lesser offense of "accessory after the fact to first-degree murder." *See* 21 O.S.1991, § 173.[150] Miller's counsel requested that his jury be instructed on this lesser-related offense, and the trial court denied this request at trial. Miller properly preserved this claim in the district court, and we review it to determine whether the trial court abused its discretion in this regard.[151]

---

**148.** In *Taylor v. State*, 2011 OK CR 8, 248 P.3d 362, the defendant, who was convicted of one count of first-degree murder and one count of shooting with intent to kill, argued that the district court committed plain error "by failing to give an instruction that each count should be considered separately," citing both *Smith* and the same unpublished opinion now cited by Miller. *See id.* at ¶ 14, 248 P.3d at 368–69. This Court concluded: "Our cases do not require that a *Smith*-type 'separate consideration' instruction must be given in trials of multiple offenses, absent a timely request." *Id.* at ¶ 18, 248 P.3d at 370.

**149.** OUJI–CR(2d) 9–6A (Supp. 2010) states as follows:

> You must give separate consideration for each charge in the case. The defendant is entitled to

have his/her case decided on the basis of the evidence and the law which is applicable to each charge. The fact that you return a verdict of guilty or not guilty for one charge should not, in any way, affect your verdict for any other charge.

The "Notes on Use" for this instruction state that "[t]his Instruction should be given if two or more charges against the same defendant are tried together."

**150.** In 1999, the punishment for accessory after the fact to first-degree murder was imprisonment for 5 to 45 years. *See* 21 O.S.1991, § 175(5). It has not changed. *See* 21 O.S.2011, § 175(5).

**151.** *See, e.g., Ball v. State*, 2007 OK CR 42, ¶ 25, 173 P.3d 81, 88 ("We review the determination

¶ 139 In *Glossip v. State*, 2001 OK CR 21, 29 P.3d 597, this Court recognized that the trial court has a duty to instruct on all lesser-included and lesser-related offenses that are supported by the evidence and that a defendant is entitled to have an instruction on his or her theory of defense if it is supported by the evidence and is tenable as a matter of law. *Id.* at ¶ 28, 29 P.3d at 603–04. We further noted that the test to determine whether an instruction on a lesser offense should be given is whether *prima facie* evidence of the lesser offense has been presented at trial. *Id.* at ¶ 28, 29 P.3d at 604.

¶ 140 This Court finds that the trial court properly declined to instruct Miller's jury on the defense of accessory after the fact to first-degree murder. Miller's defense at trial was that he was totally innocent of the 1999 murders of Bowles and Thurman and that he did not know anything about the murders at the time or shortly afterward—*not* that he was an "accessory after the fact." Even at his 2008 retrial, Miller claimed he had "no idea" whether Hanson was involved in the murders. Although Miller's testimony about wiping down Bowles' car—at the request of Hanson and at a time when Miller knew that Hanson did not own a car—could possibly support a conviction for accessory after the fact to theft of that car, it does not establish a *prima facie* case of accessory after the fact to first-degree murder. The evidence did *not* suggest that Miller had no involvement in the murders, but then later learned that Hanson was involved, and then wiped down Bowles' car at Hanson's request, with the intent that Hanson "avoid or escape from arrest, trial, conviction, or punishment." *See* 21 O.S.1991, § 173.

¶ 141 Thus the current case is quite distinguishable from *Glossip*, wherein this Court declared that the defendant's jury should have been instructed upon Glossip's chosen defense of accessory after the fact to first-degree murder. *Cf. Glossip*, 2001 OK CR 21, ¶¶ 6, 29, 29 P.3d at 599, 604 (defendant's defense at trial was that he learned of the

murder after the fact, failed to tell police what he knew, and assisted the killer "by helping conceal the murder scene"). This Court finds that the trial court did not abuse its discretion when it rejected Miller's request for a jury instruction on the lesser offense of accessory after the fact to first-degree murder. Proposition VII is rejected accordingly.

■ ¶ 142 In Proposition VIII, Miller argues that the district court's use of the current uniform jury instruction regarding the consideration of circumstantial evidence, OUJI–CR(2d) 9–5, violated his right to due process. The current version of this instruction was promulgated in *Easlick v. State*, 2004 OK CR 21, 90 P.3d 556.[152] In *Easlick*, this Court adopted a "unified approach" to dealing with sufficiency of the evidence challenges, which does not distinguish between convictions based entirely upon direct evidence and convictions based entirely or in part upon circumstantial evidence. *See id.* at ¶¶ 4, 15, 90 P.3d at 557, 559. Miller argues that the use of the current version of this instruction (which was not in existence at the time of his 1999 crimes) violated due process, because it amounts to a violation of the principles against *ex post facto* legislation.

¶ 143 In *Warner v. State*, 2006 OK CR 40, 144 P.3d 838, this Court addressed a similar challenge, namely, a claim that applying the *Easlick* approach to sufficiency-of-the-evidence challenges violated *ex post facto* principles, equal protection, and due process, since defendant Warner's crimes took place long before *Easlick*. *Id.* at ¶ 33, 144 P.3d at 862. This Court recognized in *Warner* that changes in the law due to judicial construction, such as overturning prior cases, do "implicate[ ] the Due Process Clause and require[ ] consideration of *ex post facto* principles." *Id.* at ¶ 34, 144 P.3d at 862–63. However, in *Warner* we soundly rejected the defendant's claim that the *Easlick* decision is the *kind* of change in the law that could violate due process or *ex post facto*

of instructions to be given to the jury for abuse of discretion.").

**152.** *See Easlick v. State*, 2004 OK CR 21, ¶ 15 n. 3, 90 P.3d 556, 559 n. 3 (promulgating current,

modified version of OUJI–CR(2d) 9–5, which eliminates reference to need to exclude "any reasonable theory or conclusion of a defendant's innocence").

principles, because *Easlick* was not a statutory change, did not change the crimes for which the defendant was charged, did not increase the punishment for these crimes, and did not change the quantity or degree of proof needed to establish guilt on these crimes at trial. *Id.* at ¶ 34, 144 P.3d at 863.

¶ 144 This Court now further finds, for all the same reasons, that using the current version of OUJI–CR(2d) 9–5 in the trials of crimes committed prior to *Easlick* does not violate due process or *ex post facto* principles. Jurors prior to *Easlick* and subsequent to *Easlick* have been instructed by a separate uniform instruction that "[t]he law makes no distinction between the weight to be given to either direct or circumstantial evidence."[153] Consequently, the instruction modification promulgated in *Easlick* did not change the quantity or degree of proof needed to establish guilt at trial; and the use of the post-*Easlick* version of OUJI–CR(2d) 9–5 at Miller's trial did not violate due process or *ex post facto* principles. Proposition VIII is rejected accordingly.

### First–Stage Ineffective Assistance of Counsel Claims

¶ 145 In Proposition XXIII, Miller asserts that he received ineffective assistance of counsel in both stages of his trial.[154] In order to establish such a claim, Miller must demonstrate that the performance of his counsel was deficient and unreasonable and that he was prejudiced thereby.[155] And in order to establish prejudice, Miller must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[156]

¶ 146 In particular, Miller asserts that his counsel was ineffective by: (1) failing to object to the prosecutor's "diminished" presumption of innocence argument; (2) failing to object to the prosecutor's (second-stage) "freebie" argument; (3) failing to request that the trial court instruct his jury that the two murder counts must be considered separately; and (4) failing to utilize available evidence to undermine the State's evidence of Miller's guilt.

¶ 147 This Court has already addressed Miller's (Proposition XI) claim about the prosecutor arguing that the presumption of innocence is so "diminished" that it "no longer exists." We concluded that although the district attorney's remarks were improper and plainly so, they did not render Miller's trial fundamentally unfair; nor did the remarks render the jury's first-stage verdicts unreliable. Thus Miller cannot show that he was prejudiced by defense counsel's failure to object to this argument; and we reject Miller's ineffective assistance claim regarding this argument.

¶ 148 Miller's second ineffective assistance claim (failing to object to the prosecutor's "freebie" argument) arose within the second stage of Miller's trial. Hence it is addressed *infra*, along with Miller's other sentencing-stage claims.

¶ 149 Regarding Miller's argument that his counsel was ineffective for failing to request that his jury be instructed that the two counts of murder must be considered separately, this Court has already held—in response to Miller's (Proposition VI) first-stage jury instruction claim—that it was not plain error for the trial court to fail to give this instruction. We now further find that Miller has shown neither deficient performance nor prejudice in this regard. Hence we also reject Miller's ineffective assistance claim regarding this instruction.

153. *See* OUJI–CR(2d) 9–4; *see also Easlick,* 2004 OK CR 21, ¶ 11, 90 P.3d at 559 (noting that this same instruction existed at the time of and prior to the *Easlick* decision).

154. This Court notes that Appellant's Brief in Chief does not contain a Proposition XX. This Court has maintained the claim number designations used by Miller for Propositions XXI through XXIV. Hence there is no Proposition XX addressed herein.

155. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Williams v. Taylor,* 529 U.S. 362, 390–91, 120 S.Ct. 1495, 1511–12, 146 L.Ed.2d 389 (2000).

156. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068; *see also id.* (a "reasonable probability" in this context "is a probability sufficient to undermine confidence in the outcome").

¶ 150 In his final claim of ineffective assistance, Miller asserts that his counsel should have utilized "available evidence" to undermine the State's case and, in particular, to impeach his wife, Phyllis, and establish that his fight with her did not occur on August 31, 1999, *i.e.*, on the day Thurman and Bowles were murdered. This Court notes that defense counsel's cross-examination of Phyllis was extensive, thorough, and hard-hitting. Defense counsel cross-examined Phyllis about the contents of her testimony before a federal grand jury. He cross-examined Phyllis about the fact that at the December 1999 preliminary hearing, she testified that her argument with Miller was on a Friday—August 31, 1999, was a Tuesday, not a Friday—*and* the fact that Phyllis testified at preliminary hearing that the argument was only two or three days before the robbery of the Tulsa Federal Employees Credit Union, which occurred on September 8, 1999. Counsel also cross-examined Phyllis about a recorded interview she had with a Tulsa police detective on October 14, 1999 (the recording of which was first discovered shortly before Miller's 2008 retrial), in which Phyllis recalled the argument as happening on a Friday. Defense counsel further cross-examined Phyllis about the fact that it was not until 2002 that she first testified that the Motel 6 argument with Miller must have been on August 31, since she got a Social Security check on September 1. This Court finds that defense counsel thoroughly cross-examined Phyllis regarding her testimony that the argument with Miller occurred on August 31, 1999.

¶ 151 Ultimately, however, a review of the entirety of Phyllis Miller's testimony, in conjunction with the testimony of Victor Miller himself, strongly suggests that although Phyllis may not ever have had a firm grasp of when exactly the Motel 6 argument occurred, this argument *did* occur and did, in fact, occur on August 31, 1999—even if Phyllis did not actually *remember* this date or even when the argument occurred in relation to other events. The combination of Phyllis and Victor Miller's testimony, along with all the other evidence presented at trial, was more than sufficient to establish that the Motel 6 argument occurred on the day of and just prior to the murders of Thurman and Bowles. In particular, the testimony of both Millers that on the day *after* their argument, Phyllis took Miller to the Oasis Motel—where he wiped down Bowles' car with the blue rag—strongly suggests that the argument must have occurred on August 31, 1999, since Hanson (and Miller) would not have allowed Bowles' non-operational, stolen vehicle to sit at the Oasis Motel for multiple days after her disappearance and murder, without making an effort to move the car somewhere less public or at least remove their fingerprints from it.

¶ 152 This Court firmly rejects Miller's claim that defense counsel was ineffective in his efforts to impeach Phyllis Miller regarding the date of her Motel 6 argument with Miller. Counsel was quite successful in impeaching Phyllis regarding her claim to remember that the argument was on August 31, 1999. Unfortunately for Miller, this impeachment did not persuade his jury, nor does it persuade this Court, that perhaps their argument actually did occur on a different day. More importantly, it does not change the fact that the State's evidence, as a whole, established, beyond a reasonable doubt, that on August 31, 1999, Miller and Hanson, through their joint activity, intentionally shot and killed Jerald Thurman and Mary Bowles. Thus this Court rejects all of Miller's Proposition XXIII guilt-stage ineffective assistance claims.

¶ 153 In his *Pro Se* Proposition II claim, Miller makes ten additional claims of ineffective assistance of counsel. In particular, Miller asserts (*pro se*) that his counsel was ineffective for: (1) failing to investigate, develop, and present mitigating evidence; (2) advising Miller to stipulate to stain evidence found in Bowles' car; (3) advising Miller to testify; (4) failing to make a "meaningful objection" to the "continuing threat" aggravating circumstance and failing to present rebuttal evidence regarding this aggravator; (5) opening the door to improper and prejudicial closing argument by the prosecutor; (6) failing to investigate and develop evidence supporting Miller's defense; (7) improperly denigrating Miller during direct questioning; (8) improperly referring to appeal of Miller's

case; (9) failing to request a mistrial based upon the State's knowing use of Sundeep Patel's "false" testimony; and (10) telling the jury that Patel "wasn't trying to lie to anybody."

¶ 154 Of the ten ineffective assistance claims raised *pro se* by Miller, the following eight claims involve the guilt stage of his trial: Claims 2, 3, 5, 6, 7, 8, 9, & 10. These claims are addressed herein.[157] As noted above, to establish ineffective assistance Miller must demonstrate that the performance of his counsel was deficient and unreasonable and that he was prejudiced thereby, meaning that there is a "reasonable probability that but for the inadequate performance alleged, the result of the proceeding would have been different."[158]

¶ 155 In his second *pro se* claim of ineffective assistance, Miller asserts that his counsel was ineffective for advising him to stipulate to the bloodstain evidence found in Bowles' car, *i.e.*, that Bowles could not be excluded as a DNA contributor to the multiple bloodstains found in the backseat area of her car. The transcript reflects that Miller personally agreed to stipulate to this evidence, and Miller totally fails to show either inadequate performance by his counsel or prejudice in this regard. This claim is rejected accordingly.

¶ 156 In his third *pro se* claim of ineffective assistance, Miller asserts that his counsel improperly advised him to testify at his retrial. In particular, Miller attempts to argue that he only testified at his retrial because his counsel told him that if he did not testify, the State would simply admit the transcript of his testimony from the original trial. Miller then argues, citing *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), that because his testimony at his original trial was "induced" by the testimony of Rashad Barnes—which this Court has ruled should not have been admit-

ted—the State actually could *not* have admitted his earlier testimony at the retrial, and that Miller's retrial testimony was based upon his counsel's mistaken and ineffective advice in this regard.

¶ 157 In *Harrison*, the United States Supreme Court recognized the "general evidentiary rule" that a defendant's testimony at a former trial is admissible against him in any later proceedings. *Id.* at 222, 88 S.Ct. at 2010. Nevertheless, the *Harrison* Court held that if a defendant's testimony at his first trial was "impelled" by the State's improper introduction of illegally obtained confessions, then the defendant's testimony at that first trial could *not* be used against him in a subsequent trial. *Id.* at 222–24, 88 S.Ct. at 2010–11.[159]

¶ 158 Miller proffers his own affidavit, attached as Exhibit 2 to his *pro se* Supplemental Application for Evidentiary Hearing, in support of his claim. This Court addressed a parallel claim to Miller's in *Mitchell v. State*, 2010 OK CR 14, 235 P.3d 640. In *Mitchell*, the defendant claimed that his trial testimony should not have been admitted against him in a later resentencing, because his trial testimony was "induced" by the false and misleading testimony of Joyce Gilchrist. *Id.* at ¶ 51, 235 P.3d at 654. This Court concluded, however, that Mitchell originally testified for a number of reasons, not just to respond to Gilchrist's testimony, and hence that Mitchell's claim that he would not have testified "but for" her testimony was "untenable." *Id.* at ¶ 54, 235 P.3d at 654.

¶ 159 This Court likewise concludes that Miller chose to testify at his first trial to respond to a number of aspects of the State's case against him, including: the testimony of his wife about the day of their fight and their visit to the Oasis Motel the next day; the fact that his fingerprint was found in Bowles' car; the fact that he was arrested with Han-

---

157. Miller's other two *pro se* claims of ineffective assistance (Claims 1 & 4) will be addressed *infra*, within this Court's analysis of Miller's sentencing-stage ineffective assistance claims.

158. *See Strickland*, 466 U.S. at 687, 694, 104 S.Ct. at 2064, 2068; *Williams*, 529 U.S. at 390–91, 120 S.Ct. at 1511–12.

159. *See also Littlejohn v. State*, 2004 OK CR 6, ¶¶ 30–32, 85 P.3d 287, 298 (discussing *Harrison*).

son in joint possession of the guns that killed Thurman and Bowles; and Barnes' testimony implicating both him and Hanson. This Court does not agree that our decision reversing Miller's original conviction rendered his testimony from his first trial inadmissible in any later proceeding or that Barnes' improperly admitted testimony "induced" or "impelled" Miller's original trial testimony. Thus the challenged "advice" from counsel would not have been incorrect or inadequate performance, and Miller's ineffective assistance claim cannot prevail. This claim is rejected accordingly.

¶ 160 In his fifth *pro se* claim of ineffective assistance, Miller asserts that his counsel improperly "opened the door" to prejudicial and improper remarks by the prosecutor, by eliciting testimony from Miller, during the first stage of trial, that he was already serving a federal prison sentence of "life plus 157 years." The transcript makes quite clear that defense counsel made a strategic decision to inform the jury, during the guilt stage of this retrial, that Miller was already in federal prison and would never be released from custody.[160] This Court does not find that this strategy was objectively unreasonable, nor has Miller shown prejudice in this regard. This claim is rejected accordingly.

¶ 161 In his sixth *pro se* claim of ineffective assistance, Miller asserts that his counsel failed to investigate, develop, and present evidence in support of his defense. Miller argues, in particular, that his counsel should have done a better job of convincing his jury that it was *reasonable* to believe that Miller was looking for a "kill switch" in Bowles' car when he, quite innocently, deposited his thumbprint on her front passenger seatbelt buckle.[161] Defense counsel argued, consistent with Miller's testimony, that Mil-

ler's fingerprint could have been left on the buckle while Miller was looking for a kill switch. It is not counsel's fault that the jury apparently rejected Miller's (implausible) testimony in this regard. Because Miller fails to show either inadequate performance or prejudice, this claim is rejected entirely.

¶ 162 In his seventh *pro se* claim of ineffective assistance, Miller asserts that his counsel improperly denigrated him during his direct questioning, when he asked Miller to "tell us a little bit about the work that you were doing back in 1999 other than robberies." Yet the jury already knew that Miller was involved in a string of armed robberies during 1999. Miller fails to establish that this candid phrasing of counsel's request was either inadequate performance or prejudicial to Miller. This claim is rejected accordingly.

¶ 163 In his eighth *pro se* claim of ineffective assistance, Miller asserts that his counsel improperly referred to appeal of his case. When defense counsel was asked by the court (just prior to the reading of first-stage jury instructions) whether he would waive the recording of the jury instructions, defense counsel answered, "Your Honor, we would like to, but my appellate staff would not approve of that, so we can't." This Court does not accept Miller's argument that this statement somehow conveyed to the jury defense counsel's belief that Miller was guilty. Thus Miller fails to establish either inadequate performance or prejudice in this regard, and this claim is rejected accordingly.

¶ 164 In his ninth *pro se* claim of ineffective assistance, Miller asserts that his counsel was ineffective for failing to request a mistrial based upon the State's use of Sundeep Patel's "false" testimony. This Court has already addressed Miller's characterization of Patel's testimony as "false" and re-

---

**160.** The State suggests that defense counsel may have believed that Miller's retrial jury would be more likely to consider finding him "not guilty" of the murders of Bowles and Thurman if the jury knew that Miller would be imprisoned for life *regardless* of the result of his trial on these charges.

**161.** Miller attaches two articles to his *pro se* brief in support of this claim about a recent "MyKey" innovation developed by the Ford Motor Co.,

which automatically "chimes" if front seatbelts are not used and allows parents to customize individual car keys, such that the car's audio system won't turn on if front seat passengers are not buckled up. These articles, from 2009 and 2011, are not properly submitted to this Court; and they clearly do not support Miller's claim of ineffective assistance at the time of his 2008 retrial.

jected his *pro se* prosecutorial misconduct claim in this regard. Consequently, this Court finds that any defense mistrial request regarding this same testimony would have been properly denied by the trial court. Hence defense counsel was not ineffective for failing to request a mistrial. This claim is rejected accordingly.

¶ 165 In his tenth *pro se* claim of ineffective assistance, Miller asserts that his counsel was ineffective for telling the jury, during first-stage closing argument, that Patel "wasn't trying to lie to anybody." Miller fails to establish either inadequate performance or prejudice regarding his counsel's characterization of Patel as not "trying" to lie to anybody, and this claim is rejected accordingly.

¶ 166 Thus this Court rejects all of Miller's claims of guilt-stage ineffective assistance, as asserted within both Proposition XXIII and *Pro Se* Proposition II.

### Cumulative Error in the Guilt Stage of Miller's Trial

■ ¶ 167 In Proposition XXIV, Miller argues that even if individual errors or acts of misconduct that occurred during his 2008 retrial do not merit reversal of his convictions and his death sentences, the combined effect of these errors and this misconduct deprived him of a fair trial and a fair sentencing, requiring the reversal of his convictions and his sentences. We here take up Miller's cumulative error claim regarding the guilt stage of his trial.[162]

¶ 168 This Court found, in response to Miller's Proposition II, that the trial court abused its discretion by refusing to allow defense counsel any opportunity to question or attempt to rehabilitate seven different prospective jurors—who gave equivocal, confusing, or inconsistent responses regarding their ability and willingness to consider the death penalty. However, Miller's brief seeks only sentencing relief on this claim, rather than relief from his convictions; and Miller does not claim that this error had any impact on the guilt stage of his trial. Hence this Court does not consider this error within our

analysis of the cumulative effect of errors made during the guilt stage of trial.

¶ 169 In response to Miller's Proposition X claim, this Court found that it violated the Confrontation Clause to allow Dr. Distefano to present the autopsy findings and analysis of Dr. Anzalone, but that this constitutional error was harmless. And in response to Miller's Proposition XI claim, this Court found that although the district attorney's "diminished" presumption of innocence argument was improper, it did not render Miller's trial unfair, nor did it render any of the verdicts in his case unreliable. This Court now finds, beyond a reasonable doubt, that even when these and any other first-stage errors and misconduct are considered cumulatively, they are, nevertheless, still harmless. Although the evidence presented at Miller's 2008 retrial was overwhelmingly circumstantial, it was extensive and thorough and proved powerfully and convincingly that he is guilty of the first-degree murders of both Jerald Thurman and Mary Bowles. Miller's Proposition XXIV cumulative error claim regarding his convictions is rejected accordingly.

### *Sentencing Stage Claims*

### Sufficiency of the Evidence on Aggravating Circumstances

■ ¶ 170 In Proposition XVII, Miller argues that there was insufficient evidence to support the aggravating circumstance that the murders of Bowles and Thurman were "committed for the purpose of avoiding or preventing a lawful arrest or prosecution," under 21 O.S.1991, § 701.12(5). Because this Court has already determined that Miller's death sentence for the murder of Bowles must be struck down, this claim is moot in regard to the murder of Bowles. This Court will address this claim only in regard to the murder of Thurman.

■ ¶ 171 In evaluating a challenge to the sufficiency of the evidence in support of an aggravating circumstance, we review the evidence in the light most favorable to the State, to determine whether any rational trier of fact could have found the aggravator

**162.** Miller's cumulative error claim regarding the sentencing stage will be addressed *infra*.

beyond a reasonable doubt.[163] Although the State did not present any direct evidence regarding Miller's reason for shooting Thurman, this Court concludes, considering the evidence as a whole, that the State presented more than enough circumstantial evidence for a jury to rationally conclude, beyond a reasonable doubt, that Miller shot Thurman in order to avoid being arrested or prosecuted for his crimes against Bowles.[164]

¶ 172 The evidence presented at trial established that Mary Bowles was alive and in her Buick LeSabre around 4:00 p.m. on August 31, 1999, and that by 6:30 p.m. that same day, Hanson and an associate (almost certainly Miller) were in possession of Bowles' car at the Oasis Motel in Tulsa, and that Miller and Hanson had both been inside her car, since they both left a fingerprint inside.[165] The evidence also established that Miller and Hanson were regularly committing crimes together at the time and (according to Miller) were going to go plan some bank robberies that very day, but were in need of a reliable car—since Hanson did not own one, and Miller had disabled his own car after a fight with his wife that afternoon. Taking the evidence in the light most favorable to the State, the evidence likewise established that by around 5:45 p.m. that day, Miller and Hanson (armed with their customary guns) had control of Bowles and her car and had both at Jerald Thurman's dirt pit in Tulsa—perhaps planning to leave Bowles there, in this rather isolated area. The evidence also established that Thurman saw a car in the dirt pit area that did not belong there, was suspicious, and intended to go close the gate into the area. It is likewise a reasonable inference from trial evidence that Thurman was in the process of closing the barbed-wire gate into this area—with his right hand holding his cell phone up to his right ear—when Victor Miller shot him multiple times with the silver .38.

¶ 173 The trial evidence likewise supports a rational conclusion that Bowles was shot by Hanson a short time later, with the black 9-mm, in a ditch alongside 66th Street North in Tulsa, not far from Thurman's dirt pit. The fact that two spent cartridges matching Hanson's gun were found nearby, together with the fact that a spent 9-mm bullet from this same gun was found buried in the dirt beneath Bowles' body, strongly suggests that Bowles was shot and killed at this location. This inferred fact and the finding of Bowles' blood in the backseat area of her car likewise suggest that Bowles was still alive when Thurman came upon the trio—and that Thurman would have had little trouble surmising that something was very wrong and that the elderly Bowles was not with these two young men at this secluded spot willingly, i.e., that she had been kidnapped.

¶ 174 More importantly, *Miller* knew that he and Hanson had stolen Bowles' car and kidnapped her in the process, and the sight of Thurman shutting the gate and apparently making a call on his cell phone almost certainly made Miller fear that if swift action wasn't taken, he and Hanson were in danger of being arrested and prosecuted for their crimes. Hence Miller attempted to ensure that they would be able to leave the area and that Thurman would never be able to identify them or testify against them, by shooting Thurman multiple times with his trusty .38. Although Miller and Hanson had previously committed multiple armed robberies without ever killing anyone, things did not go so well on August 31, 1999—perhaps because Thurman simply came by at the wrong time.

---

163. *See Mitchell v. State*, 2006 OK CR 20, ¶ 33, 136 P.3d 671, 687; *DeRosa v. State*, 2004 OK CR 19, ¶ 85, 89 P.3d 1124, 1153.

164. *See Hanson v. State*, 2009 OK CR 13, ¶ 49, 206 P.3d 1020, 1034 ("The defendant's intent to kill in order to avoid arrest may be inferred from circumstantial evidence.").

165. Taking the evidence in the light most favorable to the State would certainly include coming to the conclusion that Miller's story about leaving his fingerprint on the seatbelt buckle while looking for a "kill switch" is ridiculous. Miller's jury almost certainly (and quite reasonably) concluded that Miller left his thumb print on the passenger-side seatbelt buckle when he was first in Bowles' car, on August 31, 1999—along with Hanson and a captive Bowles—and that although Miller entered the car the next day and used a blue rag to wipe down the interior (to remove fingerprints), he simply failed to wipe down the latches of the seatbelt buckles.

¶ 175 Although the evidence presented at Miller's retrial did not give his jury much specific evidence regarding why things happened as they did that day, this Court finds that the abundant circumstantial evidence presented at trial adequately established, beyond a reasonable doubt, that Miller shot Thurman, at least in part, to avoid being arrested or prosecuted for the kidnapping of Bowles and the armed theft of her car. Proposition XVII is rejected accordingly.

¶ 176 In Proposition XVIII, Miller argues that the State's evidence was insufficient to support the aggravating circumstance that the murders of Bowles and Thurman "created a great risk of death to more than one person," under 21 O.S.1991, § 701.12(2). Once again, because we have already held that Miller's death sentence for the murder of Bowles must be struck down, we review this claim only in regard to the murder of Thurman. And we evaluate this sufficiency challenge to determine whether any rational trier of fact could have found this aggravating circumstance beyond a reasonable doubt.[166]

¶ 177 This Court addressed the appropriateness of this aggravator in regard to the murder of Bowles in *Hanson v. State*, 2009 OK CR 13, 206 P.3d 1020. Our approach in that case is likewise appropriate for the parallel issue in this case:

> "This aggravating circumstance is established by acts which create a great risk of death to another person in close proximity to the homicidal act in terms of time, location, and intent." *Harris v. State*, 2004 OK CR 1, ¶ 53, 84 P.3d 731, 751. We review the record for evidence that another person or persons were [ ] near the victim at the time of the murder and consequently put in jeopardy of suffering real harm.... In other words, we consider if another person was endangered by the defendant's actions in killing the victim.

*Id.* at ¶ 42, 206 P.3d at 1033 (all citations omitted). We emphasized, in *Hanson*, that the "great risk of death to another" aggravator is only established where *the homicidal act* at issue puts another person at great risk

of death, because of that other person's "close proximity" to the victim at the time of the homicidal act. *Id.* at ¶¶ 42–43, 206 P.3d at 1033. And we concluded that because Thurman had already been shot and left at the dirt pit when—after driving a short distance away—Hanson shot Bowles in a roadside ditch, Hanson's *act* of shooting Bowles did not put Thurman at great risk of death. *Id.* at ¶ 43, 206 P.3d at 1033.

¶ 178 We now likewise find that there is no evidence that Miller's act of shooting Thurman put Bowles at great risk of death. Although the evidence strongly suggests that Bowles was alive and present at the dirt pit when Miller shot Thurman, there is no evidence whatsoever that the shooting of Thurman put Bowles (or anyone else) in danger of being injured or killed by the shots fired at Thurman. Even the State does not claim that Bowles was in danger of being injured or killed by Miller's act of shooting Thurman.

¶ 179 Rather, the State argues that this aggravator is appropriate here because "the defendant's murder of Jerald Thurman certainly put [Bowles] in jeopardy, namely, as a witness who could identify the defendant as the perpetrator of the murder" and who, consequently, later became "the recipient of the same callous act of murder." The State's theory is that because Bowles was a witness to the murder of Thurman, she became a likely next victim. Unfortunately, this assertion (even if factually correct) comes nowhere near establishing that Miller's *act* of shooting Thurman put Bowles at "great risk of death" from that same act, so as to support this aggravator in regard to the murder of Thurman. We rejected a parallel "danger-due-to-witnessing-a crime" argument in the context of this same aggravator (and this same criminal episode) in *Hanson:*

> The risk to another person necessary to support this ["great risk of death"] aggravating circumstance does not exist under the unusual facts in this case.... There is undoubtedly a connection between the two murders: but for the kidnapping of Bowles, Thurman would not have witnessed the crime and been murdered. Our case law, however, requires more.... It

---

166. *See, e.g., Mitchell,* 2006 OK CR 20, ¶ 33, 136 P.3d at 687.

was uncontested that Miller shot Thurman after Thurman saw them with Bowles. They drove to another location a short distance away and Hanson shot Bowles in the roadside ditch. At the time Hanson was engaged in the act of shooting Bowles, [however,] Thurman was not in jeopardy from that act.

See id. at ¶ 43, 206 P.3d at 1033.

¶ 180 We take this same approach and now reach a parallel conclusion to that of *Hanson.* Although it seems likely that Bowles would have been left alive "but for" the murder of Thurman, which she happened to witness, that is not enough. Because there is no evidence that Miller's *act* of shooting Thurman placed Bowles "at great risk of death," this Court cannot uphold this aggravator.

¶ 181 Thus this Court must strike down this aggravator and determine what relief should be granted in this case. Yet this Court has already found other serious error in regard to Miller's death sentence. Consequently, we decline to here determine whether Miller's death sentence *could* be upheld, despite the insufficiency of the evidence on this single aggravator, as if it were the only second-stage error at issue.[167] Rather, this Court will consider the appropriate remedy for this evidentiary insufficiency, the trial court's abuse of discretion regarding capital jury *voir dire* and rehabilitation (Proposition II), and any other second-stage errors in Miller's case that are still to be addressed, *infra,* within our analysis of Miller's Proposition XXIV (second-stage) cumulative error claim.

**Victim Impact Evidence**

¶ 182 In Proposition XIV, Miller raises three challenges regarding the victim impact evidence presented at his trial. First, he claims that Jerald Thurman's stepmother should not have been allowed to testify as a victim impact witness, because stepparents are not part of a victim's "immediate family" under Oklahoma law. Second, Miller claims that the victim impact testimony of Sarah Mooney improperly and prejudicially suggested that Miller caused the death of Mooney's mother, Ora Lee Parker. Third, Miller asserts that the standard for admissibility of victim impact evidence in Oklahoma is unworkable and that such evidence has no place in Oklahoma's capital sentencing scheme.

¶ 183 Regarding Miller's first challenge, the State proposed to present victim impact testimony from four members of Thurman's family: his wife (Sherry Thurman), his son (Jake Thurman), his sister (Trish Hampton), and his stepmother (Betty Thurman, *i.e.,* "Betty"). Defense counsel objected that a stepmother did not qualify as "immediate family" eligible to give victim impact testimony and argued that although Betty could be designated a "family representative," the State could not present both immediate family members and a family representative. The State responded that Betty would be testifying about the impact of Thurman's death on herself (not as a family representative) and that she qualified as a "family member."[168] The trial court accepted this argument and ruled that Betty would be allowed to testify on her own behalf.[169] The State acknowledges that Miller's current challenge was adequately preserved, and we review the court's ruling for an abuse of discretion.[170]

**167.** *Cf. Brown v. Sanders,* 546 U.S. 212, 220, 126 S.Ct. 884, 892, 163 L.Ed.2d 723 (2006) ("An invalidated sentencing factor ... will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." (emphasis in original)); *see also Jackson v. State,* 2006 OK CR 45, ¶ 44, 146 P.3d 1149, 1164 ("If the jury could have properly considered the evidence used to support the invalidated aggravator anyway[,] because it also supported a separate and valid aggravator, the death sentence will stand.").

**168.** The district attorney argued, "[W]hen they say 'a parent,' I think it implies that a stepparent fits that category."

**169.** Defense counsel later argued, "If they wanted a stepparent to be able to do this, [the Legislature] would have put them in there since they specifically put stepchild." The trial court asked if defense counsel had a case on point, which he did not, and then maintained its ruling.

**170.** *See Malone v. State,* 2007 OK CR 34, ¶ 62, 168 P.3d 185, 211.

¶ 184 Oklahoma's statutory scheme regarding victim impact statements specifically limits *who can give such statements* to: the victim himself/herself, "members of the immediate family of each victim," or a "person designated by the victim or by family members of the victim."[171] Hence in homicide cases, members of the immediate family of the victim can present a victim impact statement *or* the family of the victim can designate a "family representative" to present a victim impact statement on behalf of the family. Oklahoma's victim-impact statutory scheme also specifically defines who qualifies as "a member of the immediate family of the victim" and limits this category to persons related to the victim in the following ways: spouses, children by either birth or adoption, stepchildren, parents, siblings, and (as of 2010) grandparents.[172]

¶ 185 In *Hanson v. State*, 2003 OK CR 12, 72 P.3d 40, in connection with the original trial of Miller's co-defendant, this Court recognized this list and noted:

> We have held that a person not within the statutory definition of "family" may be designated as a family representative, and may present otherwise admissible testimony on behalf of immediate family members. However, we have not extended the statutory definition of "immediate family" to include persons related to victims in ways other than those designated by the Legislature.

*Id.* at ¶ 28, 72 P.3d at 55 (all citations omitted). We also specifically held that a *niece* of the victim (Mary Bowles) could be designated as a "family representative" and could give evidence about the effect of the victim's death on her mother (*i.e.*, on the sister of Bowles); but the niece (Sarah Mooney) could *not* present evidence about the effect of the victim's death on herself, other nieces and nephews, or the children of these nieces and nephews, since such persons aren't covered by the term "immediate family" in this context. *Id.* at ¶¶ 27–28, 72 P.3d at 54–55.[173]

¶ 186 This Court finds that stepparents are *not* included as "members of the immediate family" of the victim, as that term is defined under Oklahoma law in this context. Although the list is quite expansive regarding "children" of the victim, since it includes biological children, adopted children, and stepchildren, the list is not so expansive regarding "parents." We conclude that under the plain language of the governing Oklahoma statute, a stepparent does not qualify as a "parent" for the purpose of being allowed to give victim impact evidence about the effect of a victim's death on himself/her-

**171.** Although there have been some changes to portions of the Oklahoma statute defining who can give "victim impact statements" and to where this statute appears, the three *categories* of persons eligible to give such statements has not changed since 1993. *See* 22 O.S.Supp.1993, § 984.1(A) ("Each victim, or members of the immediate family of each victim or person designated by the victim or by family members of the victim, may present a written victim impact statement or appear personally at the sentence proceeding and present the statement[ ] orally."); 22 O.S.2001, § 984.1(A) (same); 22 O.S.Supp. 2008, § 984.1(A) (same categories of who can present victim impact statement, but adding notation that such statements "may include religious invocations or references"); *see also* 22 O.S.2001, § 984(1) ("Victim impact statements' means information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence."); 22 O.S.Supp.2009, § 984(1) (same); 21 O.S.Supp. 2010, § 142A–1 (8) (revised and renumbered effective Nov. 1, 2010) (all same except final phrase revised to "and the opinion of the victim of a recommended sentence"); 21 O.S.2011, § 142A–1(8) (all same as 2010 version).

**172.** 22 O.S.2001, § 984(2) (" 'Members of the immediate family' means the spouse, a child by birth or adoption, a stepchild, a parent, or a sibling of each victim."); O.S.Supp.2009, § 984(2) (same). In 2010, the Oklahoma legislature added grandparents to the list, but made no other changes. *See* 21 O.S.Supp.2010, § 142A–1 (4) (" 'Members of the immediate family' means the spouse, a child by birth or adoption, a stepchild, a parent, a grandparent, or a sibling of each victim."); 21 O.S.2011, § 142A–1 (4) (all same as 2010 version).

**173.** We likewise found that the testimony of the sister of the other victim (Thurman) "regarding the impact of her brother's death on herself was within statutory limits, but her testimony regarding the effect on her son [a nephew] was not." *Hanson*, 2003 OK CR 12, ¶ 28, 72 P.3d at 55.

self.[174] We note that when the Legislature desires to include "stepparents" (and "stepbrothers" and "stepsisters") within a list in this context, it is perfectly capable of doing so explicitly.

¶ 187 Although a stepparent could be designated as a "family representative"—as could a niece, nephew, cousin, grandchild, or any person at all—this designation would not change the fact that any evidence given by such a person could not be about the impact of the victim's death on himself/herself, but only about the impact of the victim's death on persons who are on the statutory list of "immediate family members."[175] It is not the job of this Court to endorse, criticize, or even convincingly explain the Legislature's choice in this regard. It is our job, however, to respect and uphold the Legislature's decision. Hence we hold that the trial court abused its discretion in allowing the victim impact testimony of Betty Thurman, who testified as a stepmother.[176]

¶ 188 In *Hanson,* this Court found that the error of allowing a niece of the victim to testify on her own behalf—and on behalf of other persons not on the statutory list of "immediate family"—when considered "[i]n combinations with other errors, ... requires relief." *Id.* at ¶ 28, 72 P.3d at 55. As in *Hanson,* this Court need not decide whether the impact of Betty Thurman's stepparent testimony, "standing alone," requires rever-

sal of Miller's death sentence for killing Jerald Thurman. Rather, we will consider the impact of this error in combination with the other errors affecting Miller's death sentence, *infra,* within our analysis of Miller's Proposition XXIV (second-stage) cumulative error claim.

¶ 189 In the second part of Proposition XIV, Miller challenges the testimony of Sarah Mooney, niece of Mary Bowles, who testified as a family representative about the impact of Bowles' death on her mother, *i.e.,* on Bowles' sister, Ora Lee Parker.[177] Miller asserts that Mooney improperly suggested that Miller caused the death of *Parker,* due to Parker's anxiety, depression, and grief regarding Bowles' disappearance and murder.[178] Yet there is an even more basic error at stake here, because Sarah Mooney should not have been allowed to testify at all.

¶ 190 As the State has conceded regarding Proposition XII, the district attorney should *not* have been allowed to re-seek the death penalty for the murder of Bowles at Miller's 2008 retrial, because Miller was "acquitted" of the death penalty for this murder at his first trial. Consequently, as the parties agreed at oral argument, the State should not have been allowed to present *any* victim impact testimony regarding the impact of Bowles' murder on her family. Hence Mooney's testimony was entirely *irrelevant* to the

174. The State correctly notes that a victim's "step-father" gave victim impact testimony in *Cannon v. State,* 1998 OK CR 28, 961 P.2d 838, and that this Court rejected the appellant's challenge to the content of this witness' testimony. *See id.* at ¶¶ 46–48, 961 P.2d at 851. The State admits that "it is not clear that [Cannon] specifically questioned whether the victim's stepfather was a member of her immediate family." We conclude that there is no reason to think that the appellant in *Cannon* raised this issue and that our opinion clearly did not address this issue.

175. *See Hanson,* 2003 OK CR 12, ¶¶ 27–28, 72 P.3d at 54–55.

176. Betty Thurman described Thurman's murder as "the most tragic thing that has ever happened to our family, something we will never recover from." She described how much she and her husband, Lloyd Thurman (Thurman's father) loved Jerald Thurman and that even nine years later "our hearts are still broken and missing him daily." She noted that "Christmases aren't the same" and described the family's concerns

about Lloyd, who had developed diabetes and who "keeps his feelings bottled up, which is not good." She concluded, "He is sorely missed by me and Lloyd and we loved him dearly." Betty Thurman also described Thurman's murder as follows: "It was and is senseless. That is why it hurts so bad. No one should have to die trying to protect his property." Defense counsel objected to this characterization, arguing that the evidence did not support it. The trial court seemed to agree with defense counsel in this regard, stating, "I don't think that's really what happened." Yet the court declined to order this characterization excised.

177. Sarah Mooney is the same person whose testimony was at issue in the just-discussed analysis from the *Hanson* case. *See Hanson,* 2003 OK CR 12, ¶¶ 27–28, 72 P.3d at 54–55.

178. The State correctly notes that Miller's counsel failed to object on this ground at trial.

only capital-sentencing question properly before Miller's retrial jury: the proper sentence for Miller for the first-degree murder of Thurman.[179] Thus the question is not simply whether the content of Mooney's testimony was admissible as properly constrained victim impact testimony. Rather, the question is whether Mooney's testimony could possibly have prejudicially impacted the jury's determination of whether to sentence Miller to death for the murder of Thurman. Hence this Court is here considering the likelihood of prejudicial impact from the State's improper attempt to re-seek the death penalty (post-acquittal) for the murder of Bowles, in terms of the jury's consideration of Miller's sentence for the murder of Thurman.

¶ 191 Mooney read a prepared victim impact statement to the jury.[180] She told the jury that she hoped to convey how much Bowles meant to her mother and to put into perspective "how her murder affected my mother." Mooney then briefly described her Aunt Mary's life history, noting that she was a lifelong resident of Tulsa, had a long and distinguished career in banking, was involved in many civic organizations, did extensive volunteer work, and also that Bowles never married and had no children. Mooney described how "extremely close" Bowles was to her mother and that "[t]hey really were best friends."[181] If Mooney's testimony had stopped here, this Court could possibly conclude that even though Mooney's testimony was irrelevant to the jury's determination of whether to sentence Miller to death for the murder of *Thurman*, it was not particularly prejudicial or harmful. Hence this Court could possibly find "harmless error."

¶ 192 But Mooney's testimony continued; and Mooney described the impact of Bowles'

abduction and murder on her mother as follows:

The whole circumstances surrounding [Bowles'] abduction, disappearance and murder made it impossible for my mother to cope. To find that she died in the manner that you now have learned is something that my mother could never comprehend or fully accept.

The nightmare began for my mother when she learned that Aunt Mary might be missing. My mother's voice was full of panic and fear when she called me one evening in August 1999 to see if I had either heard from Aunt Mary or I knew where she was.

From that point forward, my mother knew that something was terribly wrong. My aunt was very much a creature of habit and she never deviated from her routine. My mother was completely familiar with that routine, so from the beginning she was convinced that something bad had happened.

The fear and panic was complicated by distance, as my mother lived in Dallas at that time. Her anxiety and fear intensified as she navigated the bureaucratic process, trying to enlist aid in finding my aunt. Initially, my mother became physically ill. She could not eat nor sleep and that aggravated some of her preexisting medical problems. That began my mother's physical decline. The stress of the trip and four days of frantic searching caused a number of physical complaints.

As time passed, her anxiety worsened. My mother did not want to return home without an answer. She wanted to stay in Tulsa, in my Aunt Mary's home, where she said that she could still smell her presence and be surrounded by all of her belongings. However she had to return to Texas

---

179. While it is possible that improperly seeking the death penalty "post-acquittal" could have resulted in the improper admission of irrelevant aggravating evidence (relating only to the murder of Bowles), Miller's counsel has failed to cite any such evidence under the facts of this case.

180. Mooney began by noting the limitations on her testimony: "My name is Sarah Mooney and I am making this statement on behalf of my recently-deceased mother, Ora Lee Parker. I am

only allowed to give this statement as it pertains to my mother. My mother was the only surviving sibling of Mary Bowles." This approach was consistent with *Hanson*.

181. Mooney noted that her mother and Bowles "grew up doing most everything together," that they had spent over 70 Christmases and birthdays together, and that they talked to each other by phone several times a week and "conferred with one another on all important life decisions."

at the advice of the law enforcement personnel.

My mother said that being in the state of limbo was worse than any possible outcome. It made it incredibly difficult for her to return to her normal activities, which at that time included work. The investigation produced no leads for nearly a week. And although my mother thought she was prepared for a negative outcome, she was not prepared for the information that she received.

The circumstances surrounding my aunt's execution-style murder, coupled with the condition of her body, precluded my mother from the opportunity to view her body or have that closure. She was not given an opportunity to make a physical identification nor to say goodbye. It was impossible for her to accept the complicated forensic pathological investigation, and the time involved with that just exaggerated her grieving process. She said that waiting for a funeral without a body was something she did not know how to handle. Also, she felt media attention was intrusive and left her without privacy and dignity.

As the months passed, my mother continued to decline physically and psychologically. She became more profoundly depressed, and sadly, neither medical personnel nor our immediate family recognized the full picture. We now believe that this was in part due to her advanced age and other chronic medical problems. This led to a significant medical crisis, which required several weeks of inpatient hospitalization. Depression aggravated her underlying medical conditions and precluded her ability to return to her work as the executive director of a medical foundation. Because of this, she came to live with my family for approximately four months and ultimately she had to relocate from her home in Dallas to Sherman, Texas. This was most upsetting to my mother and she felt it was a loss of control and of her independence.

My mother always felt that the fiber of what we call our family was irreparably broken. My Aunt Mary held the role of matriarch. Although my mother tried, things were never the same. She lamented the loss of cohesiveness we once enjoyed. We no longer had extended family gatherings. She began to lose contact with distant relatives. The last—

Can I have some water?

[At this point the district attorney said "Yes," and apparently provided Mooney with some water.]

I apologize. The last conversations that I had with my mother concerned her love for Aunt Mary. She told me and her minister that the murder had caused her to question her own beliefs and she felt that she had lost her faith. I hope that this puts my Aunt's life in some perspective. My mother was always supportive of this process and would be very thankful of the time that you are giving to your community.

Defense counsel did not ask any questions.

¶ 193 It is hard to overstate the potential emotional impact of Mooney's testimony on Miller's jury. Although four different victim impact witnesses testified regarding the loss of Thurman—and described what a beloved, generous, funny, and admirable man he was, how much he loved life, how hard he worked, how dedicated he was to his family, and how devastating Thurman's death has been to his family (emotionally, personally, financially, and in terms of the family business)—Miller does not challenge the content of the testimony of any of these witnesses.[182] He challenges only the content of Mooney's testimony.

¶ 194 Mooney's testimony revealed that she blames Miller not only for the loss of her Aunt Mary, but also for the loss of her mother. Mooney told the jury how overwhelming it was for her mother during the time from Bowles' disappearance until the finding of her body. She described her mother's fear, panic, and anxiety and how she became physically ill and could not eat or sleep, "which aggravated some of her preex-

---

**182.** Rather, Miller asserts that because Betty Thurman was a stepparent, she did not qualify as a member of Thurman's "immediate family" under Oklahoma's victim impact statutes.

isting medical problems" and "began my mother's decline." Mooney noted how awful it was for her mother, who was living and working in Dallas at the time Bowles disappeared, who came to Tulsa to look for her and "enlist aid in finding my aunt," and who remained in an agonizing "state of limbo" for nearly a week. Mooney also described how the condition of Bowles' body and the circumstances of her "execution-style murder" prevented her mother from seeing the body—making it even harder for her to cope with Bowles' death. Mooney emphasized that the impact on her mother did not diminish over time and that her mother "continued to decline physically and psychologically" and became "more profoundly depressed," which in turn "aggravated her underlying medical conditions and precluded her ability to return to her work." Although Mooney may never have explicitly said that she blamed Miller for the death of her mother, her victim impact statement left no real question that she did.

¶ 195 In addition, Mooney concluded by noting that in her last conversations with her mother, before her mother's death, her mother talked about her love for Bowles and told both Mooney and her minister "that the murder had caused her to question her own beliefs" and that "she felt that she had lost her faith." Hence Mooney blamed Miller not only for the loss of her elderly mother, but for her mother's despair at the end of her life, which shook her mother's religious beliefs and caused her to feel that she had lost her faith.

¶ 196 Once again, this Court notes that the issue before us is not simply whether Mooney's testimony went "too far" in terms of victim impact testimony regarding the murder of Bowles.[183] Rather, because the death penalty for the murder of Bowles was not properly at issue in this retrial—hence Moo-

ney should not have testified at all—the issue is whether Mooney's testimony potentially prejudiced the jury's determination of Miller's sentence for the murder of Thurman.

¶ 197 It is extremely difficult to see how testimony as poignant and emotionally gripping as that of Sarah Mooney could have failed to powerfully affect Miller's jurors in terms of both sentencing determinations that they had before them at the time. This Court can affirm Miller's death sentence for the murder of Thurman *only* if we can conclude, beyond a reasonable doubt, that Mooney's testimony was "harmless" and had no effect on the jury's decision to sentence Miller to death for the murder of Thurman, *i.e.*, only if we can conclude, beyond a reasonable doubt, that there is no reasonable probability that Miller could have avoided a death sentence for the murder of Thurman, even if Mooney had not testified at his retrial.[184] We simply cannot make this conclusion. Because this Court cannot find, beyond a reasonable doubt, that Mooney's poignant, compelling victim impact testimony was harmless in terms of the jury's decision to sentence Miller to death for the murder of Thurman, we cannot affirm Miller's death sentence on Count II.

¶ 198 In the third part of Proposition XIV, Miller asserts that the standard for admissibility of victim impact evidence in Oklahoma is unworkable and that victim impact evidence has no place in Oklahoma's capital sentencing scheme. Miller's basic argument is that such evidence does not fit within the capital sentencer's obligation to balance aggravating and mitigating circumstances, since victim impact evidence is not a proper aggravating circumstance, but neither is it a mitigating circumstance.[185] This Court has repeatedly rejected such general challenges to the role of victim impact evidence in Oklahoma's capital sentencing scheme.[186] We de-

---

**183.** *See, e.g., Cargle v. State,* 1995 OK CR 77, ¶ 81, 909 P.2d 806, 830 ("The more a jury is exposed to the emotional aspects of a victim's death, the less likely their verdict will be a reasoned moral response to the question whether the defendant deserves to die; and the greater the risk a defendant will be deprived of Due Process.").

**184.** *See, e.g., Mitchell v. State,* 2006 OK CR 20, ¶ 111, 136 P.3d 671, 713 (2006).

**185.** *See generally Cargle,* 1995 OK CR 77, ¶¶ 65–81, 909 P.2d at 825–30 (discussing appropriate role of victim impact evidence in capital sentencing context).

**186.** *See, e.g., id.; Hogan,* 2006 OK CR 19, ¶¶ 70–71, 139 P.3d at 932; *Malone,* 2007 OK CR 34,

cline to further address the undeveloped claim made herein.

### Waiver of Mitigating Evidence

¶ 199 In Proposition XV, Miller asserts that the district court failed to fully comply with this Court's decision in *Wallace v. State*, 1995 OK CR 19, 893 P.2d 504, regarding his decision to waive the presentation of mitigating evidence during the second stage of his trial. We begin by emphasizing that Miller did not actually waive all mitigating evidence, since he testified on his own behalf during the second stage and read a prepared statement to the jury, which contained some potentially mitigating evidence (an expression of sympathy for the families of the victims, a statement of regret regarding his armed robberies, an assertion that he is a changed man, *etc.*). Miller later testified, on cross-examination, about growing up "just surrounded by a bunch of criminals" and that he was just "a kid" when he committed his first armed robberies. (Miller did not, however, admit to playing any role in the shooting deaths of Bowles and Thurman.) Nevertheless, because Miller chose not to present any mitigating evidence from members of his family (such as the two sisters who testified at his first trial) or any expert testimony about his background and upbringing (such as the psychologist who testified at his first trial), the trial court conducted a hearing to determine whether Miller was making a knowing and intelligent waiver in this regard. The hearing transcript reflects that the trial judge had our *Wallace* decision in front of her at the hearing and was following it.

¶ 200 In *Wallace*, this Court was dealing with a defendant who refused to allow his attorney to present any evidence during the second stage of his capital trial and who was, in fact, requesting the death penalty. *Id.* at

¶ 2, 893 P.2d at 508. After holding that a capital defendant could constitutionally choose to waive the presentation of *any* mitigating evidence, *id.* at ¶ 18, 893 P.2d at 512, this Court established a seven-step procedure to be followed by the trial court in this situation, in order to ensure: that the defendant has an understanding of what mitigating evidence is and its role in a capital sentencing proceeding, that defense counsel has attempted to determine if any mitigating evidence exists, and that the defendant is making a knowing and intelligent waiver of the presentation of such evidence. *See id.* at ¶ 21, 893 P.2d at 512–13.

¶ 201 Miller did not actually waive all mitigating evidence; he declined to present certain kinds of mitigating evidence and certain witnesses. Thus it is not clear that a *Wallace* hearing was even required. Nevertheless, after reviewing *Wallace* and the hearing held in Miller's case, we conclude that the trial court complied with the *Wallace* procedure and, more importantly, that the record clearly establishes that Miller's waiver of the mitigating evidence at issue was voluntary and was also knowing and intelligent.[187] Proposition XV is rejected accordingly.

### Second–Stage Jury Instructions

¶ 202 In Proposition XVI, Miller argues that the trial court erred in refusing to instruct his jury on the meaning of a sentence of "life without the possibility of parole." Because Miller requested such an instruction at trial, he has adequately preserved this claim, and we will review it for an abuse of discretion.[188] Nevertheless, as Miller notes, this Court has repeatedly held that trial courts are not required to instruct juries on the meaning of "life without parole."[189] We decline to revisit this issue. Proposition XVI is rejected accordingly.

¶ 46, 168 P.3d at 204 (rejecting general challenge and citing cases).

187. Defense counsel, who was also Miller's counsel during his first trial, informed the court that no new mitigating evidence had developed since the first trial and that Miller was "unwilling to put his family through that" again. Miller then confirmed for the court that this was correct.

188. *See Jones v. State*, 2006 OK CR 5, ¶ 40, 128 P.3d 521, 539.

189. *See, e.g., Murphy v. State*, 2002 OK CR 24, ¶ 52, 47 P.3d 876, 886 (citing cases finding that meaning of "life without parole" is "self-explanatory" and that no defining instruction is required).

¶ 203 In Proposition XIX, Miller argues that his sentencing proceeding was unconstitutional because the trial court refused to instruct the jury that it could not impose the death penalty unless it first found, beyond a reasonable doubt, that the aggravating circumstances in the case outweighed any mitigating factors in the case. This Court has repeatedly and recently rejected this claim.[190] We decline to revisit this issue. Proposition XIX is rejected accordingly.

### Second–Stage Prosecutorial Misconduct

■ ¶ 204 In the fourth part of his Proposition XI prosecutorial misconduct claim, Miller objects to an argument made by the district attorney during his final, second-stage closing argument. We evaluate such claims to determine whether the challenged action so infected the defendant's trial that it was rendered fundamentally unfair, such that the jury's verdicts cannot be relied upon.[191]

¶ 205 The challenged prosecutorial argument to the jury was as follows:

You can weigh the mitigating circumstances that you find in this case, and I would ask you as you go through those mitigating circumstances do the weighing process based on the facts and the evidence that you know. And when you do, the State of Oklahoma is confident you are going to come to a conclusion and that is this: One of the mitigators is the defendant is serving life plus 157 years and he will never get out of the federal penitentiary. No objection to that.

*But in the idea of consequences and accountability and justice under the law for Mary Bowles and Jerald Thurman, if you were to give him any punishment other than death, what would the punishment for him be? Does he get a freebie*

because he is already serving life plus 157 years? Yes, it's time to put a price tag on what a human life exists, because that's accountability and consequences under the law in due process in this courtroom.[192]

Because defense counsel did not object to this argument at trial, we review it only for plain error.[193]

¶ 206 This Court has already ruled, in conjunction with the re-sentencing trial of Miller's co-defendant, that arguments like the one challenged here are improper. In *Hanson v. State*, 2009 OK CR 13, ¶ 22, 206 P.3d 1020, 1029, this Court addressed a parallel prosecutorial misconduct claim, *i.e.*, that it was improper for the prosecutor to argue that since Hanson was already serving a sentence of life without parole, only a death sentence could redress the murder of Bowles. In Hanson's trial, however, defense counsel objected to this argument, and the trial court sustained the objection. This Court concluded: "The trial court correctly sustained defense counsel's first objection. We agree that it is *improper for a prosecutor to argue that a sentence less than death is meaningless* and would not hold a defendant accountable for a victim's death when he is already serving a life sentence." *Id.* at ¶ 24, 206 P.3d at 1029 (emphasis added). Nevertheless, because the court sustained counsel's original objection, and because it was unclear from the record whether Hanson's jury was ever actually exposed to the improper argument, this Court determined that we could not find that Hanson was actually prejudiced by the argument. *See id.* at ¶¶ 23–26, 206 P.3d at 1029.

¶ 207 Miller's case, however, does not leave open the possibility that perhaps the jury was not actually exposed to the district attor-

190. *See, e.g., Coddington v. State*, 2011 OK CR 17, ¶ 71, 254 P.3d 684, 712 (citing cases); *Cuesta–Rodriguez v. State*, 2010 OK CR 23, ¶ 103, 241 P.3d 214, 245 (citing cases).

191. *See Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974); *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986).

192. The prosecutor's overall argument suggests that the word "exists" in the above quotation may actually have been "costs" or some similar

word, but since the record is unclear in this regard, the trial transcript is quoted as it stands—though the emphasis has been added by this Court.

193. *Mitchell*, 2006 OK CR 20, ¶ 95 n. 206, 136 P.3d at 709 n. 206. Miller also argues, in his Proposition XXIII ineffective assistance claim, that defense counsel's failure to object to this "freebie" argument constituted ineffective assistance of counsel.

ney's improper "freebie" argument. Furthermore, the argument in the current case was not only improper ... it may well have been misleading. As noted within this Court's analysis of Miller's Proposition I double jeopardy/double punishment claim, in Miller's federal case (for his involvement in seven different armed robberies during the summer of 1999), the federal district judge who sentenced Miller concluded that it was *appropriate*, under the federal sentencing guidelines, to consider Miller's role in the summer 1999 murders of Thurman and Bowles within that court's sentencing decision in that case. In particular, these murders may well have been considered as "relevant conduct" and been part of the federal district court's decision to sentence Miller to "life" in that case.

¶ 208 Consequently, it is entirely possible that the district attorney's "freebie argument" was based upon a false premise, *i.e.,* that the murders of Thurman and Bowles were not taken into account within Miller's federal sentence of "life plus 157 years." This makes the district attorney's improper argument particularly troubling, especially because the argument is emotionally powerful. The district attorney argued that if the jury did not sentence Miller to death, he would receive no punishment whatsoever for the first-degree murders of Thurman and Bowles, *i.e.,* that these murders would be "a freebie," because Miller would get no real, additional punishment for them. Although we decline to find that this argument, standing alone, constituted *plain* error at the time—since the *Hanson* decision was not handed down until 2009—we find that the argument was improper and potentially prejudicial. We will consider the potential impact of this improper prosecutorial argument within our analysis of Miller's Proposition XXIV (second-stage) cumulative error claim.

### Right of Allocution

 ¶ 209 In Proposition XXI, Miller argues that he had a common law and a statutory right of allocution to directly address the sentencing judge in his case, before judgment was rendered, and that this right was improperly denied. Miller maintains that his statutory right of allocution is found at 22 O.S.2001, § 970.[194]

¶ 210 Miller did request "his right of allocution" at his formal sentencing, before judgment was pronounced in his case. After "noting" this request, but without ruling upon it, the trial court pronounced judgment in the case and sentenced Miller to death on Count I and on Count II. After this judgment was pronounced, and as the court was explaining Miller's appeal rights, Miller personally asked if he was "going to get to exercise my right to allocution," to which the court responded that it had "denied" that request. After taking a break to research the issue and being provided with this Court's decision in *Malone v. State,* 2002 OK CR 34, 58 P.3d 208, the court found that it had been "incorrect" in denying Miller's request for allocution and offered to let him address the court. Miller, again speaking on his own behalf, declined this invitation, arguing that because the trial court had already formally announced his death sentence, "this Court has no further jurisdiction over this matter and for me to even attempt allocution at this point, I feel that the Court would be biased and the attempt at allocution will be futile." Upon questioning by the court, defense counsel acknowledged that he did not know of any reason that judgment should not be pronounced against his client, but that he would stand on the position of his client.

¶ 211 In the portion of *Malone* discussed at the time of Miller's sentencing, this Court stated as follows:

> Oklahoma's criminal statutes allow *non-capital* defendants, at the time of formal sentencing, to explain to the trial judge "any legal cause" they have why judgment should not be pronounced against them.

---

194. This statutory provision has never been amended and states as follows:
When the defendant appears for judgment, he must be informed by the court, or by the clerk under its direction, of the nature of the indictment or information, and his plea and the verdict, if any thereon, and must be asked whether he has any legal cause to show why judgment should not be pronounced against him.
*See* 22 O.S.2011, § 970 (reflecting no amendments since original adoption in 1910).

22 O.S.2001, § 970. But 22 O.S.2001, § 971 qualifies the phrase "any legal cause" by giving specific grounds for such a showing of cause, *i.e.*, insanity and those grounds that would support a motion for new trial in 22 O.S.2001, § 952.

2002 OK CR 34, ¶ 6, 58 P.3d at 209 (emphasis added). Thus despite the concession by the trial court and the parallel concession by the State in its brief on appeal, *Malone* did *not* hold that a defendant in Miller's position, *i.e.*, a capital defendant, has a right to personally address the sentencing judge at the time of formal sentencing, in order to make a statement of allocution. Hence *Malone* does not resolve whether or not Miller had a right to the allocution he sought.

¶ 212 Miller argues that the current case gives this Court the opportunity to address the meaning of the "right of allocution" within the context of a capital case.[195] This Court finds that any "right of allocution" that exists for capital defendants under 22 O.S. 2001, § 970, is necessarily limited, by the terms of this statute, to an opportunity to address the trial court, at the time of formal sentencing, regarding why judgment should not be pronounced against the defendant. In the current case, Miller has failed to provide any reason that judgment should not have been pronounced against him at his formal sentencing. Because Miller fails, even now, to offer any reason that judgment should not have been pronounced against him, we cannot find that he was prejudicially denied his right of allocution, nor can this Court grant any relief based upon the denial of the "right of allocution" alleged herein. *See* 20 O.S. 2011, § 3001.1. Proposition XXI is rejected accordingly.

### Constitutionality of the Death Penalty

¶ 213 In Proposition XXII, Miller argues that the death penalty is unconstitutional.

He acknowledges that this Court has repeatedly rejected this claim in the past.[196] We decline to address it again here. Proposition XXII is rejected accordingly.

### Second–Stage Ineffective Assistance of Counsel Claims

¶ 214 In Proposition XXIII, Miller asserts that he received ineffective assistance of counsel in the sentencing stage of his trial, because his counsel failed to object to the prosecutor's improper "freebie" argument. In addition, in his *Pro Se* Proposition I, Miller asserts that his counsel was ineffective in the second stage for failing to investigate, develop, and present mitigating evidence. In order to establish ineffective assistance, Miller must demonstrate that the performance of his counsel was deficient and unreasonable and that he was prejudiced thereby.[197] And in order to establish prejudice, Miller must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[198] Hence in order to show second-stage ineffectiveness, Miller must demonstrate that but for the inadequate performance of his counsel, there is a reasonable probability that he would have been sentenced to something less than death at his retrial.

¶ 215 This Court has already addressed Miller's (Proposition XI) claim regarding the prosecutor's "freebie" argument. We concluded that the argument was improper and also potentially misleading—since it is possible that the murders of Bowles and Thurman were taken into account within Miller's federal sentence of "life." We now find that defense counsel's performance was defi-

---

**195.** In *Mitchell v. State*, 2010 OK CR 14, ¶ 125, 235 P.3d 640, 665, this Court summarily rejected a capital defendant's claim that the trial court erred in denying his request for allocution, citing *Duckett v. State*, 1995 OK CR 61, ¶¶ 54–60, 919 P.2d 7, 20–22, as already rejecting this claim and declining to further address it. The *Duckett* opinion, however, was joined by only two judges of this Court, with three judges concurring only in result. *See id.* at ¶ 94, 919 P.2d at 27.

**196.** *See, e.g., Matthews v. State*, 2002 OK CR 16, ¶ 49, 45 P.3d 907, 923; *Banks v. State*, 2002 OK CR 9, ¶ 40, 43 P.3d 390, 401.

**197.** *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S.Ct. 1495, 1511–12, 146 L.Ed.2d 389 (2000).

**198.** *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

cient in failing to object to this argument and that Miller was potentially prejudiced by this improper but emotionally powerful argument for the death penalty, since there is a reasonable probability that this argument "could have alter[ed] the jury's selection of penalty" in this case.[199] We will consider the remedy for this ineffective assistance *infra*, within our analysis of Miller's Proposition XXIV (second-stage) cumulative error claim.

¶ 216 In his first *pro se* claim of ineffective assistance (within *Pro Se* Proposition I), Miller asserts that his counsel failed to investigate, develop, and present mitigating evidence. This Court has already found (regarding Proposition XV) that Miller validly waived the presentation of mitigating evidence beyond that of his own testimony at this retrial. The record reflects that defense counsel was prepared to present mitigating evidence regarding Miller's background and family life (as he did at the first trial), but that Miller did not want his counsel to do so. Hence Miller fails to show ineffective assistance in this regard.

¶ 217 Although Miller attempts to supplement the record, through his *pro se* Supplemental Application for Evidentiary Hearing, with additional "mitigating" evidence that he maintains his counsel should have presented during the second-stage of his 2008 retrial, this Court's finding that Miller validly waived the presentation of any such material precludes Miller's attempt to now present additional evidence in support of his ineffective assistance claim in this regard. Consequently, this attempt to enhance his *pro se* ineffective assistance claim must fail. (This Court addresses Miller's *pro se* application for an evidentiary hearing *infra*, at the conclusion of this Opinion.)

¶ 218 In his fourth *pro se* claim of ineffective assistance (within *Pro Se* Proposition I), Miller asserts that his counsel failed to argue that the "continuing threat" aggravating circumstance is unconstitutional, failed to make a "meaningful objection" to this aggravator, and failed to present rebuttal evidence to this aggravator. However, Miller fails to adequately develop and present this claim and totally fails to show either inadequate performance or prejudice in this regard. This claim is rejected accordingly.

## Cumulative Error in the Sentencing Stage of Miller's Trial

■ ¶ 219 In Proposition XXIV, Miller argues that even if individual errors and misconduct during his 2008 retrial do not merit reversal of his convictions or his death sentences, the combined effect of these errors and misconduct deprived him of a fair trial and a fair sentencing, requiring the reversal of his convictions and his sentences. This Court has already rejected Miller's cumulative error claim regarding the guilt stage of his retrial. We now take up his cumulative error claim regarding the capital sentencing stage of his retrial.

¶ 220 The State has conceded that Miller's death sentence on Count I (for the murder of Bowles) must be reversed; and this Court has already found multiple examples of serious error and also prosecutorial misconduct potentially impacting Miller's death sentence on Count II (for the murder of Thurman). We find herein that even if this Court could decline to reverse Miller's death sentence on Count II when these errors and this misconduct are considered individually, we cannot possibly conclude that the cumulative effect of all this error and this misconduct is "harmless" when it is considered cumulatively.

¶ 221 Regarding *voir dire* in this case, this Court has found that the trial court abused its discretion by refusing to allow defense counsel any opportunity to question seven different prospective jurors, who gave equivocal, confusing, or inconsistent answers regarding their ability and willingness to consider the death penalty. Regarding the aggravating circumstances found by the jury, this Court has found that the evidence in this case is insufficient to support the "great risk of death to more than one person" aggravating circumstance regarding the murder of Thurman; hence this aggravator must be struck down. Regarding the victim impact evidence presented at Miller's retrial, this Court has found that stepmother Betty

---

**199.** *See Williams,* 529 U.S. at 398, 120 S.Ct. at 1516.

Thurman should not have been allowed to testify as a victim impact witness on her own behalf, since "stepparents" are not within the class of "immediate family" allowed to present such testimony.[200]

¶ 222 Furthermore, we have found that the victim impact testimony of Sarah Mooney was entirely irrelevant to the only capital sentencing question properly before Miller's retrial jury *and* that Mooney's testimony about her mother (the sister of Bowles) was poignant, emotionally gripping, and compelling. Again, it is hard for this Court to overestimate the potential prejudice from hearing Sarah Mooney testify that she blames Miller not only for the death of her beloved aunt, Mary Bowles, but also for the suffering and death of her own beloved mother—and that she likewise blames Miller for her mother's despair at the end of her life and her mother's loss of her religious faith.

¶ 223 Regarding Miller's prosecutorial misconduct claims, this Court has found that the district attorney's second-stage "freebie" argument—that if the jury did not sentence Miller to death, he would not be punished *at all* for the murders of Thurman and Bowles—was improper, quite possibly false, and emotionally powerful in a potentially prejudicial way. We have likewise found that defense counsel's failure to object to this improper argument was deficient performance and potentially prejudicial, *i.e.*, that defense counsel's failure to object to the improper argument constitutes ineffective assistance of counsel.

¶ 224 Although Miller has now been tried two times and been sentenced to death for the murder of Jerald Thurman two times, this Court cannot allow this death sentence to stand in the face of this much serious and potentially prejudicial error. It only takes only one juror refusing to vote for death for a defendant to avoid a death sentence in a particular trial. Given the circumstances of Miller's retrial, this Court cannot conclude, beyond a reasonable doubt, that all these errors did not make the difference in the sentencing vote of *any* of his 12 jurors. Consequently, Miller's death sentence on Count

II, as well as his death sentence on Count I, must be struck down.

¶ 225 The question is not whether the State presented enough evidence to establish that Miller was *eligible* to be sentenced to death for the murder of Thurman. It certainly did. The question is not whether a jury could properly find that the mitigating evidence at issue in this case is outweighed by the (properly found) aggravating circumstances in this case. This could certainly happen. The question is whether this Court is convinced, *beyond a reasonable doubt,* that this is *what would have happened* if Miller's 2008 retrial had been properly and constitutionally conducted, which, unfortunately, it was not. This Court concludes that we simply cannot affirm Miller's death sentence under these circumstances. Hence we find that Miller's case should be remanded for a capital resentencing proceeding on Count II only.

¶ 226 The Court acknowledges that two of its judges disagree with this conclusion and have filed separate writings in this case. Regarding the separate writing of Presiding Judge Lewis, his opinion focuses exclusively on the Proposition II *voir dire* issue and simply dismisses the *"ad hoc* litany" of second-stage errors and misconduct found herein, calls this Court's thorough analysis of all these other issues "unconvincing" (without offering any actual analysis or explanation), and then summarily concludes, without apparent hesitation, that all these errors "had no prejudicial effect."

¶ 227 The presiding judge's separate opinion contains a long quotation from the United States Supreme Court's decision in *Uttecht v. Brown,* 551 U.S. 1, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007). This Court fully agrees with and has sought to be faithful to the governing principle of broadly-defined deference to trial court determinations that is emphasized in *Brown.* This Court notes, however, that the capital-eligibility *voir dire* and factual circumstances at issue in *Brown* are *very* different from what occurred in

---

**200.** In addition, Thurman was not eligible to testify as a family representative, since other

members of Thurman's immediate family also testified at Miller's retrial.

Miller's case.[201]

¶ 228 This Court also notes that the presiding judge's separate writing repeatedly quotes from cases in a way that does not fairly represent the legal authorities at issue. He quotes portions of this Court's opinions in *Stouffer v. State*, *Postelle v. State*, and *Harmon v. State* to suggest that as long as the trial court asks appropriate capital-eligibility *questions* during the court's *voir dire*, there is no need to grant defense counsel any opportunity to attempt to rehabilitate prospective jurors—as if it does not matter how prospective jurors *answered* the court's questions. In *Stouffer*, *Postelle*, and *Harmon*, this Court specifically found that the prospective jurors at issue were ultimately *unequivocal* in their answers to the trial court that they would not be able to consider the death penalty. *See Stouffer v. State*, 2006 OK CR 46, ¶¶ 20–22, 147 P.3d 245, 257–58; *Postelle v. State*, 2011 OK CR 30, ¶ 50, 267 P.3d 114, 135, and *Harmon v. State*, 2011 OK CR 6, ¶ 20, 248 P.3d 918, 930. As we herein make clear, if a prospective juror's answers to trial court questioning (and on any court-approved questionnaire) demonstrate that the juror is unequivocal in his or her unwillingness to consider the death penalty, the trial court need not grant any opportunity for rehabilitation. But whether further questioning of a prospective juror is needed (either by the trial court or by a party) depends not merely upon whether the court asked appropriate *questions*, but upon what the prospective juror's *answers* revealed about his or her ability and willingness to consider

the various penalties at issue. The juror's answers always matter.

¶ 229 Finally, regarding Judge Lumpkin's separate writing, Judge Lumpkin, like Presiding Judge Lewis, totally fails to address the prejudicial impact of the State being allowed to re-seek a death sentence on Count I, in violation of Double Jeopardy—a grave error that is now conceded by the State—which allowed Miller's jury to hear the very powerful testimony of Sarah Mooney (about how she blames Miller for the death of her beloved mother and her mother's loss of religious faith), which was legally irrelevant to the only capital-sentencing issue that was properly before that jury. Furthermore, many of the statements made within Judge Lumpkin's opinion are inaccurate, such as the remark that "[n]o legal authority is cited" for this Court's conclusion regarding Miller's Proposition II claim "because there is none." It is equally inaccurate to suggest that this Court finds an abuse of discretion on this same claim "[b]ecause we [ ] find the record confusing," rather than because Miller's counsel was not allowed to question prospective jurors who were confused (and equivocal and inconsistent). The opinion also refers to the trial court "denying the defense further attempts at rehabilitation," when the issue at stake was the denial of *any* attempt to rehabilitate. Similarly, Judge Lumpkin's long quotation regarding structural error seems out of place, since this Court's Opinion does not purport to be granting relief based upon "structural error" and contains a clear discussion of the appropriate "harmless error"

201. In *Uttecht v. Brown*, 551 U.S. 1, 4–5, 127 S.Ct. 2218, 2221–22, 167 L.Ed.2d 1014 (2007), the Supreme Court took up a capital case that the Supreme Court of Washington had affirmed (and then the federal district court denied habeas relief), but then the Ninth Circuit Court of Appeals granted federal habeas sentencing relief, based entirely upon the trial court's decision to strike one particular juror ("Juror Z"). The Supreme Court noted that the *voir dire* in Brown's case lasted over two weeks and that "[e]lleven days of the *voir dire* were devoted to determining whether the potential jurors were death qualified." *Id.* at 10, 127 S.Ct. at 2225. Both parties were given the opportunity to question *every* juror regarding their capital eligibility; the parties took turns going first during this questioning; and the trial court gave the parties the chance to

further question any juror whose capital eligibility was being challenged. *Id.* at 11–14, 127 S.Ct. at 2225–26. Finally, and most importantly, when the State announced (after extensive questioning by both sides) that it was challenging the capital eligibility of Juror Z, defense counsel stated that the defendant had "no objection" and offered no argument against Juror Z's removal. *Id.* at 34–35, 127 S.Ct. at 2238. The *Brown* Court (in a 5–4 decision) emphasized the critical significance of this defense waiver, amounting to a defense "invitation to remove Juror Z." *See id.* at 17–20, 127 S.Ct. at 2229–30. As this Court's extensive discussion of Miller's Proposition II *voir dire* claim reveals, the factual circumstances upon which this Court found an abuse of discretion herein (regarding seven jurors) are nothing like the case of Juror Z in *Brown*.

analysis regarding Proposition II and the other claims at issue in Miller's appeal.

¶ 230 This Court has thoughtfully considered the separate writings of both Presiding Judge Lewis and Judge Lumpkin in regard to the current decision and the Court's analysis herein. Nevertheless, these writings do not change this Court's analysis or our firm conclusion regarding the legally and constitutionally appropriate result in the current case.

### Applications for Evidentiary Hearing

¶ 231 On January 18, 2011, Miller's counsel on appeal filed an **Application for Evidentiary Hearing on Sixth Amendment Claims,** seeking an evidentiary hearing on Miller's Proposition XXIII ineffective assistance of counsel claim, on the basis of evidence not currently in the record. In addition, on March 21, 2011, Miller, acting *pro se,* filed a *pro se* **Supplemental Application for Evidentiary Hearing,** seeking an evidentiary hearing on some of the ineffective assistance claims made within *Pro Se* Proposition II, on the basis of evidence not currently in the record. Miller's applications for an evidentiary hearing are governed by Rule 3.11(B)(3)(b) of this Court's Rules.[202] Under this Rule, Miller is entitled to an evidentiary hearing only if his application and attached documents "contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence."[203] We first take up the application filed by Miller's counsel and then take up his *pro se* application.

¶ 232 Miller's Application for Evidentiary Hearing attaches and relies upon two documents that are not part of the record: (1) a "Supplemental Offense Report" from the Tulsa Police Department, and (2) an Affidavit from Hurldine Walton (mother of Victor Miller). Both of the documents are offered in support of Miller's first-stage ineffective assistance claim, in which he asserts that his counsel did an inadequate job of presenting evidence and persuading his jury that he should be acquitted. Because we are affirming Miller's first-degree murder convictions, we have thoroughly reviewed his Application and attached documents, and we address them herein.

¶ 233 The proffered "Supplemental Offense Report" from the Tulsa Police Department is dated September 13, 1999, and was prepared in connection with the armed robbery of the Tulsa Federal Employees Credit Union on September 8, 1999 (and cross-references numerous other 1999 robberies for which Miller and Hanson were considered to be suspects).[204] The report notes that a witness at the credit union robbery was able to get the tag number of the "older white car" in which the suspects in that robbery left the scene and that the tag number of this car matched a white Oldsmobile owned by Miller.[205] Within this same report, an unnamed officer is described as observing this same car "leaving the area of the Oasis Motel ... a couple days prior to [the credit union] robbery." This observation is described as occurring during "robbery surveillance" over "several nights." Thus the report suggests that someone saw Miller's car leaving the area of the Oasis Motel around September 6, 1999.

¶ 234 Miller argues that this Supplemental Offense Report thereby supports his version of events that the fight with his wife and their trip to the Oasis Motel the next day occurred well after August 31, 1999. This Court finds that even though the report suggests that Miller may have driven his Oldsmobile to (or near) the Oasis Motel shortly before the credit union robbery—perhaps to verify that Bowles' car was still in the parking lot and had not been disturbed or discovered by police—this report would not have made any difference at Miller's trial. The referenced car sighting occurred at night,

---

**202.** *See* Rule 3.11(B)(3)(b), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2011); *see also Taylor v. State,* 1998 OK CR 64, 972 P.2d 864 (discussing and applying rule).

**203.** *See* Rule 3.11(B)(3)(b)(i).

**204.** The report proffered, however, does not appear to be a complete copy of this report.

**205.** Hence Miller was correct that his Oldsmobile was specifically identified at this scene.

which is inconsistent with Miller's testimony that he wiped down Bowles' car during the afternoon and also with Phyllis' testimony that Miller did so during the morning. This strongly suggests that any evening trip made by Miller to the Oasis Motel around September 6, 1999, was *in addition to* Miller's visit to Bowles' car during the daytime of September 1, 1999, when he wiped the car down.

¶ 235 The fact that an unnamed witness may have seen Miller's car leaving the area of the Oasis Motel approximately six days after Bowles' car was first left there—and where the car remained on September 6, 1999—would not have significantly changed the overall balance of the powerful circumstantial evidence presented at trial to establish, beyond a reasonable doubt, that on August 31, 1999, after Miller and Hanson hijacked Bowles' car and kidnapped Bowles, Miller shot and killed Thurman, and Hanson shot and killed Bowles. This Court concludes that even if defense counsel had obtained and presented this Supplemental Offense Report, there is no reasonable probability that it would have changed the result of Miller's trial regarding either his convictions or his sentences. Consequently, Miller cannot establish either prejudice or ineffective assistance in regard to the proffered Supplemental Offense Report.

¶ 236 The potential significance of the affidavit from Miller's mother, Hurldine Walton, is even less. The affidavit states that Walton was available and expected to testify at Miller's original trial, but that "[a]t some point during the trial I was told that my testimony was not necessary." Walton's affidavit further states that Phyllis Miller called Walton in 1999 and told her there had been a robbery and that the police were looking for Victor. Walton's affidavit asserts that she later provided detectives with Phyllis' phone number and that "[a] day or two later," a very emotional Phyllis Miller called her again and told Walton that police detectives had taken her (Phyllis) "into a room with bright lights and told her that she had to connect Victor to the recent murder of a lady or that her children would be taken from her and she would go to jail." Walton's affidavit states that Phyllis told her that the detectives called her vulgar names and "forced [her] to say things connecting Victor to the murder."

¶ 237 It should be noted at the outset that, according to the affidavit, Miller's counsel (who was the same for both trials) was aware of the availability of Miller's mother to testify and actually considered presenting her testimony at the first trial. Defense counsel did not fail to discover Walton as a possible witness; rather, counsel presumably made a strategic decision not to present her testimony. This is not surprising. The evidentiary value of Miller's mother testifying that her son's wife told her that she was pressured and "forced" to connect Miller to the murder of Bowles is not very significant in the context of this case. This Court notes that portions of Walton's affidavit are consistent with Phyllis' trial testimony, since Phyllis testified that police detectives told her "all kind[s] of stuff," scared her, and "terrorized" her. In addition, this Court notes that Phyllis did not directly implicate Miller in the murders. Rather, Phyllis provided "indirect" evidence regarding Miller's actions, schedule, demeanor, situation (being "carless"), *etc.*, on August 31, 1999, and similar circumstantial evidence regarding Miller's regular criminal partnership with Hanson, their customary weapons, *etc.*, most of which was entirely consistent with Miller's own trial testimony. As such, Phyllis' testimony indirectly implicating Miller (based on circumstantial evidence) could not be readily "impeached" with evidence that she was pressured to directly implicate him.

¶ 238 This Court concludes that the proffered affidavit does not suggest either that the performance of Miller's counsel was inadequate or that Miller was prejudiced by his counsel's failure to present Walton's testimony at trial. Thus Miller fails to show, by clear and convincing evidence, a strong possibility that his retrial counsel was ineffective for failing to present either the Supplemental Offense Report or Walton's testimony. Consequently, **THIS COURT DENIES MILLER'S APPLICATION FOR EVIDENTIARY HEARING.**

¶ 239 Miller's *pro se* Supplemental Application for Evidentiary Hearing attaches and

relies upon numerous documents that are not part of the record in this case: (1) an undated article about the termination of Mark Boese (Exhibit 3),[206] (2) four affidavits from Miller himself (Exhibits 1, 1h, 2, and 4), (3) various certificates relating to Miller's completion of prison courses in life skills training, communication training, rational behavior training, substance abuse education, and his G.E.D. (Exhibits 1a–1g), and (4) an affidavit from Miller's mother, Hurldine Walton (Exhibit 5). We have reviewed Miller's *pro se* Supplemental Application and the attached documents. Without finding that any of these documents are properly submitted, we will briefly review why none of them establish that Miller should be given an evidentiary hearing.

¶ 240 We begin with proffered documents that could potentially relate to the guilt-phase of Miller's trial. Regarding the article about the later termination of Mark Boese (Exhibit 3), this Court has already rejected Miller's *Pro Se* Proposition III claim that the trial court erred in allowing Boese to testify as a firearms expert at Miller's retrial, noting that Boese's retrial testimony was entirely consistent with the testimony of firearms expert Dennis Fuller at Miller's original trial. We note that Miller offers nothing to suggest that Boese's analysis in his case was unreliable or improperly conducted. Hence Miller has failed to show any entitlement to an evidentiary hearing in this regard.

¶ 241 In his Exhibit 2 affidavit, Miller asserts that he only testified at his retrial because his counsel (wrongly) told him that if he did not testify, the State would simply present a transcript of his testimony from his original trial. This Court has already addressed Miller's *Pro Se* Proposition II(3) claim in this regard in detail; and this Court

has already concluded that the challenged advice from counsel would *not* have been incorrect or inadequate performance. Consequently, Miller's ineffective assistance claim on this issue cannot prevail, and his request for an evidentiary hearing on this claim is likewise rejected.

¶ 242 Miller also proffers an affidavit containing his personal assertion that his retrial counsel "coerced" him into stipulating to the blood stain evidence found in Bowles' car (Exhibit 1). This Court has already found, in connection with Miller's *Pro Se* Proposition II(2) claim, that Miller personally agreed to stipulate to this evidence and that he has totally failed to show either inadequate performance by his counsel or prejudice in this regard. We now likewise reject his request for an evidentiary hearing in this regard.[207]

¶ 243 All of the other non-record documents proffered by Miller are offered as "mitigating evidence," in support of his *Pro Se* Proposition II(1) claim that his counsel was ineffective for failing to develop and present such evidence during the second stage of his retrial. This Court has already found (in connection with Proposition XV) that Miller adequately waived the presentation of all such mitigating evidence, beyond that of his own testimony. Regarding the proffered documents, this Court notes that Miller does not actually claim that his counsel failed to investigate or develop such evidence, but rather that his counsel "failed to present an acceptable plan to me for presentation of mitigating evidence" (Miller's Affidavit, Exhibit 1). Miller apparently did not like the advice he received from his counsel regarding the presentation of such evidence. This comes nowhere close to showing "a strong possibility" that his counsel was ineffective in this regard.[208] We further note

**206.** This Court notes that Miller asserts, in his *pro se* application, that the newspaper article is from a June 21, 2010 article in the Tulsa World. Because the article references events in October of 2009, it was clearly published no later than that time, *i.e.*, well after Miller's 2008 retrial.

**207.** Miller's *pro se* application for an evidentiary hearing also re-asserts his *pro se* claim that the continuing threat aggravating circumstance is unconstitutional and that his counsel was ineffective for failing to object to it. Miller offers no

non-record documents that support this claim, however, and he certainly has not established an entitlement to an evidentiary hearing on it.

**208.** This Court notes that all of the certificates proffered by Miller are for courses completed *before* the 1999 homicides of Thurman and Bowles (and all the armed robberies). The potential mitigating value of such evidence, under the circumstances of this case, appears negligible.

that because this Court has already ruled that both of Miller's death sentences in this case must be reversed, Miller's request for an evidentiary hearing regarding *second-stage* ineffective assistance of counsel is moot.

¶ 244 This Court finds that Miller has failed to show that there is a strong possibility that his trial counsel was ineffective based upon any of the materials attached to his *pro se* application for an evidentiary hearing and has failed to show that he should be granted an evidentiary hearing regarding any of the claims made in his *pro se* brief. Consequently, **THIS COURT DENIES MILLER'S [*PRO SE* ] SUPPLEMENTAL APPLICATION FOR EVIDENTIARY HEARING.**

### DECISION

¶ 245 Victor Millers **FIRST–DEGREE MURDER CONVICTIONS** for the murders of Mary Bowles (Count I) and Jerald Thurman (Count II) are **AFFIRMED.** Because Miller was previously acquitted of the death penalty on Count I, however, his **DEATH SENTENCE ON COUNT I IS REVERSED AND MODIFIED** to a sentence of **LIFE WITHOUT THE POSSIBILITY OF PAROLE.** For the reasons discussed in this Opinion, Millers **DEATH SENTENCE ON COUNT II** is also **REVERSED,** and this case is **REMANDED** to the District Court **FOR RESENTENCING ON COUNT II.** In addition, this Court **DENIES** both of Miller's **APPLICATIONS FOR EVIDENTIARY HEARING.**

¶ 246 Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2013), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

LEWIS, P.J., and LUMPKIN, J., concur in part/dissent in part.

C. JOHNSON, J., and A. JOHNSON, J.: concur.

LEWIS, Presiding Judge, Concurs in Part, Dissents in Part:

¶ 1 Appellant has shown no error warranting reversal of his conviction or death sentence for the murder of Jerald Thurman. The rule of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), which concerns us in Appellant's Proposition Two, is nothing more, or less, than this:

> [A] sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

*Witherspoon,* 391 U.S. at 522, 88 S.Ct. at 1777.[1]

¶ 2 The Court's exhaustive analysis of the trial court's *voir dire* and subsequent exclusion of several jurors opens with a critical concession that the trial court did not exclude *any* juror in violation of *Witherspoon* or the Eighth Amendment. The Court then finds the trial court abused its discretion by denying defense counsel an opportunity to question jurors before excluding them. The trial court thus reached an apparently *correct* constitutional result by incorrect means, when it denied the defense an opportunity to question some seven (7) prospective jurors who were, it certainly seems, properly excluded anyway.

¶ 3 The manner and extent of *voir dire,* much less the complex process of capital *voir dire,* cannot be prescribed by any definite, unyielding rule, *Strube v. State,* 1987 OK CR 144, ¶ 9, 739 P.2d 1013, 1015, but rests in the sound discretion of the trial judge. *Sanchez v. State,* 2009 OK CR 31, ¶ 44, 223 P.3d 980, 997. An abuse of discretion is "a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented." *C.L.F. v. State,* 1999 OK CR 12, ¶ 5, 989 P.2d 945, 946. Respecting the exercise of that discretion, the prevailing law in capital cases, at least until today, has been very clear.

---

1. A juror is properly excused for cause in a capital case if his or her views regarding the death penalty would "prevent or substantially impair the performance of his [or her] duties as a juror in accordance with his [or her] instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851–52 (1985) (internal quotation marks omitted).

It is *not an abuse of discretion* to deny counsel an opportunity to rehabilitate a potential juror if the trial court has *sufficiently questioned the juror to make an informed decision. The trial court is not required to allow the parties to rehabilitate potential jurors.*

Stouffer v. State, 2006 OK CR 46, ¶ 17, 147 P.3d 245, 257 (internal citations omitted; emphasis added).

¶ 4 Even more recently, in *Postelle v. State,* 2011 OK CR 30, 267 P.3d 114, the Court said:

Where the trial court has appropriately questioned prospective jurors regarding their eligibility to serve on a capital jury, it is *not error to deny defense counsel a chance* to rehabilitate jurors excused for inability to impose the death penalty.

Postelle, 2011 OK CR 30, ¶ 51, 267 P.3d at 135–36 *(quoting Coddington v. State,* 2011 OK CR 17, ¶ 10, 254 P.3d 684, 695)(emphasis added); *see also, Harmon v. State,* 2011 OK CR 6, 248 P.3d 918, 930, where the Court said:

When the proper questions have been asked by the trial court to determine whether prospective jurors can sit in the case, it is *not error to* deny defense counsel an opportunity to rehabilitate the excused jurors.

Harmon, 2011 OK CR 6 ¶ 21, 248 P.3d at 930 *(quoting Littlejohn v. State,* 2004 OK CR 6, ¶ 49, 85 P.3d 287, 301–02) (emphasis added).

¶ 5 In *Brown v. Sirmons,* 515 F.3d 1072 (10th Cir.2008), Chief Judge Henry said for the Tenth Circuit Court of Appeals:

[T]he *trial court* must determine whether the [juror] could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment. The *trial court,* however, retains great latitude in conducting *voir dire,* and *the Constitution does not require an additional opportunity to make a searching inquiry.* A trial judge's determination of a potential juror's bias under this standard is a factual finding entitled to a presumption of

Brown, 515 F.3d at 1079 (internal citations and quotations omitted; emphasis added); *see also, id.* at 1081 (noting that capital habeas petitioner "concedes there is no constitutional right to rehabilitate" a juror in capital voir dire).

¶ 6 The majority incorrectly suggests that a trial court earns additional appellate court deference to its decisions to exclude jurors under *Witherspoon* to the degree that it first allows defense counsel to engage in rehabilitative mini-inquisitions on every juror who vacillates on a questionnaire or during the prescribed death qualification questions.[2] The Supreme Court recently held that exactly the opposite is true:

The Court in *Witt* instructed that ... reviewing courts are to accord deference to the trial court. Deference is owed *regardless of whether* the trial court engages in *explicit analysis* regarding substantial impairment; *even the granting of a motion to excuse for cause constitutes an implicit finding of bias.* The judgment as to whether a venireman is biased *is based upon determinations of demeanor and credibility* that are *peculiarly within a trial judge's province.* Such determinations *[are] entitled to deference even on direct review;* the respect paid such findings in a habeas proceeding certainly should be no less. *And the finding may be upheld even in the absence of clear statements from the juror that he or she is impaired* because many veniremen simply cannot be asked enough questions to reach the point where their bias has been made unmistakably

---

**2.** The real world outcome of these interrogative exercises deemed so salutary by the majority can be seen in the examination of Juror E.M., who became so "angry," "adverse," and "hateful" during further questioning by defense counsel about her "civic duty" and her death penalty views that the trial court ultimately felt compelled to excuse her for cause. *See also, Trujillo v. Sullivan,* 815 F.2d 597 (10th Cir.1987), where the Tenth Circuit Court of Appeals pointed to a 1979 study by Dr. Craig Haney indicating that "prejudicial [to the defendant] alteration in [juror] attitudes resulting from death-qualifying voir dire is a *direct function* of *how extensive the questioning becomes" Trujillo,* 815 F.2d at 607 n. 5 *(citing* C. Haney, *On the Selection of Juries: The Biasing Effects of the Death Qualification Process,* 8 L & Hum. Behav. 121 (1984))(emphasis added).

clear; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. *Thus, when there is ambiguity in the prospective juror's statements, the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State.*

*Uttecht v. Brown*, 551 U.S. 1, 7, 127 S.Ct. 2218, 2223, 167 L.Ed.2d 1014 (2007) (internal citations and quotations omitted; brackets in original; emphasis added).

¶ 7 Our reliance on the trial judge's peculiar ability to observe the demeanor and credibility of potential jurors is particularly warranted when there is "every indication that the judge indeed applied the correct standard." *Darden v. Wainwright*, 477 U.S. 168, 203, 106 S.Ct. 2464, 2483, 91 L.Ed.2d 144 (1986)(*quoting Witt*, 469 U.S. at 431, 105 S.Ct. at 856). There is no showing here that the trial court's questioning was insufficient to permit an *informed decision* about the qualifications of these prospective jurors. The majority's recitation of the trial court's conduct of *voir dire* proves way too much; it shows an extensive, thoughtful investigation of the jurors' qualifications.

¶ 8 The majority cites an aberrant and impoverished precedent in *Mitchell v. State*, 2006 OK CR 20, 136 P.3d 671. The trial court's *voir dire* in *Mitchell* was one-sided to a degree approaching judicial bias; it was "far from even-handed," granting "almost totally unconstrained questioning/argument from the State during *voir dire*" while all but categorically denying such *voir dire* to the defense. *Id.*, 2006 OK CR 20, ¶ 48, 136 P.3d at 694. The trial court in *Mitchell* also "allow[ed] and even assist[ed] in protracted attempts to rehabilitate jurors who expressed an unwillingness to consider" any sentence but death. *Id.*, 2006 OK CR 20, ¶ 47, 136 P.3d at 694. *Mitchell* is invoked today to reverse a trial court that was committed to seating a fair death-qualified jury and succeeded in doing so, even according to the majority.

¶ 9 Nor did the Court see "this same claim," or resolve it the same way, in *Cudjo*

*v. State*, 1996 OK CR 43, 925 P.2d 895. In *Cudjo*, the trial court limited its death qualification *voir dire* to a single, *legally erroneous* question. The only two venire-persons who expressed any reservations about the death penalty in response to this single question were then *immediately excused. Id.*, 1996 OK CR 43, ¶ 11, 925 P.2d at 899. Finding a clear violation of *Witherspoon* based on an erroneous trial court examination, the Court in *Cudjo* held that "[w]ithout further inquiry into their views regarding the death penalty, we cannot conclude [the excluded jurors'] views would have prevented or substantially impaired the performance of their duties as jurors." *Id.*

¶ 10 In profound contrast to *Mitchell* and *Cudjo,* the trial court here asked the legally *correct* questions and excluded jurors who stated that they could not follow the law. Neither *Mitchell*, nor *Cudjo*, nor any controlling Supreme Court case holds that a trial court's denial of defense requests to question prospective capital jurors who were *properly excluded* under *Witherspoon* denies "due process" or a "reliable sentencing hearing." Form has conquered substance, and appellate strict scrutiny has supplanted trial court discretion, in death-qualifying *voir dire.*

¶ 11 I concur that double jeopardy bars Appellant's death sentence in the Mary Bowles murder. But the *ad hoc* litany of "serious and potentially prejudicial" errors cited by the majority to reverse the death sentence in the murder of Jerald Thurman is unconvincing. These errors had no prejudicial effect on the reliability or fundamental fairness of the sentence for this heinous crime. I therefore respectfully dissent to remand for re-sentencing in Count II.

LUMPKIN, JUDGE: Concur in Part/Dissent in Part

¶ 1 I concur in affirming the first degree murder convictions in Counts I and II and in the reversal and modification of the death sentence to life without the possibility of parole in Count I. However, I dissent to the reversal of the death sentence and remand for resentencing in Count II.

¶ 2 In Proposition II, the claim of error is stated as the trial court abused its discretion by "refusing to give defense counsel any opportunity to question or attempt to rehabilitate prospective jurors who gave equivocal, confusing or inconsistent answers regarding their willingness and ability to consider the death penalty." The opinion resolves this claim by stating:

> This Court concludes that the trial court abused its discretion by refusing to allow defense counsel any opportunity to question or attempt to rehabilitate Jurors A.A., B.S., R.L., L.D., S.S., S.G., and J.V. because these prospective jurors gave equivocal, confusing and inconsistent responses regarding their ability and willingness to consider the death penalty. Furthermore, defense counsel was denied this opportunity regarding Jurors S.S., S.G., and J.V., even though the State was allowed to question these jurors. This Court finds that this violated due process and Miller's 8th Amendment right to a reliable sentencing. Hence Miller is entitled to sentencing relief on his Proposition II claim.

¶ 3 No legal authority is cited supporting this conclusion, because there is none. There is no constitutional or statutory mandate that defense counsel be given the opportunity to attempt to rehabilitate jurors excused for their inability to impose the death penalty.

¶ 4 While paying lip service to our well established appellate review of jury selection issues, this opinion deliberately fails to apply that law. Prior to this opinion, this Court has consistently held that the manner and extent of *voir dire* are within the trial court's discretion. *Coddington v. State*, 2011 OK CR 17, ¶ 5, 254 P.3d 684, 694. *See also Postelle v. State*, 2011 OK CR 30, ¶ 43, 267 P.3d 114, 134; *Grant v. State*, 2009 OK CR 11, ¶ 24, 205 P.3d 1, 13; *Patton v. State*, 1998 OK CR 66, ¶ 9, 973 P.2d 270, 280. The trial court's decision to disqualify a prospective juror for cause will not be overturned unless an abuse of discretion is shown. *Mitchell v. State*, 2010 OK CR 14, ¶ 19, 235 P.3d 640, 647–648; *Bernay v. State*, 1999 OK CR 37, ¶ 10, 989 P.2d 998, 1005.

¶ 5 "Where the trial court has appropriately questioned prospective jurors regarding their eligibility to serve on a capital jury, it is not error to deny defense counsel a chance to rehabilitate jurors excused for inability to impose the death penalty." *Coddington*, 2011 OK CR 17, ¶ 10, 254 P.3d at 695; *Littlejohn v. State*, 2004 OK CR 6, ¶ 49, 85 P.3d 287, 301–02. *See also Postelle*, 2011 OK CR 30, ¶ 51, 267 P.3d at 135–136; *Mitchell*, 2010 OK CR 14, ¶ 31, 235 P.3d at 649. It has been this Court's opinion that "[b]ecause the trial court is in a position to assess each juror's response to questions, including non-verbal responses which may not appear in a cold transcript, we defer to the trial court's personal observations." *Coddington*, 2011 OK CR 17, ¶ 5, 254 P.3d at 694 *citing Harmon v. State*, 2011 OK CR 6, ¶ 14, 248 P.3d 918, 929. Because we might find the record confusing is not grounds for finding an abuse of discretion. "Despite the lack of clarity in the written record, there are situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Jones v. State*, 2009 OK CR 1, ¶ 14, 201 P.3d 869, 877. "This Court will look to the entirety of the juror's *voir dire* examination to determine if the trial court properly excused the juror for cause. As the trial court personally observes the jurors and their responses, this Court will not disturb its decision absent an abuse of discretion." *Id. See also DeRosa v. State*, 2004 OK CR 19, ¶ 40 n. 82, 89 P.3d 1124, 1141 n. 82 ("[t]he *Wainwright* Court recognized the difficulty of assessing jurors like Stanfill, noting that 'many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakeably clear.' 469 U.S. at 424–25, 105 S.Ct. at 852. The Court explained that this is the reason 'why deference must be paid to the trial judge who sees and hears the juror.' *Id.* at 426, 105 S.Ct. at 853"). "Because of the obvious difficulty in reviewing juror candidness, we must rely and place great weight upon the trial court's opinion of the jurors." *Mitchell*, 2010 OK CR 14, ¶ 13, 235 P.3d at 647–648.

¶ 6 In the present case, the trial court conducted a very thorough *voir dire*, asking

numerous appropriate questions of prospective jurors regarding their eligibility to serve on a capital jury. The trial judge, who directly observed and evaluated these potential jurors and their responses, dismissed certain jurors for cause despite denying the defense further attempts at rehabilitation. I find no abuse of the trial court's discretion.

¶ 7 Even if I were to find error, it would be subject to a harmless error analysis. In *Robinson v. State*, 2011 OK CR 15, ¶ 4, 255 P.3d 425. 428 this Court recognized "[t]here is a strong presumption that errors which occur during trial are subject to harmless error analysis, as long as a defendant is represented by counsel and is tried by an impartial judge. *Neder v. United States*, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999); *Rose v. Clark*, 478 U.S. 570, 579, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986)." We further stated:

> The United States Supreme Court has restricted use of structural error, with its requirement of automatic reversal, to "a limited class of cases." *Johnson v. United States*, 520 U.S. 461, 468–69, 117 S.Ct. 1544, 1549–50, 137 L.Ed.2d 718 (1997). These errors appear to have in common the violation of a right granted by the Constitution, rather than a violation of due process by failure to afford a right granted by state statute. Among these are a faulty jury instruction on reasonable doubt, *Sullivan v. Louisiana*, 508 U.S. 275, 282, 113 S.Ct. 2078, 2083, 124 L.Ed.2d 182 (1993); intentional racial discrimination in selection of grand jurors, *Vasquez v. Hillery*, 474 U.S. 254, 263–64, 106 S.Ct. 617, 623, 88 L.Ed.2d 598 (1986); denial of the right to a public trial, *Waller v. Georgia*, 467 U.S. 39, 49, 104 S.Ct. 2210, 2217, 81 L.Ed.2d 31 (1984); denial of the right to self-representation, *McKaskle v. Wiggins*, 465 U.S. 168, 177 n. 8, 104 S.Ct. 944, 950 n. 8, 79 L.Ed.2d 122 (1984); improper exclusion of qualified capital jurors, *Davis v. Georgia*, 429 U.S. 122, 123, 97 S.Ct. 399, 400, 50 L.Ed.2d 339 (1976) (*per curiam*); exposure to improper publicity which wholly denies the defendant an impartial jury, *Sheppard v. Maxwell*, 384 U.S. 333, 351–352, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600 (1966); failure to afford a defendant the right to counsel, *Gideon v. Wainwright*, 372 U.S. 335, 345, 83 S.Ct. 792, 797, 9 L.Ed.2d 799 (1963); and the lack of an impartial trial judge, *Tumey v. Ohio*, 273 U.S. 510, 535, 47 S.Ct. 437, 445, 71 L.Ed. 749(1927).

2011 OK CR 15, ¶ 4, 255 P.3d at 428.

¶ 8 The wrongful exclusion of an eligible juror in a capital case, based solely upon that juror's opposition to the death penalty, otherwise known as a *Witherspoon* error, was added to the above list by *Gray v. Mississippi*, 481 U.S. 648, 668, 107 S.Ct. 2045, 2057, 95 L.Ed.2d 622 (1987). In *DeRosa*, 2004 OK CR 19, ¶ 36 n. 78, 89 P.3d at 1140 n. 78 this Court recognized that a *Witherspoon* error is not subject to a harmless error analysis.

¶ 9 In the present case, the opinion relies on *Witherspoon* but does not find an actual *Witherspoon* error. Therefore, any error in the manner in which the trial court conducted *voir dire* and excused potential jurors for cause is subject to a harmless error analysis. Under a harmless error analysis, a reviewing court must determine whether the error was harmless beyond a reasonable doubt. *Bartell v. State*, 1994 OK CR 59, ¶¶ 13–14, 881 P.2d 92, 97 *citing Chapman v. California*, 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967).

¶ 10 Here, the trial court's failure to allow defense counsel the opportunity to attempt to rehabilitate potential jurors was harmless beyond a reasonable doubt. The trial court treated the State and the defense even handedly, denying both parties an opportunity for additional questioning of potential jurors who were firm in their responses to the trial court about their ability to consider all three punishment options. The prospective jurors excused for cause were ultimately unequivocal in their stated ability to consider all three punishment options. There has been no allegation that the jury that actually decided Appellant's punishment was not impartial. As the opportunity to attempt to rehabilitate potential jurors is not a constitutional issue, any claim of jury partiality must focus on the jurors who ultimately sat. *See Rojem v. State*, 2006 OK CR 7, ¶ 36, 130 P.3d 287, 295 (since the loss of peremptory challenges is "not of constitutional dimension", "[a]ny

claim of jury partiality must focus on the jurors who ultimately sat"). Nothing in the record suggests that Appellant's jury was anything less than impartial. The trial court's failure to allow attempts at rehabilitation of prospective jurors was harmless beyond a reasonable doubt.

¶ 11 In Proposition XVIII, the opinion strikes down the great risk of death aggravator. As to Count I, the issue is moot as the sentence in that count has been modified to life without parole. As to Count II, the opinion finds the evidence insufficient to support the aggravator, stating that the shooting of Mr. Thurman at the dirt pit, with Ms. Bowles alive and present, did not put Bowles in danger of being injured or killed. As I stated in my separate writing to *Hanson*, objecting to the invalidation of the aggravator in that case:

> The opinion uses the methodology of parsing the events into a time and space justification for invalidating the aggravator. This parsing disregards our case law that victims killed in the same manner, at the same place, and essentially the same time, presents "a classic example of the 'great risk of death' aggravating circumstance." *Dodd v. State*, 2004 OK CR 31, ¶¶ 106–107, 100 P.3d 1017, 1047–48. See also, *Eizember v. State*, 2007 OK CR 29, ¶ 123, 164 P.3d 208, 239.

> The argument made by Appellant in this case could be made by any defendant charged with multiple homicides, i.e. no one was at risk when he killed the second, third or more victims because the first victim or subsequent victims were already dead. This is a factual decision to be made by the trier of fact. The jury in this case was properly instructed and there are facts in evidence to support their verdict. Therefore, we should honor that principle of law and their application of it in their decision and affirm the great risk of death aggravator.

2009 OK CR 13, ¶¶ 2–3, 206 P.3d 1020, 1036 (Lumpkin, J. concur in part/dissent in part).

¶ 12 In the present case, I find the evidence supported the aggravator as Appellant's act of shooting Thurman put Bowles at a great risk of death. Thus there is factual evidence to support the jury's verdict and under our case law we should uphold that decision. I find the aggravator valid and would remove the issue from any cumulative error discussion.

¶ 13 In Proposition XI, the opinion reviews the prosecutor's "freebie argument" for plain error but fails to set forth and follow the established standard of review. *See Hogan v. State*, 2006 OK CR 19, ¶ 38, 139 P.3d 907, 923. Applying a plain error analysis, I find no error in the prosecutor's comment. The argument was merely a request for the separate punishment of death, based upon the facts in this case, even taking into account Appellant's federal sentence. There was nothing misleading about the argument. That the argument may have been "emotionally powerful" is no reason for finding it improper. Further, the defense first raised the issue of the prior sentences and the State had a right to respond in an appropriate manner, which it did. The opinion's determination that the comment was error is based upon unsupported assumptions. I find no error in the argument and no reason for it to be considered in a cumulative error claim.

¶ 14 Similarly, I disagree with the conclusion in Proposition XXIII, that defense counsel's failure to object to the "freebie argument" was deficient performance. The comment was based on the evidence and any objection would have been overruled. Trial counsel will not be found ineffective for failing to raise objections which would have been overruled. *Eizember v. State*, 2007 OK CR 29, ¶ 155, 164 P.3d 208, 244.

¶ 15 Finally, I recede from participation in the numerous comments in this opinion which are mere dicta, speculation or assumptions not necessary to the adjudication of the issues presented in Appellant's claims of error.